# EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS

BAYAAN ACADEMY, INC., *et al.*,  §
   Plaintiffs,  §
      §
      §
v.  §   CIVIL ACTION NOS. 4:26-CV-01960
      §             4:26-CV-01675
KELLY HANCOCK, *et al.,*,  §
      §
   Defendants.  §

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

MURL MILLER

MAY 19, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL 30(B(6) DEPOSITION OF MURL MILLER, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on the 19TH day of MAY, 2026, at 10:08 A.M. to 6:22 P.M.

                    A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS BAYAAN ACADEMY INC.:

     Eric Hudson, Esquire
     ARAMBULA TERRAZAS PLLC
     1001 S. Capital of Texas Highway, L250
     Austin, Texas 78746
     Phone:  (512) 904.0200
     Email:  Ehudson@atlawpllc.com.


ON BEHALF OF THE PLAINTIFFS ISLAMIC SERVICES FOUNDATION, BAYAAN ACADEMY INC., AND MUNA HAMADAH:

     Maha Ghyas, Esquire
     WRIGHT, CLOSE, BARGER & GUZMAN LLP
     One Riverway Dr., Suite 2200
     Houston, TX 77056
     Email:  mghyas@wcbglaw.com

ON BEHALF OF THE PLAINTIFFS THE EAGLE INSTITUTE, FARHANA QUERISHI, AND LAYLA DAOUDI:

     Ayesha Najam, Esquire
     GIBBS & BRUNS LLP
     1100 Louisiana, Suite 5300
     Houston, Texas 77002
     Phone: (713) 650-8805
     Email:  anajam@gibbsbruns.com


ON BEHALF OF THE DEFENDANTS KELLY HANCOCK, ET AL.:

     Dennis Roosien, Esquire


ALSO PRESENT:

     Ryan Polanco, Notary

E X H I B I T S

Exhibit 1...............................................8
    NOD
Exhibit P2.............................................12
    CPA 1-18
Exhibit P3.............................................35
    Subchapter J of Chapter 29, Texas Education Code
Exhibit P4.............................................81
    CPA 355-357
Exhibit P5............................................105
    CPA 634-648
Exhibit P7............................................147
    CPA 19-62
Exhibit P8............................................155
    CPA 329-330
Exhibit P9............................................163
    CPA 401-422
Exhibit P10...........................................171
    CPA 679-690
Exhibit P11...........................................176

Exhibit P12...........................................178
    CPA 572-586
Exhibit P13...........................................180
    CPA 561-572

Exhibit P14.............................................182

   Accusation Report of Houston Quran Academy

Exhibit P15.............................................191

   Kelly Hancock communications to Ken Paxton

Exhibit P16.............................................199

   CPA 590-591

Exhibit P17.............................................209

   12/12/25 Letter

Exhibit P18.............................................214

   KP-0509

Exhibit P19.............................................220

   Administrative Code Section Title 34

Exhibit P20.............................................249

   01/20/2026 Communications

Exhibit P21.............................................254

   01/20/2026 Communications

Exhibit P22.............................................258

   E-mail communications

Exhibit P23.............................................261

   Lara Burns and Reuben Katz report

     (Exhibits not provided at the time of production.)

P R O C E E D I N G S

THE NOTARY: This is the deposition of Murl Miller. The date is May 19th, 2026. The witness is located in Austin, Texas. My name is Ryan Polanco, notary in Texas. I'll be administering the oath.

Will counsel please identify themselves for the record.

MR. HUDSON: Eric Hudson on behalf of Bayaan Academy Inc., et al.

MS. NAJAM: (Audio disruption) Institute and Layla Daoudi.

MS. GHYAS: Maha Ghyas on behalf of Bayaan Academy, Islamic Services Foundation, and Muna Hamadah.

MR. ROOSIEN: Dennis Roosien on behalf of the defendants.

THE NOTARY: Thank you.

All right. Will you raise your right hand to be sworn in.

Do you swear or affirm the testimony you're about to give will be the truth, whole truth, nothing but the truth?

THE WITNESS: I do.

THE NOTARY: All right. Thank you.

The time is 10:08 A.M. We are on the record.

MURL MILLER,

having been first duly sworn, testified as follows:

E X A M I N A T I O N

BY MR. HUDSON:

Q.   Do you mind to introduce yourself to the jury?

A.   Yes.  My name is Murl E. Miller.  I am the
Chief Counsel for General Litigation, as well as the
Anti-Fraud Coordinator for the Texas Comptroller of
Public Accounts.

Q.   And how long have you held that position?

A.   Sixteen years.

Q.   All right.  You understand you're here today to
testify on behalf of the Comptroller's Office?

A.   I do.

Q.   And if I refer to the "comptroller," do you
understand that I'm referring to the comptroller in all
of its official capacity, employees who have
decision-making authority?

A.   I do.

Q.   Okay.  So in other words, if you're answering
on behalf of the comptroller, you're also answering on
behalf of Kelly Hancock, Mary Stout, et cetera, in their
official capacities?

A.   I do.

Q.   Okay.  I'm going to hand you what I've already

marked as Exhibit 1.

(Exhibit 1 was marked.)

MR. HUDSON: For purposes of the record and for the -- the benefit of the Court, this is a video only deposition. The way that I handle these is I will collect the exhibits at the end, scan them in, and circulate them to all counsel present. If there's any objection to that, please let me know.

MR. ROOSIEN: Yeah. I'd like to be able to see what the witness is seeing. Thanks.

MR. HUDSON: So I copied the deposition notice.

MR. ROOSIEN: Yeah, that's fine. Give that back to you because I do have that.

Q. (BY MR. HUDSON) Have you ever seen that document or a substantially similar copy of that?

A. I have.

Q. Obviously, this one is marked for today as a first amended, but I'll represent to you that we previously disclosed that topic list several weeks ago.

So is the topic list, to your knowledge, the same as it was in the one that you saw?

A. I believe it is.

Q. And did you come designated to speak to all 24 topics?

A.   I have.

Q.   Are there any topics on which you do not intend to offer testimony?

A.   Not to my knowledge.

Q.   Are there any topics on which you believe you are going to be invoking privilege today?

A.   I don't know.

Q.   Okay.  I don't want to go through all 24 topics.  You've been designated.  You've testified now that you're going to speak to each one of them.  What did you do to prepare to speak to the 24 topics in our Exhibit A to the deposition notice?

A.   Well, I've reviewed the statutes.  I have taken a look at all of the exhibits that we have presented.  I have spoken with the comptroller.  I've spoken with Mary Katherine Stout and also with the attorneys that are in our office regarding the program.

Q.   You said you've reviewed all of the exhibits. What does that mean?

A.   The exhibits that we have produced to this date -- prior to this date.

Q.   All right.  So the document production?

A.   Yes.

Q.   All right.  So I got handed a copy of a letter this morning --

A. Yes.

Q. -- by your counsels, marked CPA 776. Did you see that?

A. Yes.

Q. And did you take a look at that letter this morning?

A. Yes.

Q. Now I'll represent to you that there are -- I'm going to say "gaps," but to my friend on the other side, that's not intended to be a qualitative statement, but there are gaps in the production for various extended reasons I'm not going to get into on the record. To the extent that documents have been produced 1 through 776, have you reviewed all of the documents that have been produced in discovery?

A. I'm not sure if I've produced -- reviewed them all. I've reviewed the ones that were -- I actually brought them. I was required on 24 to bring them, so I did bring actual copies of all the documents I reviewed.

Q. Okay.

A. And I also asked for this particular document because there was a question about the schools that have been denied. And so I wanted to get a list of the current schools that have been denied.

Q. For the record, when you said "this particular

document," you were pointing at CPA776, the document that we received this morning?

A.   Yes, sir.

Q.   Have you ever been deposed before?

A.   Yes.

Q.   How recently?

A.   It's been a couple of years.

Q.   Okay.  Just so we're on the page, let's go over -- same page, let's go over a little bit of deposition etiquette during the course of the deposition today.  I'm going to ask questions.  I will give you an opportunity to respond.  We are on video.  This may later be transcribed.  So I ask that after I ask a question that you allow me to finish it, and I'll extend you the same courtesy.

Can we agree to that today?

A.   Absolutely.

Q.   During the course of the deposition, if you don't understand my question or if you need me to rephrase it, can we agree that you'll let me know?

A.   Yes, sir.

Q.   You do understand that you are under oath; and therefore, any answer that you give is presumed to be an answer that is responsive to the question.  Do you understand that?

A. Yes, sir.

Q. Is there any reason -- I don't want to get into personal details, but I ask this on the record just as a matter of course.

Is there any reason, be it personal, family, medical, prescription -- any reason why you're unable to give your best testimony today?

A. I do not believe so.

Q. I'm going to hand you what's going to be marked as Exhibit 2. Actually, I'll mark it P2.

Have you ever seen Exhibit 2 before?

(Exhibit P2 was marked.)

A. I have.

Q. (BY MR. HUDSON) Can you explain to the jury what that document is?

A. The document is a listing of schools that have applied for or are interested in the TEFA program, and the schools that were -- that are related to Cognia.

Q. Okay. Let's see if we can unpack that. So you said schools that have applied for or are interested in --

A. Yes.

Q. -- how do I know the difference between "applied for" or "are interested in"?

A. Well, under the circumstances, I don't have

anything specifically beyond what is here. I'm -- I'm -- there were 3,912 schools that were originally presented with the opportunity to participate based upon the TEPSAC list as well as the other accredited entities or accreditation entities that are approved by the TEA. And so with that in place, there were 700 Cognia schools that were withdrawn in order to be able to be reviewed separately. And so this -- this list appears to be those that were the TEPSAC, Texas Rising Star, and Cognia, but it's not complete with regard to, you know, the total -- all the total schools.

Q. For the benefit of the jury, can you explain what "TEPSAC" stands for? That is an acronym; right?

A. Yes, it is an acronym.

Q. What -- what does that mean?

A. It's the Texas Private School Accreditation Commission.

Q. And who operates that?

A. The commission itself operates it.

Q. By "the commission," you mean --

A. -- TEPSAC.

Q. Okay. So that's a separate state agency?

A. It's not a state agency, but it is a separate entity.

Q. Okay. Well, when you say it's a commission,

you say it's private. Is it privately funded, or is it funded in part by state funds?

A. I don't know how it's funded.

Q. Okay. Does it have any relationship with the Comptroller's Office?

A. No.

Q. You also mentioned Texas Rising Star; is that correct?

A. Yes.

Q. And then there was a third that you mentioned. What is that?

A. Well, they're -- Texas Rising Star is an accreditation for pre-K, and then there are other entities that are identified and accepted by the TEA as accreditation entities, and those are not listed potentially on the TEPSAC list.

Q. And then TEA does its own accreditation; is that right?

A. It has the authorization of identifying schools that will accept its accreditation -- their accreditation.

Q. Don't want to get lost in the weeds here, so I want to go back to Exhibit No. 2.

Now, you mentioned that this is a list of schools that had applied or were interested in. Is there

some list somewhere that tells me the difference between applied versus interested in? How -- how would I figure that out?

A. Well, I guess for the -- what -- there are schools that once they have, you know -- well, let me back up.

There are schools when, you know, they were offered, with the exception was -- with Cognia schools -- they were offered the opportunity to be able to participate in the program. They were communicated with and there was a effort on their part if they wanted to be able to participate. So there are approximately 2,499 schools that have -- presently that are participating. The remainder of the 3,912 schools have either decided not to participate or have -- you know, are waiting to be able to qualify to participate.

Q. So how do I figure out who's applied and who is just interested based on Exhibit No. 2?

A. I don't know if you can. I guess the -- the listing appears to be schools that would have qualified or been -- because -- let's see. This -- this appears to be the list that would have been schools that have -- would have been still in the process of being reviewed in March of -- of this year, but I will -- I'll need to verify that.

Q.   Okay.  How would you go about verifying that?

A.   I would basically ask or val- -- or I would look to be able to see because I've got -- I've -- I have reviewed some of these notes in, you know, as exhibits. So this is one of the ones that I would have to look to see what the exhibit --

Q.   Okay.

A.   -- is and look back on it.

Q.   Where would you look?

A.   On the exhibit list or the exhibits that we have.

Q.   Okay.  So there's some exhibit somewhere that tells me who's interested and who's applied, based on the list in P2?

A.   Well, the -- the schools that have applied would be the ones that would be interested.

Q.   Okay.  Well, so maybe that's the confusion. You said this is a list of schools that are interested or who have applied.

A.   Right.

Q.   You made the distinction.

A.   Yeah.

Q.   So is that a distinction that you're making, or are you saying they've applied, therefore, are interested?

A. Okay.

Q. That -- that's what I'm trying to figure out here.

A. Okay. And I'm not trying to be, you know, vague. I -- I guess what I'm looking at is I'm looking at a -- I'm looking at a document here that basically indicates the fact that there are schools; and so, again, starting off with the schools that were on the TEPSAC list, you know, and those that were approved as accreditation were, you know, sent the I -- sent the opportunity to be able to apply if they were interested with the exception of the Cognia schools.

And so -- you know, and so this is a sublist of that -- of those schools. I see the Cognia schools. It appears that these were the schools that would have still been going through the approval process in -- in March of 2026.

Q. Okay. Well, let's back it up. So you have a database somewhere of schools that were invited to participate; right?

A. Yes.

Q. Okay. How were the schools that were invited to participate notified that they were being invited?

A. By e-mail.

Q. And was it the same e-mail to every school?

A. Yes, to my knowledge.

Q. And when did that e-mail go out?

A. It would have gone out -- it would have gone out prior to December 9th of 2026 -- or 2025, I'm sorry. December 9th of 2025.

Q. And when you say prior to 12/9, I mean, was it in proximate distance to 12/9? Was it January of '25? Can you give me kind of a range of where you would think that would have gone out?

A. Sometime prior to that. I'd say maybe a month to three weeks, because, you know, December 9th is when schools were invited to -- to apply, as well as existing educational vendors.

Q. And at the time that e-mail went out, I believe you had mentioned that roughly 700 Cognia schools were not invited to apply; is that correct?

A. That's correct.

Q. Tell me about how the decision was made to not include Cognia schools in the 12/9 invitation.

A. One of the things that the program found is that the TEPSAC list in and of itself was not completely accurate with regard to accreditation. And so we had experienced issues with Cognia from an accreditation standpoint, as well as we had received a number of, you know, accusations about schools that potentially could

have a relationship with a foreign terrorist organization, a transnational criminal organization, or a foreign adversary. And so we needed to be able to set those aside because we noticed that almost all of those exclusively were Cognia.

So at the time, we were in the process of trying to develop the program, preparing for each phase of the program moving forward. It's a very small group of people that are working on this program. And so we began the process of setting up a -- you know, a method or a process where we can get as many of those schools, you know, pursued and passed. And we knew that Cognia would be -- you know, it would take more work to be able to verify the accreditation and/or these questions about these individual accusations, and so we set that back for later.

Q. Okay. The questions that you had about the Cognia schools, your testimony today is that you heard accusations about being related to transnational organizations, foreign enemies, or terrorist organizations prior to 12/9 and '25; is that right?

A. Yes.

Q. Okay. And we'll get into that in a little bit, but I just want to make sure I've got the timeframe correct.

So prior to 12/9, your testimony is Cognia was excluded from the list because someone had gone in and determined that TEPSAC was not accurate as it related to Cognia's accreditation.

A. In some instances, yes.

Q. Okay. Which instances were those?

A. Well, we found out that some of the schools that had been accredited were no longer accredited by Cognia. You know, for instance, the Bishop's council -- the Catholic Council of Bishops [sic] school was not -- was one example of a school that had dropped Cognia several years before, but was still on the list.

There were some schools that were going to, you know, qualify, but they were shown as being on the TEPSAC list, even though they were not fully qualified and accredited at that time. There was some schools that they had -- we had put on and they had to pull off because -- because of the fact that they had not fully complied with all the accreditation requirements.

For instance, one school had a situation where the site visit hadn't occurred, and so we put it on and they were forced to take it off. We also discovered later the fact is that they also had a process in which that they had lead accreditation entities that we had no knowledge of that were accrediting, and then it would

flow through Cognia.  That accreditation agency that was the lead accreditation agency is not recognized by the TEA.  And so we -- but it pulled through as -- pulled through Cognia and so we were blind as to that.  So we found -- you know, we learned about those particular issues, and we also had the situation where there was the 49 entities that basically were -- had allegations against them.

Q.   Okay.  Before we get too far down that field, because we'll take that up later this afternoon. Exhibit P2, you have data somewhere, right, at the comptroller's office about schools that have applied and not applied and schools that have not been approved despite applying; right?

A.   Yes.

Q.   All right.  So who is the custodian of that information.

A.   Both the comptroller as well as Odyssey.

Q.   By what authority is Odyssey a custodian of that information?

A.   Odyssey has -- it -- Odyssey has kind of a unique role in the fact is that it's a technological entity, and so they're the ones that take in the applications through the comptroller's website.  They're the ones that also -- and those applications are for

the -- the student applications also, as well as the financial use of the account and wallet for those that have been approved, as well as the transactional activities that will occur with the products -- the educational products and services that will be purchased.

All of that information basically is pulled up through Odyssey.

Q. Sure. Maybe my question wasn't clear.

I'm asking what authority or who authorized Odyssey? How are they authorized to be a custodian?

A. By contract.

Q. So there's a contract between Odyssey and the Comptroller's Office.

A. That's correct.

Q. And who authorized the contract?

A. The Comptroller of Public Accounts.

Q. All right. So comptroller -- did they publicly bid this, or did you go directly to Odyssey?

A. No. It was a request for public -- in our, you know, request for produc- -- you know, for proposal.

Q. Okay. So the RFP goes out. Did you have any other applicants?

A. I don't know.

Q. Regardless, contract gets entered between

Odyssey and the Comptroller's Office; right?

A.   That's correct.

Q.   So -- but for this contract, Odyssey could not do any of this work?

A.   That's correct.

Q.   And so Odyssey is a contractor of the Comptroller's Office?

A.   That's correct.

Q.   So any actions that Odyssey takes would only be because the comptroller allowed them to take them?

A.   Not necessarily.

Q.   So what actions can Odyssey take independent of authorization from the Comptroller's Office?

A.   Well, they can obviously breach the contract.

Q.   Okay.  Well, I guess let me put it like that. Aside from breaching the contract, is Odyssey allowed to take any steps or make any decisions absent authorization from the Comptroller's Office?

A.   It can make decisions based upon certain rules that are established by the Comptroller's Office, but other than that, no.

Q.   Okay.  Well, I think we're saying the same thing.  So unless there's a rule, authorization, some sort of formal authority from the comptroller to Odyssey, Odyssey cannot act outside of that.  Would that be fair?

A.   That'd be fair.

Q.   Let me get you to flip over to the back of P2, and if you go to -- I should have done this earlier, but let me do it now.

MR. HUDSON:  For identification purposes, P2 is Bate-stamped as CPA 1 through CPA 18.

Q.   (BY MR. HUDSON) Let me get you to go ahead and flip over to CPA 13 for me if you would.

A.   Yes, sir.

Q.   All right.  So if I look at CPA 13, and I look at the back, this chart looks a little bit different than the chart in CPA 1 through 12.  Would you agree with that?

A.   Yes.

Q.   All right.  What is the difference between the chart in CPA 1 through 12 and CPA 13 through 18?

A.   These are the schools that are Cognia related. Either co-accredited by Cognia or directly accredited by Cognia.

Q.   Do you know what Cognia stands for?

A.   I do not.  I think it's just the name.

Q.   What about T-A-A-P-S?

A.   T-A-A-P-S, I -- that is an acronym.  I'm not sure exactly who the acronym is for.

Q.   But if we look at the top of the chart, we see

school name on the top left; right?

A. Mm-hmm.

Q. And then to the right of that, we see accreditor?

A. Yes.

Q. And so for each acronym that's on the list -- and I'm assuming Cognia is an acronym? Maybe it's not.

A. No, it's not. I don't believe so, not unlike -- like, you know, these others.

Q. Sure. So for each name that's listed under accreditor, that tells us all of the various accreditations that each of these entities has?

A. Yes.

Q. You would agree with me the comptroller's not in the school accreditation business; right?

A. That's correct.

Q. So there's nobody at the Comptroller's Office who's trained in how to evaluate accreditation of any kind of school from pre-K all the way through 12?

A. I -- I can't say that that's true because under the circumstances when issues arise regarding accreditation, then we investigate.

Q. Who would you identify at the Comptroller's Office as the people who are qualified to evaluate accreditation of schools at any grade level from pre-K

through 12?

A. Based upon specific issues that arise, there are two attorneys that were involved, possibly three -- you know, three attorneys involved, as well as the director, Mary Katherine Stout.

Q. So Mary Katherine Stout and which attorneys?

A. Victoria North, Mark Hamel (phonetic), and Jeff Mullins.

Q. Are all three of those attorneys attorneys with the general counsel's office at the comptroller?

A. They are with what's called FAALS, which is a Fiscal and Agency Affairs Legal Services Division.

Q. So that would be F-A-A-L-S.

A. Yes.

Q. Now, what is -- I'll use the acronym FAALS. What is FAALS' relationship with the Comptroller's Office?

A. FAALS handles just that. Fisc- -- all of the fiscal affairs and legal opinions, determinations as for, you know -- and assistance with policy rulemaking for fiscal work that's being performed by the -- by the comptroller as well as it also deals with the in- -- you know, individual aid divisions within the agency for agency affairs. It's just like, for instance, the unclaimed property division and other divisions within

the agency?

Q. Let me ask it a little bit different way. If I look at an organizational chart for the Comptroller's Office, am I going to find FAALS somewhere on the org chart?

A. Yes.

Q. Who's the director of FAALS?

A. Well, that's Victoria North. She's general counsel of FAALS.

Q. Do you know whether Mary Katherine Stout's an attorney?

A. I do not know.

Q. Does the Comptroller's Office -- well, I guess let me ask it to you like this: Prior to the -- I'm going to call it TEFA, but you'll understand when I refer to TEFA, I'm talking about Texas Education Freedom Accounts; right?

A. Yes, sir.

Q. And I'm going to refer to the program throughout the day as TEFA. You okay with that?

A. Yes.

Q. Prior to TEFA being enacted, did the Comptroller's Office have any occasion to investigate the accreditation of schools pre-K through 12 in the state of Texas?

A. No.

Q. Did Victoria North work at the Comptroller's Office prior to 2025?

A. Yes.

Q. How about Mark Hamel?

A. I do not know.

Q. What about Jeff Mullins?

A. Yes.

Q. What about Mary Katherine Stout?

A. She was hired in 2025.

Q. To your knowledge, does the Comptroller's Office provide any continuing education on accreditation issues with schools pre-K through 12 in the state of Texas?

A. Not to my knowledge.

Q. Just briefly, on P2, do you know the date that this was generated?

A. I do not at the present time.

Q. Do you know if it's still valid?

A. It's no longer valid.

Q. When did it cease being valid?

A. March 24th.

On or before March 24th.

Q. So in terms of schools that -- well, and to be clear, I don't know that I -- I got an answer. So if I'm

asking this again and you answered, please correct me.

A.   Okay.

Q.   Do we know if this is schools that have applied or are just interested?

A.   All of these schools have applied, and all these schools have been admitted, to my knowledge.

Q.   Okay.  So everything in P2, and that would include CPA 1 through 12 and CPA 13 through 18, have been admitted?

A.   To my knowledge, yes.

Q.   Where would you go to verify that?

A.   By running a report on the computer.

Q.   What kind of system do you all use for handling the TEFA program?

A.   I'm not sure exactly what the system is.

Q.   You mentioned a few minutes ago that there were, quote, "49 entities" that had allegations against them.  Where would I find that list of 49 entities?

A.   We would have -- well, I mean, we would have reports, and they should be incorporated in here.

Q.   Well, you say "in here," and then you're --

A.   Yeah.

Q.   -- picking up P2.  I just want it clear for the record --

A.   I would say -- I would say they would be -- it

would -- they would be located in the -- to the extent that they were Cognia related, they would be -- they would appear in CPA 13 through CPA 18. And to the extent that they were not Cognia related, they would appear in CPA 1 through CPA 10 -- oh, let's see. No, 12, sorry.

Q. All right. So how do I figure -- figure out which ones are the ones that were the 49?

A. Well, you have reports for some of them, but I don't think that they're specifically identified in here.

Q. I agree. And I do have some reports; I don't think I have 49 reports. Where are those reports held?

A. Comptroller's Office.

Q. Are they held separate and apart from something else? How would I -- how would I go about finding them?

A. Well, you'd have to do discovery.

Q. Well, I did discovery and I asked for them, and that's why I'm saying where would I -- where would I go to find the specific 49 that you say are referenced in here? How do I differentiate them? Because I can't right now, so if I asked you, Murl Miller, to go figure out which of the 49, what steps would you take?

A. Well, the first is I would take a look at the Plaintiff's schools, which were at issue, and then I would take a look at the Spring schools that are at issue, and I would look at the remaining schools in which

that there have been allegations that have been made for -- to get complete the 39 -- to complete the 49.

Q. Let me ask it to you like this: Has anybody investigated the 49 schools that you just referenced?

A. What do you mean by "investigate"?

Q. Do you have a general understanding of what the word "investigate" means?

A. It can mean a lot of different things.

Q. Right. How -- how would you use it?

A. Well, I -- if -- if you're talking about in this particular context, did we collect all of the accusations to be able to identify as much information that was publicly available, and then compared that against Foreign Terrorist Organization lists, against Transnational Organization lists, and against the OFAC lists and other information that would identify who falls within those lists? Yes, we did that.

Q. Okay. So, yeah, let's use that definition of investigate. Who did that?

A. Well, it was several individuals, but myself was part of that as well as we hired professional researchers that are experts in this area.

Q. Who are the professional researchers that you hired?

A. Lara Burns and Reuben Katz.

Q.   Do they have a business that they're associated with, or are these just individuals that were hired?

A.   We hired them as individuals.

Q.   So did somebody make a list of the 49 entities and then hand that out?  That's why -- 49's a very specific number.

A.   Yeah.

Q.   So I'm trying to figure out is there a list somewhere, or is this just a number that you know because you've worked on it?

MR. ROOSIEN:  And I'm going to interrupt because you've now asked him several times for this as if he should know.  I don't know that this is related to or certainly as specific within the topics that you would want to know that.

MR. HUDSON:  So I noticed topics 1, 3, 7, 12, 20, and 22.

MR. ROOSIEN:  Can you tell me any of them that -- that are asking specifically how he would identify the 49 schools that had allegations against them?

MR. HUDSON:  Those all relate to discretion of the Comptroller's Office to investigate, and he's now told me they have 49 entities.  So I'm trying to figure out where I find that information about

the 49 entities.

MR. ROOSIEN: And I'm just saying, I don't know that -- that he was prepped to answer that specific question. I can suggest to you where you might -- I -- I know where you can find it.

MR. HUDSON: Okay. Well, so I want to hear from him, but if there's instruction on the record, go ahead and instruct him, but I want to keep asking him questions. I don't --

MR. ROOSIEN: You can -- you can ask him as many as you like, but I think he is considering the nature of the topics and their breadth. This particular piece of information, I don't know that he would have been prepared to answer.

MR. HUDSON: Okay. Are you instructing him not to answer?

MR. ROOSIEN: No. You can explore it as you want to, I'm just trying to keep you from wasting your time.

Q. (BY MR. HUDSON) Do you know the answer to the question?

A. I believe that generally, from a public information standpoint, the schools would be the 36 schools that would have been provided by the Middle East Forum and the 13 Spring schools that were identified an

accusation with regard to the ownership of those schools.

Q.   What is the Middle East forum?

A.   It's a private foundation that has been, I guess, investigating and reporting on the Middle East for an extended period of time.

Q.   So 36 schools came in a list from Middle Eastern [sic] Forum to Comptroller's Office?

A.   It -- it was actually a report, yes.

Q.   And 13 schools identified with accusations. Could you clarify what that means?

A.   Well, there was -- there was 49 schools with accusations, but the -- the others, the Spring schools -- there was a question about whether or not that they were associated with the Chinese Communist Party based upon the ownership of the -- in the involvement of a gentleman by the name of Fred Hu.

Q.   And you say "Spring schools."  I want to be -- I'm assuming you're talking about Spring, Texas?

A.   No.

Q.   Or what are you talking about?

A.   Spring is a -- is a -- is a series of schools that 13 schools in all.  They go like Maryville, Primrose Prep, a variety of different, three different individual entities have been identified as being owned by the Spring grouping.  It's a private -- it's -- I believe

it's called Primavera Capital is the -- is the owner of those particular schools.

Q. All right. So let's talk about -- are you familiar with the Texas Education Code provision related to the Education Savings Account program (audio disruption) TEFA?

A. Somewhat, yes.

Q. Do you know where I would find that?

A. Where I would find what?

Q. The -- the actual code.

A. Oh, the actual code? In Chapter 29.

Q. Any particular subchapter?

A. Well, you'd be looking at is -- I mean, what I think the focus you're going to do is 29.538.

Q. I'm going to hand you what I'm going to mark as P3. I'll go ahead and just write that on here for you. Go ahead and take a look at that. Let me know when you're finished.

Now, I'll represent to you that this is a printout of Subchapter J of Chapter 29 of the Texas Education Code, but go ahead and take a look at it.

You finished?

A. Yes, sir.

(Exhibit P3 was marked.)

Q. (BY MR. HUDSON) We've talked about this a few

moments ago, but you would agree with me the comptroller approves education service providers under TEFA; right?

A. Correct.

Q. And that would mean Odyssey also approves them to the extent directed by the Comptroller's Office?

A. That's correct.

Q. Are there any other third-party vendors outside of Odyssey that the comptroller relies upon to approve or disapprove education service providers?

A. No.

Q. And I want to make sure I'm clear. Education service providers I'm referring to are schools providing educational services from pre-K through 12.

A. Correct.

Q. Does that change your answer at all?

A. No, sir.

Q. And I'm going to use education service providers, schools interchangeably, but you'll understand what I mean if I use either?

A. Yes, sir.

Q. Now, the statutory approval criteria, you would agree with me, are contained in Texas Education Code Section 29.358?

A. That's correct.

Q. And that's on page 168 of P3?

A. Yes.

Q. So the comptroller's authority to approve or disapprove is all contained in 358. Would you agree with that?

A. No.

Q. All right. Where else would I look for authority to approve or disapprove outside of 358?

A. What it would qualify as other relevant law under H -- H1/H2.

Q. Is that in 358?

A. Yes.

Q. Okay. All right. So my question's a little bit different. Is there anything outside of 29.358 that governs how the comptroller approves or disapproves education service providers?

A. No.

Q. Now, as I understand it, a private school has to demonstrate accreditation by an organization recognized by TEPSAC or TEA. Would you agree with that?

A. Yes.

Q. All right. A private school does not have to be a member of TEPSAC to satisfy the accreditation requirement, though. Would you agree with that?

A. That is -- yes.

Q. And a private school doesn't have to appear on

the TEPSAC list of schools to satisfy the accreditation requirement; right?

A. As long as it's been approved by TEA.

Q. Now, Cognia is recognized by TEPSAC; is that right?

A. It is.

Q. I want to get into a little bit -- well, let's -- let me finish this.

Cognia accredited private school can satisfy the first statutory -- I'm going to refer to it as a "gate" for TEFA participation; is that right?

A. No.

Q. No? So if they're Cognia accredited, that doesn't satisfy the approval requirements?

A. No.

Q. Why not?

A. Because they can end up being sub -- you know, H2 -- or H1 and H2 are additional requirements, and so in and of by itself, it does not substantiate the fact that this is just accreditation.

Q. So from your perspective, or from the comp- -- well, from the comptroller's perspective, being accredited by Cognia is necessary but not sufficient to be approved for the TEFA program?

A. If there are questions of accreditation, yes.

Q. Okay. What authority is there to look behind the Cognia accreditation in 358?

A. In H -- H1/H2.

Q. Okay. Let's take a look at H1 and H2. So it's on page 171 of P3.

A. Yes.

Q. Now, 171 at H says, "An education service provider or vendor of educational products that receives approval under this section may participate in the program until the earliest of the date on which the provider or vendor, one, no longer meets the requirements under this section, or, two, violates this subchapter or other relevant law."

Did I read that correctly?

A. Yes.

Q. Okay. So how is being accredited by Cognia a violation of 358?

A. In and of itself, it's not.

Q. How is being accredited by Cognia a violation of, quote/unquote, other relevant law?

A. Just being accredited by an agency, if it's -- if it's inaccurate, if it's -- if it's false, that's where it falls under H2.

Q. So that's what I'm trying to figure out. Where in 358 do I look to see that before the comptroller

approves a Cognia-approved school, it first must look behind the accreditation?

A.   Well, in order to be able to -- I mean, in order to be able to verify the fact that a school is -- is qualified, we go through the individual elements of the 358.  And then to the extent that there are allegations in which that we are not able to contract with that entity as a matter of law, we would -- that would end up, you know, overriding any accreditation in of by itself under H2.

The same thing is we find out that the entity is -- is been a creditor on the TEPSAC list and is not qualified under -- for accreditation, they've pulled it back.  That would also fall under -- that would fall under H1.

To situ- -- in situations where we end up having questions with regards to whether or not that -- it -- you know, an element or a school has been accredited, then there would be a question as whether or not the H2 or H1 has been violated as we look in -- we look into that.  I mean, it doesn't make sense to be able to put a school on only to remove a school instantly.

Q.   Well, let's talk about that because I'm reading H.  Just follow along with me here.

It says, "An education service provider or

vendor of educational products that receives approval under this section."

So, "receives approval," meaning has been approved; right? Is that how you read it?

A. That's not how I interpret it.

Q. Okay. How do you interpret it? Because that -- that's the piece that I'm missing here. What does "receives approval" mean to the Comptroller's Office?

A. I mean, "receives approval" is that it qualifies under 358.

Q. Okay. So at the point that we're qualified under 358, that's when H kicks in; right?

A. It could kick in -- it could kick in contemporaneously.

Q. Okay. So in the comptroller's view, there's a world in which I approve you and then I immediately disapprove you?

A. That's what we're trying to prevent.

Q. Well, that's what I'm trying to figure out under the statute is how you get there, right. So if you have to receive the approval before we start talking about H1 and 2, give me -- I guess let me do it like this. Give me an example of a school that was contemporaneously approved and then immediately

disapproved under H1 or 2.

A. Well, there isn't a school that was immediately approved or disapproved. What you end up having is that you have a school that would be appearing to be pre-approved. There are facts that would potentially negate that under -- under 1 or 2, and so we held those off until we made a full investigation to determine the validity of the accusations or the validity of the accreditation. And then -- and then once we were satisfied, we released them.

Q. Okay. So that's what I'm trying to figure out. So school comes in -- we'll just call it school A for right now -- the comptroller says, well, they should be approved under 358, but we have some other piece of information that makes us say we don't want to approve them.

Who was making that decision prior to 12/9 of 2025?

A. I wouldn't agree that that's the -- that was what was happening.

Q. Well, tell me what was happening.

A. Okay. Well, we have the TEPSAC list, and we have the schools that were approved by T -- you know, approved by TEA for being accredited. Again, we ended up in a situation where there were accusations made against

some schools. There were also schools in which there were questions about the accreditation as raised by the -- the school itself or by the accreditation entity. We're talking about Cognia primarily.

And so in those particular regards, again, we're trying to be able to create this program from scratch. And so we have -- you know, we -- at the time, we end up having, you know, from just -- you know, we end up having school applications that are being made, 274,000 of them. We end up having almost 1,000 vendors that are coming on board. We end up having the -- making these reviews as for the nature of the accreditation and also dealing with the -- with the -- the potential for these accusations.

And so what would end up happening is that we took the 700 entities that were -- that were from Cognia, set those aside, and then once we set those aside, we looked for ways in which to be able to work through those. So what we did was we took those that were duly accredited, with the exception of Bayaan Academy, because there was accusations against Bayaan Academy. And we sought to be able to get those -- those who are duo accredited because this Cognia and one other entity, and so then we completed those in -- in January.

Then we began the process of 22 individual batches of slowly but surely working through all of the Cognia list: Checking to make sure that there was no accusations, there was no potential involvement in any foreign terrorist organizations, the nature of the -- the structure of the entity, and then we would release those in batches. And then we got down to, I believe, a final four or final six batches when the court order was -- was issued by Judge Bennett, and then we released those particular schools at -- you know, at the very end. We had not anticipated having to do any of that because the schools were not required to be, you know, identified until at latest -- at the latest, July 15th.

So we were -- you know, we're anticipating -- you know, we're working through all of the process up until this point, focusing in on the day-to-day effects of trying to get all of the school student applicants set with all the different tiers, getting them -- getting them identified as being within the correct tiers, making sure that there's no duplicates in -- in preparation for the -- the lottery and/or the award. And so there was not a desire or a need at this particular time as we were planning on moving through and working this in order.

Q. Okay.

A. So to the extent -- I mean, I guess to the extent what we were doing is is that we were working through all of these 700 schools from Cognia through January all the way on through until March.

Q. So you would agree that of the roughly 700 Cognia schools, the Comptroller's Office declined to send them links to apply? Would you agree with that?

A. Delayed.

Q. Okay. Well, whether you call it delayed or declined, they did not receive links at the same time as every other school; right?

A. We're still investigating them, yes.

Q. Still investigating who?

A. The 700 schools. I mean, we were -- we were working through the schools. I mean, we -- again, we're focusing in on making sure that these organizations, that these schools, meet all of the requirements. And so with Cognia, because of the situation with accreditation, the situation with the unique accusations that were made, we had set those aside, and we were working through them in batches.

And so the ones that were going to take the most time, were delayed the longest, and those that became the most effective and inefficient to be able to determine because they were -- let's say they were a

member of a franchise, so it was easier to be able to choose that. And we prioritized schools that were, you know, upper grades, you know, K through 12, K through 8, because they would potentially have the most largest impact upon the potential student population, focusing on those as we went through.

Q. Who made the decision to, in your words, delay issuing the application links to Cognia schools?

A. It was the Comptroller's Office.

Q. No, I understand that, but who?

A. It was a group decision.

Q. Who was in the group?

A. The attorneys and the -- Mary Katherine Stout.

Q. So when you say "it was a group decision," I guess my question is is if I look at an org chart, usually there's a person who's running the show in any particular department. You would agree with that; right?

A. Yes.

Q. All right. So if Mary Katherine Stout is getting legal advice, are her attorneys the decision maker or is she?

A. Kind of a combination of both. I mean, she's making the -- she's making the determination, but she's acting on advice of counsel, and -- and the counsel is -- you know, is making those determinations as well.

Q. And that's where I'm trying to go, right, because I -- I think it's the case that I don't need an injunction against Murl Miller in the event that the court finds violations of the Constitution; right?

A. I would hope not.

Q. I would hope not too. And so what I'm trying to get at is if the Court is going to enjoin someone from acting or not acting, the answer wouldn't be legal counsel of the controller's [sic] office; it would be, for instance, Mary Katherine Stout as the decision maker; right?

A. I don't know how you would get it. I don't know how you'd enjoin. I don't know what you'd enjoin.

Q. Well, I'm not asking about what we enjoin; I'm asking who would be the decision maker in terms of releasing or not releasing application links?

A. All the application links have been released.

MR. HUDSON: Objection; nonresponsive.

Q. (BY MR. HUDSON) My question is if the Court were to enjoin someone who had the decision-making authority over issuing or not issuing application links, who would that be?

A. It would be Mary Katherine Stout.

Q. Thank you. All right. So I want to make sure before I move on, I heard you to say the Comptroller's

Office is still investigating 700, roughly, Cognia schools; is that right?

A. No.

Q. Okay. How many are you still investigating?

A. None.

Q. And so the Comptroller's Office is not currently investigating any Cognia school?

A. Not for -- for admission into the program, no.

Q. For what circumstances are you investigating Cognia-related schools?

A. Nothing as of right now.

Q. Okay. So as we sit here today, there are zero investigations going into any Cognia-related school? And by "Cognia-related," I mean accredited by Cognia.

A. At this present time, yes.

Q. Have there been investigations into Cognia-accredited schools since 12/9 of 2025?

A. Going back to the -- the prior answer, the -- is that we did do research into identifying the entities that -- that had the complaints against them and went into those reports that you have -- all that information went into those reports that you have in evidence. Then we checked against the -- you know, the statutory, Foreign Terrorist Organization list, the OFAC list, the, you know, Hostile Nation list, and the individuals

that -- the individuals that were identified and listed and found that -- that those schools met the requirements of 29.358, so they were admitted.

Q. So Foreign Terrorist Organization list, who is custodian of that?

A. The Secretary of State, I believe.

Q. Secretary of State of Texas, or?

A. No. Secretary of State of the United States, and then we also have a list with our -- with our trust company.

Q. With your trust company?

A. Yeah. Texas -- Texas Safekeeping Trust Company invests the funds in part for the State of Texas. So there is a list in which that we -- you know, Foreign Terrorist Organization, but also station -- the nations that are hostile to the United States, we can't invest in those.

Q. For instance, if I go on the comptroller's website, you have a list of potential FTOs; is that right?

A. I believe that are hostile nation states. But, in any case, it's the same list as the United States. Treasury and the United States Secretary of State.

Q. Why is it the same list?

A. Because the federal government is the one that

identifies those. There is currently a question about whether or not the CAIR, Texas could be potentially involved in that list, but at the present time, that hasn't been determined.

Q. Let me ask you this: You say that the federal government's responsible for investigating it. Does the Comptroller's Office have any responsibility or participation with the federal government in investigating Foreign Terrorist Organizations?

A. Directly? No.

Q. How about indirectly?

A. To the extent that there is a potential lead, it would go to the FBI or the Homeland Security.

Q. So if the lead came to the Comptroller's Office, you all would not send out, for instance, one of your tax investigators to go figure out if somebody was a Foreign Terrorist Organization?

A. Our CID officers are primarily tax enforcement, exclusively.

MR. HUDSON: Right. Objection; nonresponsive.

Q. (BY MR. HUDSON) My question's a little bit different: You don't send out any of your investigators to go investigate whether an entity or organization is a Foreign Terrorist Organization?

A.   That's correct.

Q.   Okay.  Can you describe to the jury what an OFAC list is?

A.   An OFAC list is a Office of Foreign Asset Control, and it is a list that is utilized by financial institutions to identify monies that go through individuals and entities that are prohibited for transacting and/or contracting by federal law.

Q.   Do you know what OFAC stands for?

A.   I believe it's Office of -- Office of Foreign Asset Control, I believe.

Q.   And the Hostile Nation list that you referred to?

A.   It's listed -- it's -- it's listed both in the federal government.  That is Iran, North Korea, Russia, China, and some cases Colombia and Nicaragua.

Q.   Who is custodian of the OFAC list?

A.   United States government.

Q.   What about the Hostile Nation list?

A.   United States government, and we also have in the Comptroller's Office a -- a list that's required.

Q.   Does the Comptroller's Office have any direct participation in investigating entities for the OFAC list?

A.   No.

Q. What about the Hostile Nation list?

A. No.

Q. You mentioned CAIR. What does CAIR stand for?

A. Council of American Islamic Relations.

Q. Do you know whether CAIR is on the FTO list that you mentioned?

A. It is not.

Q. What about the OFAC list?

A. No, I do not believe it is. No.

Q. What about the hostile nation list?

A. No.

Q. Okay. So on the federally managed lists, CAIR doesn't appear on any of those?

A. That's correct.

Q. All right. So let's go back to prior to 12/9 of 2025. I believe you testified a moment ago that prior to that, there was some investigatory activity related to Cognia schools; is that right?

A. That's correct.

Q. Describe for me what actions were taken by the Comptroller's Office in being -- or excuse me -- let me go back.

How was -- or how was the Comptroller's Office notified about these accusations that you're referencing?

A. They were being directed at the Comptroller as he was campaigning. They were also directed by legislators and interested members of the public in a variety of different ways. They were -- individuals were concerned that entities that were related or had connections with foreign terrorist organizations, transnational criminal organizations, or hostile nations would be receiving money under the -- under the TEFA program.

MS. NAJAM: Objection as nonresponsive.

Q (BY MR. HUDSON) So how were the -- you mentioned campaign, you mentioned legislators, you mentioned emails from the public -- or not emails, but concerns from the public.

How was that actually delivered? Was it in writing?

A. It was in writing, as well as, it was, you know, a oral communication directly to the comptroller and to the agency.

Q. Okay. Which legislators expressed interest in Cognia schools?

A. That would have been predominantly Ellen Troxclair.

Q. Okay. As it relates to member -- do -- do you know if there are any e-mail communications from her to

the Comptroller's Office about her concerns?

A. There are.

Q. Okay. Any other legislator that sent written communications about Cognia-accredited schools?

A. Not -- not that I'm aware of that sent e-mail communications.

Q. Okay. What about legislators sending e-mail communications to the Comptroller's campaign?

A. I don't know.

Q. Who would know?

A. The person that has control over the Comptroller's website.

Q. Madison McDonald?

A. Possibly.

Q. Okay. Does that ring a bell?

A. No.

Q. Any idea who she is?

A. No.

Q. Did you take a look at any emails to or from her as part of the documents you reviewed in preparation for today?

A. I did not really pay attention to her identity, no. So I don't know if there -- it's in amongst those materials.

Q. All right. So what members of the -- are you

aware of members of the public sending anything in writing to the Comptroller's Office about concerns over Cognia-related schools?

A. Yes.

Q. Okay. Any idea how many individual writings came?

A. I don't know, completely, no.

Q. Okay.

A. I just know what we basically have produced.

Q. What about from the campaign itself for comptroller?

A. I don't know about the -- what the campaign has received.

Q. Well, let me ask you this. Did the campaign itself ever send a complaint to the Comptroller's Office?

A. Not that I am aware of.

Q. Okay. Are you aware of any Cognia-related school that is listed on the FTO list we just discussed?

A. After review, no.

Q. What about the OFAC list?

A. After review, no.

Q. What about the hostile nation list?

A. After review, no.

Q. Okay. All right. I want to go back to the discussion. I believe you testified that there is not

currently any investigation into any Cognia-accredited school; is that correct?

A. That's correct.

Q. Was there prior to 12/9 of 2025?

A. Based upon my definition of investigation, yes.

Q. Okay. Well, let's see if we can pull up Merriam-Webster here real quick.

MR. HUDSON: Dennis, do you all have a website or Wi-Fi access?

MR. ROOSIEN: Yeah. Yeah.

MS. NAJAM: While Mr. Hudson's looking that up, in order to not waste time, I was going to state on the record, that best as I can recall, we did not receive any production of communications with the Midd -- Middle East Forum and Ms. Troxclair from December of 2005 -- '25.

We received productions from January onward. So, if during the break, you want -- you might want to check to make sure we got everything, that would be excellent.

MR. ROOSIEN: I'm reasonably confident that you have everything, but I don't think this gentleman was involved in the search for records.

Q. (BY MR. HUDSON) All right. So, Merriam-Webster, you're familiar with that dictionary;

right?

A. Yes.

Q. Okay. I'll just show you. I pulled it up on my phone, right here on the website.

A. Uh-huh.

Q. It says, "to observe or study by close examination and systemic -- systematic inquiry." It's Merriam-Webster's definition.

A. Okay.

Q. Does that differ from your definition of investigate?

A. It's to -- no, not with -- but within the context of what I explained.

Q. Okay. All right. So it doesn't differentiate. So tell me what systematic inquiry was made of Cognia schools prior to 12/9 of 2025?

A. Well, first of all, we'd take a look to make sure that they were, you know, in good standing with the state of Texas.

Q. What does that mean --

A. I mean you -- are you --

Q. In good standing?

A. Well, the fact is that the -- that they are -- been approved by the Secretary of State to operate as -- in Texas and that they have not been suspended or

terminated as a result of failure to pay tax or some other action.

Q. So somebody went to the SOS website to see if their franchise filings were still good?

A. Well, that wouldn't be the franchise tax issue. The question is whether or not that they would be dis -- you know, disqualified and terminated as a result of not paying their taxes, and that would be the Secretary of State's website. But other than that, their franchise tax would not.

Q. Aside from Cognia-related schools, did the Comptroller's Office endeavor to look up SOS good standing for any other entities?

A. It has looked at some, yes.

Q. Okay. Well, you say it has looked at some. Any other grouping as large as the 700 Cognia-related schools?

A. No, Cognia was separately isolated, yes.

Q. And so you say there were some others that you looked at outside of the Cognia schools. Can you give me a ballpark of how many that would be?

A. It -- it'd be a handful.

Q. So five or less?

A. Yes.

Q. Okay. Out of the, I believe you said, 2,400 or

so?

A. Yes, 20 -- 2,499, yes.

Q. What rule or policy written did the Comptroller's Office create to indicate when a member of the Comptroller's Office should investigate whether an entity is or is not in good standing with the SOS?

A. Texas Government Code 552 requires you to be able to, you know, be active on the -- with the Secretary of State in order to be able to contract.

Q. Yeah. Understood.

MR. HUDSON: Objection; nonresponsive.

Q (BY MR. HUDSON) My question's a little bit different. What internal written rules did the comptroller come up with to determine when an employee should go investigate whether an entity seeking to access TEFA was or was not in good standing with the SOS?

A. I don't know if there is a written rule specific to that, other than just the need to be able to investigate in order to be able to determine the quality, you know, that the individual qualified under 29358.

Q. So we have 700 schools that we're looking at the SOS for because they're Cognia-accredited, and then we have five or less not Cognia-accredited that are looked at; right?

A. Yes.

Q. Okay. First off, how did you decide whether to go look at the SOS good standing for the other five?

A. Because there was a question that got raised as -- as a -- whether or not that they were in good standing.

Q. Questioned by who?

A. It could be a member of the staff. It could be a -- it could be the entity, itself, raised the question, and they identified it, it could be the accreditation agency.

Q. Okay. Does anything in 358 -- 29358 say that the Comptroller's Office should go check SOS good standing before sending out pre-approval -- or excuse me, participation links to schools who want to participate in the TEFA program?

A. 29358H.

Q. Okay. And that's the one that we talked about earlier where -- I think you agree with me, maybe you don't -- then tell me now. That investigation occurs after it receives approval?

A. I -- I believe we had a disagreement as for the nature. Why would you put on a school that doesn't qualify?

Q. Right. Now, I -- I don't question the -- the good sense and writing of the legislature. So I'll --

I'll just tell you, I'm just reading the -- the legislation.

Why does the comptroller believe that it shouldn't put people on, that it would then have to take off?

A. Because it would -- well, a couple different reasons. One, if we don't have the authority to be able to contract with an entity, then we're prohibited from bringing that entity on. But also, if you end up having a school that is added and that is chosen, that goes through the process of -- of ending up being selected and having a student enrolled and the money is funded, it would be very challenging in order to be able to terminate it at that stage.

Q. Okay. Let me see if I can put it like this. Could the reason be that you only investigate after it receives approval because maybe the comptroller got it wrong and the entity should have an opportunity to make its case before the comptroller refuses to give out a participation link in the first place?

A. I don't understand. Could you repeat that?

Q. Yeah, sure.

TEFA program --

A. Uh-huh.

Q. -- in order to apply, I have to receive a link

to apply from the Comptroller's Office; right?

A.   Yes.

Q.   But if I never get that link, I never apply; right?

A.   Well, that's true.

Q.   That's true.  Okay.  So I'm never going to be in the program if I never get the link; fair?

A.   That's true.

Q.   But if I get the link, and then I get placed on because I meet the general accreditation and all the other things, but the comptroller believes maybe you shouldn't be on here, well, now the comptroller would have to let me know that I shouldn't be on there; right?

A.   Yes.

Q.   Okay.  So I'd have an opportunity to come make my case under the statute; right?

A.   Yes.

Q.   Okay.  But if I never applied and I never got a - got the chance to participate in the first place, well, the comptroller doesn't have to give me notice about why I didn't get the link; right?

A.   No.

Q.   Okay.  So maybe that's why the statute's set up that way, because we want to give due process to the schools; would that be fair?

A.   I'm -- I'm missing the -- there's -- there's a step that you're -- that you're missing.

Q.   What step am I missing?

A.   Well, the fact is is that we haven't made a determination on the approval and offered the links because we're still in the process of reviewing the schools, no school was terminated; no school was suspended.  We were still reviewing those on an ongoing basis.  And we needed to be able to review the questions of whether or not that these accusations were correct and whether or not through the accreditation issues were -- were verified before we provided the links.

And we provided the links to all schools, you know, that are on that -- on that list, with the exception of those that did not qualify under 20 -- under 25 -- 20 -- 29358 or that chose not to apply.  And many of those schools that were denied are going -- are going to end up having the opportunity, because they didn't qualify under 29358, to be able to reapply to the program when they become qualified.

Q.   You said, "that list."  Are you referring to P2?

A.   I'm referring to -- well, all the entities on P2, yes, but also the entities that are amongst the 3,912 that were -- that were, you know, offered the

opportunity, minus the 700 Cognia schools that were reviewed second.

Q. All right. All right. I want to make sure I'm -- I'm crystal on this. So the Comptroller's position, it sounds like, is you have no obligation under 29358 to send out an application link unless and until the comptroller determines that you're going to meet the criteria to be approved for 358; is that right?

A. No.

Q. Okay. So I guess let me give you the counter example. Are there cases in which you believe that you're going to investigate a school, determine that they would not otherwise be qualified under 358, give them the participation link just to reject them?

A. No.

Q. Okay. I guess I'm confused then by what the position is.

A. I think, I -- I -- maybe I'm misunderstanding, but again, what I'm trying to indicate is this, is that it -- it just -- when you just look at the app -- you know, I mean, it seems like to me that when you're talking about 29358, it's -- it just everybody gets sent through.

We had, with the Cognia schools, questions of whether or not the information we were receiving was

accurate. We had questions of allegations that had been made against 49 different schools. There were a variety of different issues that -- that we thought that would be very important to be able to review and validate. The fact is that there was not -- the allegations were accurate or inaccurate. And whether or not that they were -- that these entities had been qualified. And so we went through the allegations. We went through all of those 700 schools to be able to verify. The fact is they were all treated the same in reviewing and then approving them from that Cognia list.

MS. NAJAM: Objection; non-responsive.

Q (BY MR. HUDSON) Go to 168 for me.

You would agree with me that religious affiliation's not listed as an approval criterion under 29358; right?

A. Yes, sir.

Q. You would agree with me that Islamic religious instruction's not listed as an approval criterion under section 29358; right?

A. Yes, sir.

Q. You would agree with me that denominational identity's not listed as an approval criterion under section 29358; right?

A. Yes.

Q.   You would also agree that association with CAIR is not listed as an approval criterion under section 29358; right?

A.   Yes.

Q.   So associated or not with CAIR, that's no basis to deny or grant approval; right?

A.   At the -- well, yes, and -- at the present time, yes.

Q.   You think that is a reason to deny approval?

A.   No, I said at the present time.  Well, under the circumstances, there is a question about CAIR and whether or not it falls within the Foreign Terrorist Organization.  It has not been determined by the United States government that it does fall within it.

Question that the governor has issued a proclamation identifying the cou -- entity as a foreign terrorist organization.  That is in litigation.  You also have questions that are occurring at the congressional level as to whether or not it qualifies as a foreign terrorist organization.

And so to the extent that ultimately it would fall within a foreign terrorist organization, once, you know, if it did, it would potentially impact it.  But until it does, no.

Q.   Okay.  So as of right now, you would agree that

association with CAIR is not any, kind of, approval criterion for the Comptroller's Office?

A.   That's correct.

Q.   Okay.  What about association with CAIR?

A.   Association in what way?

Q.   Any way at all.

A.   No.

Q.   So -- and we'll talk about that in a little bit.  Association -- do you know what CISNA is?

A.   Yes.

Q.   Okay.  What is CISNA?

A.   CISNA is the a -- is the Council of Islamic Schools in North America.

Q.   Okay.  You would agree that association with CISNA is not listed as an approval criteria under 358; right?  I'm referring to 29358 of the Texas Education Code.

A.   Run that by me, I'm sorry, again.

Q.   Sure.  You would agree with me that association with CISNA is not listed as an approval criterion under Texas Education Code Section 29.358?

A.   To the extent that it's -- that it is not an accredit -- it's an accreditation in of by itself, it's not accredited by TEA.  So it could be impact that way, but other than that, no.

Q. Okay. I just want to be real clear. Association with CISNA is not an approval criterion for the Texas Comptroller's Office; right?

A. That's correct. Unless it's the sole accreditation. Because it wouldn't be accredited by a school. It wouldn't be accredited by a ent -- a agency that's rec -- rec -- recognized by the TEA and it's not a member of TEPSAC.

Q. Okay. You would agree with me that use of Islamic Services Foundation curriculum is not listed as an approval criterion in Texas Education Code Section 29.358; right?

A. Yes.

Q. You would agree with me that alleged associations with the mother -- Muslim Brotherhood's not listed as an approval criterion in Texas Education Code Section 29.358?

A. No, the Muslim Brotherhood is been under 360 -- under 29358H2. That would be prohibited.

Q. Yeah. What kind of association does the comptroller believe is sufficient to bar a school from participation in TEFA?

A. Direct involvement.

Q. What does "direct involvement" mean?

A. Direct participation in the management

operation of that entity.

Q. Okay. So if a person is an active member, whatever that means, of the Muslim Brotherhood, and they're also in the direct management of a school in Texas that would otherwise be qualified, the Comptroller's position is that they should be excluded from TEFA?

A. If an individual -- could you please ask that question again?

Q. Yeah, sure. I thought I -- maybe -- maybe I can unpack it a little bit.

So here's the question again. The alleged association with the Muslim -- Muslim Brotherhood, you would agree with me, is not listed as an approval criteria in section 29.358.

A. It's not listed, no.

Q. Okay. But you believe that if there is any kind of association between a school, direct involvement with the Muslim Brotherhood, that would exclude the school under TEFA?

A. If -- I guess, there -- there's a -- I'm hearing a separation there. If there's direct involvement and direct engagement by the Muslim Brotherhood, we would be precluded from contracting with that school.

Q. And that's what I'm trying to figure out. What -- what does "direct involvement" mean?

A. That the organization itself was directly involved in operating and in directing that school.

Q. Are you aware of any school in Texas -- that's being directly operated by the Muslim Brotherhood?

A. No.

Q. Okay. Are you currently investigating that?

A. No.

Q. Are you aware of anybody who's currently investigating that on behalf of the Comptroller's Office?

A. No.

Q. Okay. You would agree with me that the phrase, quote unquote, "potential ties to an organization" are not listed as an approval criterion under Texas Education Code 29.358?

A. Yes.

Q. We talked about this a few minutes ago, but I just want to make sure I'm -- I'm crystal on the record. Are there any written policies that allow the controller's office to delay providing a provider application links for the TEFA program based on alleged affiliation or association?

A. I do not believe that there are regulations that would fall within that, but there -- there is, as

identified within the Attorney General's letter, the requirement that the comptroller investigate and review, you know, all individuals that are seeking to participate in the program.

Q. Aside from the Attorney General's response to the query from the comptroller, is there any other written policy that you're aware of?

A. No, not -- no, I'm not.

Q. Same question with regard to disabling access to the TEFA program for an already approved school?

A. We're talking about the -- you were talking -- Bayaan Academy?

Q. No, not yet.

Let me -- let me ask the whole question. Are you aware of any written policy that allowed the comptroller to disable provider access to the TEFA program based on any alleged affiliation or association?

A. To the extent that there would still need to be an investigation, it would still fall under the same guidelines as provided by the Attorney General's office.

Q. All right. So the only written policy that you're aware of is the Attorney General's response to the comptroller?

A. And the statutory authority that he cites.

Q. Well, I know -- I know about the statute, but

I'm talking about separate from the statute.  Anything else aside from the Attorney General's letter?

A.    To my knowledge, no.

Q.    All right.  Any written policies that you're aware of that allow the comptroller to suspend access to the TEFA program to an education provider based on alleged affiliation or association?

A.    Policies, no.

Q.    Well, you're saying policies like you're questioning.  Is there anything in writing?

A.    Well, just the statute.

Q.    Okay.  Anything other --

A.    -- 58H2.

Q.    Anything other than the statute?

A.    Not that I can recall.

Q.    All right.  The same question, but with regard to disabling, anything in writing, not just policies?

A.    Just the investigation.  Not to my -- not that I can recall.

Q.    Okay.  All right.  Has the Comptroller's Office come up with any written policy about what it means to be quote unquote "affiliated"?

A.    No.

Q.    Okay.  What about associated?

A.    No.

Q. What about ties, T-I-E-S?

A. No.

Q. So who in the Comptroller's Office determines whether an affiliation between an education provider and any -- I'm going to refer to them as a disfavored group -- I'm not trying to put words in your mouth. But who in the Comptroller's Office is responsible for determining whether an affiliation is sufficient with a disfavored group that the comptroller would deny access to TEFA?

A. Are you talking about 293585?

Q. I'm talking about anything. As -- as I understand it, you're saying that if there's an affiliation based on an investigation with a group, we just talked about the Muslim Brotherhood for instance, you said if they're directly involved --

A. Uh-huh.

Q. Right? I'm asking about the word "affiliated." So does the -- well, let me ask it like this. Does the Comptroller's Office believe that affiliation with a disfavored group, for whatever reason, is sufficient to remove them from the TEFA program?

A. At the present time, no.

Q. Okay. Is there any written policy saying that, at the present time, that is not the policy of the

Comptroller's Office?

A.   No.

Q.   All right.  Same question, but with regard to association.  Is there anything in writing that defines how the Comptroller's Office should look at whether being associated with a disfavored group is sufficient to remove an education provider from TEFA?

A.   Not to my knowledge.

Q.   Same question, but with regard to the word "ties"?

A.   Not to my knowledge.

Q.   All right.  Are there any written policies at the Comptroller's Office defining what a quote unquote, "foreign adversary" is for purposes of TEFA?

A.   The -- let's see, it's 2274 of the government code defines it.

Q.   And so Texas Government Code --

A.   2274 basically identifies the hostile nation states and then, I believe, it's 2254 deals -- or 52, I'm sorry -- that deals with foreign terrorist organizations.

Q.   Okay.  Do you know what the chapter is for that?  I know you're giving me the -- the point and then the number.

A.   The -- those are the chapters.

Q.   Okay.  So it's chapter 2241?

A. Chapter 4 -- well, chapter 2274 for -- for -- for hostile nation states. And then, I believe, it's 2252 for foreign terrorist organizations.

Q. Okay. And so those are the chapter numbers for the Texas Government Code?

A. That's correct.

Q. Any written policies on burden of proof for the Comptroller to determine whether a pro -- an education provider should or should not be granted access to the TEFA program?

A. No.

Q. Any written policies requiring notice to the school before actions taken on any allegations related to alleged affiliation?

A. Not at this time. We haven't had any matters that have come before the Comptroller's Office that -- that have fallen within 29.358.5. So we have -- we're still in the process of developing, or we haven't even got to the point where we're even developing that yet.

So we have not suspended or terminated any -- any individual schools, nor do we have an entity or a school that's -- that's going to be involved. And so the statute 293585 is very clear about notice, about the ability to be able to be heard, and also to be able to, you know, have a determination made within a specific

time period.

Q. Any written policies from the Comptroller's Office that requires neutrality in the way that it treats religious schools in the TEFA program?

A. We don't consider religion at all.

MR. HUDSON: Objection; nonresponsive.

Q. (BY MR. HUDSON) My question's a little bit different. Are there any written policies requiring the Comptroller's Office to maintain neutrality in dealing with religious schools that would seek to be in the TEFA program?

A. They -- we -- we don't need one because of the fact is that we don't take it into consideration at all. It's not part of any of the forms. It's not something that we even look at.

Q. So the answer is no, you don't have any?

A. Both, my full explanation.

Q. So no?

A. No.

Q. Okay. To the extent that you had any investigations into any schools related to alleged foreign terrorist organizations, have all of those investigations been concluded?

A. At the present time, I believe, yes.

Q. Well, you say at the present time, I -- I'm --

I want to make sure that we're crystal on the record, are there any investigations that have been opened and are not closed finally, as we sit here today?

A. Closed finally, I mean -- I do not believe there is, no. Because I mean it would -- there is -- to my knowledge, there is no open investigations. If something were to occur where we would get a complaint or something in the future, well, then that would, you know, that investigation would begin potentially under 3585.

But at the present time, there's no investigations under 293585. And there's no actions that basically are being taken considering any school that's looking to be suspended or terminated.

Q. Can you explain to the Court what the life cycle of an investigation is in the context of TEFA?

A. Currently, it would be -- it -- in -- in general, okay, for -- well, with TEFA, it would first of all be validating the fact is that it qualifies under the general terms of twen- -- of 29358. We'd also validate the fact that it is a -- a organization that is validly operating within the state of Texas under Government Code 552.

We would look at the accusations that are being made or the cla- -- or the issues that have rose with regard to accreditation and/or if there were

accusations made against that particular entity.

We would investigate using public sources to be able to determine, you know, the as -- as full as -- as we could, the operations, and the individuals, and the entity that's involved in those accusations. And then we would compare that against the Foreign Terrorist Organization list, against the OFAC list, against the -- the hostile nations list.

And any other cross relations with regard to questions, with regard to parties or persons that the federal government has. And if there was not a direct link between person that was directly involved in that school, then that's it. I mean, under the circumstances, virtually all the schools have passed those requirements. There is no involvement that would disqualify a school based upon the research that we've done to this -- at this time to be able to terminate any schools.

Q. To the extent that you had ongoing investigations, when did those cease? When did the last one cease?

A. The last one ceased -- it would have -- it would have ceased -- well, they were -- the -- it would have -- they would have been concluded at the same time that they would have been issued the links. So that would have been by March 24th of -- of 2025 -- or 2026,

I'm sorry.

Q. Now, when you concluded your investigations, was it documented that you concluded them?

A. The reports that were submitted are -- are complete as-is.

Q. Sure. But my question is a little bit different. Was there any kind of closing letter, some sort of indication in a database, something indicating that the investigations had concluded?

A. Not to my knowledge.

Q. Are there any other -- other kind of investigations that the Comptroller's Office does outside of TEFA?

A. Yes.

Q. And let's talk about tax investigations, for instance.

A. Yes.

Q. Are there closing letters in tax investigations?

A. No, there would be the -- generally, no. Generally, what you end up having with tax investigations is either the case moves forward under SOAH or it would move forward under a criminal complaint.

Q. And that would be the end it?

A. In -- in general, yes.

Q.   Okay.  But if it were found that there were no tax violation --

A.   Well, the --

Q.   -- meaning it doesn't go to SOAH and it doesn't go to criminal complaint.  Is there a closing letter for those?

A.   There would be a closing audit letter if it didn't get to the point where there was, you know, a -- a charge or -- or monies that were owed -- determined to be owed.

Q.   Okay.  So that's what I'm asking about here, as it relates to these investigations that you say the last one was as of March 24 of 2026.  Is there anything in the file indicating that the investigation was completed and no violations were found?

A.   We just have the report in and of itself, which is in evidence, and we also have the determination by the comptroller that -- that -- that, you know, giving them the links and allowing all of the schools, I mean, all of the schools that were under review, to be admitted into the program.

Q.   You say the decision by the comptroller, whose decision exactly?

A.   Well, it went through Mare -- Mary Katherine Stout and then Odyssey provided for the links.

Q.   You would agree that the Comptroller's Office was investigating potential ties to foreign terrorist organizations; right?

A.   That's what was alleged.  We were -- whatever the allegations were is what we looked at.

Q.   I'm going to hand you a copy of what I'm going to mark as P4.

MR. HUDSON:  For identification purposes, this is CPA 355 through 357.

(Exhibit P4 was marked.)

A.   Yes, sir.

Q    (BY MR. HUDSON) On CPA 357, see where it says paragraph 2?

A.   Yes, sir.

Q.   Top sentence, paragraph 2 says, "You know the comptroller asked the Attorney General about schools with potential ties to foreign terrorist organizations or foreign adversaries and those are the issues of concern. Not that the schools are Islamic or tied to any other religion."  Did I read that correctly?

A.   Yes, sir.

Q.   Are you aware of any non-Islamic school that was investigated for foreign terrorist ties?

A.   Yes.

Q.   Which ones?

A.   The Spring School.

Q.   Which terrorist organization was attached to the Spring schools?

A.   It -- it -- we've reviewed for all those -- those schools -- Spring schools and see if there was anybody on any of those lists.

Q.   I believe you testified earlier that the Spring schools were the ones that you believe were associated with the Chinese Communist party?

A.   That's true.

Q.   All right.  What foreign terrorist organizations are related to the Chinese Communist Party?

A.   I don't know.

Q.   What about Islamic schools?

A.   What about -- what about Islamic schools?

Q.   What foreign terrorist organizations does the Comptroller's Office believe are associated with Islamic schools?

A.   I don't know if we believe any of them are associated.  We have accusations.  We were doing our due diligence to investigate the accusations, but we have no belief in the fact that any school has an affiliation with a Foreign Terrorist Organization, the Transnational Criminal Organization, or for that matter, a foreign adversary.  The question becomes strictly as to whether

or not there's a connection.  That's it.

Q.  Did you reach out to any of the schools to let them know that you were investigating them for potential ties to foreign terrorist organizations?

A.  Other than this right here, I mean, this is -- it indicates the fact is that -- that there is that connection here.  An explanation right here in the -- in the e-mail to -- with regard to these individuals that received it -- there is the fact -- the fact is that we're looking at, again, subject to Cognia's January 5th letter, that we're looking at in -- individual relationships with potential ties to foreign terrorist organizations or foreign adversary.

MR. HUDSON:  Objection; nonresponsive.

Q   (BY MR. HUDSON) My question's about the schools.  Did anybody at the Comptroller's Office reach out to any of the schools that were being investigated because of quote, "potential ties to foreign terrorist organizations," end quote.  Were any of the schools contacted about that?

A.  Not to my knowledge.

Q.  Okay.  Why not?

A.  I don't know.

Q.  Wouldn't that be part of an investigation?

A.  Well, again, we're in the process of trying to

be able to build, you know, the TEFA program from scratch. So again, with all of the activity that's going on, and you have three individuals that are performing all of those functions, along with two individuals from Odyssey. That we were putting this entire grouping of schools with regard to Cognia on a suspended -- not a suspended -- but on a list that basically were -- we were working through those to be able to ensure, across the board, that they qualified for accreditation and there was no accreditation issues.

And the fact is that they did not belong with any of these accusations. So it didn't matter whether you -- what type of school you were, they all basically received the same review.

Q. What evidence supported the concerns that any TEFA applicant or potential TEFA applicant, had potential ties to foreign terrorist organizations?

A. Those were the emails and the -- and the report and the documents that -- that, you know, we provided. Basically identify, again, the Middle Eastern Forums Report, the connection with Representative Troxclair, the -- Chip Roy's congressional inquiries in to foreign terrorist organizations. So you end up having a lot of different activities that were going on at that -- at that time, which caused the public to ask questions.

Q. Did Chip Roy's office send a request for information from the Comptroller's Office?

A. No.

Q. Did the -- Chip Roy from D.C., send any information to the Comptroller's Office?

A. No.

Q. Well, then what are you referring to with regard to Chip Roy's inquiry?

A. I didn't say he was inquiring. I said that the fact is, is that those activities were ongoing. Same thing with CAIR, that those activities were separately ongoing. We were aware of those.

Q. Who made you aware that Chip Roy was investigating -- well, I guess what do you think Chip Roy was investigating?

A. Well, there was a congressional -- there was congressional hearings regarding the potential for terrorist activity in Texas.

Q. How did you become aware of it?

A. It was on YouTube. I mean, it was pointed out to us that it was on YouTube.

Q. Pointed out by whom?

A. I don't recall.

Q. If we go over to CPA 355, which is the front page of that and I want to compare 357 to 355. The

reason being, if we go to the top, we see the firm line and we've talked about Mary Katherine Stout.

A. Uh-huh.

Q. So we know who she is.

A. Uh-huh.

Q. Who is Barbara-Jane Paris?

A. I believe Barbara-Jane Paris is with Cognia.

Q. What about Laura Colangelo?

A. Laura Colangelo is with the private -- Texas Private Schools Association.

Q. All right. And who is legal team?

A. That would be the individuals that are with FAALS.

Q. Those are the three people we discussed earlier?

A. Yes.

Q. Who's Ray Pecku?

A. I do not know.

Q. Who's Krista Anderson?

A. I do not know.

Q. Okay. If we go to 355, we see that this is an e-mail from somebody purporting to be the ISI president, which appears to be the Islamic School of Irving. Do you see that?

A. Yes.

Q.   In this particular letter, I'm just going to paraphrase it, but feel free to read it.  I don't want to put words in your mouth and I don't want you answering questions you don't understand.  But this letter reads to me like they are asking about why they're not receiving an invitation or onboarding communication as of March 19, 2026.  Would you agree with that?

A.   Yes.

Q.   Did anybody reach out to Naheed Kutmal and let him know that there were concerns about potential ties to foreign terrorist organizations with ISI?

A.   I do not know.

MR. ROOSIEN:  Can we take a -- a short comfort break?

MR. HUDSON:  Sure.

THE NOTARY:  All right.  The time is 11:53 A.M.  We are off the record.

(Break taken.)

THE NOTARY:  All right.  The time is 12:09 P.M.  We are on the record.

Q.   (BY MR. HUDSON) I want to switch gears a little bit and talk about the way that a school enters the TEFA pipeline.  So can you describe generally for the jury how we get from TEFA program announced to school receives application link?

A. Well, the -- the TEFA program looked at the list that was provided or -- you know, through TEPSAC, as well as all the entities that are also deemed to be accrediting agencies recognized by TEA. It sent out and those that had the e-mail addresses and that we sent out, basically, notices that they could come and apply. With the exception of the Cognia schools, virtually the other entities received their links.

The Cognia schools were, as I indicated before, they were held and -- for further review. And as we worked through those individual by groups, we were ending up, you know, validating the fact is that there was no, you know, problems with accreditation. There was no problems with any of these accusations or anything else. That they qualified, you know, as being active under the Secretary of State. So qualified from that perspective and -- and then we contacted Odyssey. And Odyssey would -- would issue the links.

Q. All right. So I want to break this up just a little bit. It sounds like the Comptroller's Office made the first run at deciding who was going to get an application link; is that fair?

A. The -- well, it -- it made a determination based upon what was the most obvious. There were also individual schools that were not listed or not

identified, and that those, you know, this was the largest group that we -- of information that we had with those schools that may be interested. There were additional schools that contacted us later that indicated that they were accredited and they provided us with information. And so we added them to those schools, yes.

Q. Why did the Comptroller's Office decide to do it that way?

A. Because it seemed to be the most efficient way to be able to proceed.

Q. Okay. Was there a public application link?

A. A public application link for what?

Q. For the schools. So, for instance, was there any public portal where a school could go around the Comptroller's Office or Odyssey and just submit their application?

A. Not to my knowledge.

Q. Why not?

A. Because we wanted to be able to control the entry point to validate the facts that there were schools that were accredited. And the schools that would be put onto the system would be available for selection between December 9th -- I'm sorry, February 4th, all the way through -- I'm sorry -- December 9th all the way on through to today. I mean, there -- there's constantly

rolling on of new schools. And there's been additions to accreditation eight entities that have been added by TEA. So it's continuously evolving.

Q. Can I get you go to 168 for me? 68 in P3 for the record -- 168. See at the bottom where it says section 29 through 58?

A. Yes.

Q. Top right-hand corner on page 169 of P3. First, full sentence reads -- you with me?

A. Yes.

Q. "The comptroller shall allow for submission applications on a rolling basis." Did I read that correctly?

A. Yes.

Q. Okay. So applications can still be submitted now; right?

A. Correct.

Q. The process that we described today. Prior to the short break that we took, is that the process that is still in place at the Comptroller's Office?

A. Yes.

Q. Okay. Now, you have Odyssey as provider, sending out links; is that right?

A. That's correct.

Q. So they're the ones who receive all of the

information in the application; is that right?

A. They're the ones that would receive the application information, yes.

Q. Okay. So can you explain to the jury where the Comptroller's Office -- prior to an application being submitted -- where or what the Comptroller's Office was using prior to an application actually being submitted to decide whether to send a link in the first place?

A. Well, I mean, originally we were looking at the -- at the TEPSAC list and moving forward, making sure that -- going on -- online to make sure the fact is that they presented all the information and it was consistent with what they were presenting.

So we were looking at the fact as whether they were in operation for two years, whether or not that they were giving the appropriate tests. We were also looking at the factors admitting some of these schools would identify themselves as, you know, being for multiple grades that were not within their -- within their accreditation. So we were looking, kind of, through all of these particular things. But with regard to the Cognia schools, that was a separate application.

Once we got to Cognia and the issues with regard to Cognia, including their January 5th letter, that was treated differently and as compared to what had

gone previously.

Q. Okay. Was there some sort of checklist that the Comptroller's Office was using? You know what, let me -- let me back up.

Let me ask it this way. I get a link as a school that's -- that link is going to give me access to provide all of my information; right?

A. If you're -- yes.

Q. So that's the application. That's the -- the full boat. Everything I've got. Boom. Here I am; right?

A. Yes.

Q. All right. And so Odyssey has access to that. Once the application is completed; is that correct?

A. No, they -- they -- they would get app -- they would get that information upon getting approval to be able to issue the link.

Q. Right. So let me be clear. I'm talking about, I've got a link. I've applied. I now send the application materials in. Odyssey should have everything on the application; right?

A. Possibly, yes.

Q. Well, assuming that they did it correctly and were actually qualified, they should have all of the information supporting that application; right?

A.   Yes, if they did that correctly --

Q.   Okay.

A.   Yes.

Q.   So let's live in a world where we have an application that's complete and correct and they're actually accredited.  They should be approved; right?

A.   Unless there is some other reason why not to accredit them to be able to review it.

Q.   Agreed.  So instead of doing the TEPSAC and TEA Lists, you hired this third party vendor.  Why not just let them create a public site and let people apply?

A.   Because we wanted to be able to control the quality and -- and you're talking about the people, who are you talking about people?  Because if we're talking about schools, schools have a specific criteria.

If you're talking about the application for parents, parents had the ability to be able to come in and do it.  If you're talking about vendors, they, again, had to qualify under, you know, 29358.

Q.   The comptroller wanted to be able to control that as it's going in?

A.   Well, you needed to do that for quality control purposes, yes.

Q.   So I believe you said you went through the TEPSAC and TEA and it sounds like things are getting

approved on a rolling basis; is that right?

A. And they still are, yes.

Q. Okay. Tell me about the process of how it goes from TEPSAC to there's a decision maker who says, yes, go forth and send them the link. What -- what does that process look like?

A. When --

Q. Well, I guess, let's go back to the beginning. I understood your testimony to be that somebody from the Comptroller's Office, or some group of people, went to TEPSAC and TEA and got lists; right?

A. Yes. Uh-huh.

Q. Okay. Now, once you have those lists, how many people were involved in vetting candidates off of those lists?

A. As I indicated before, Mary Katherine, her two, sub -- you know, subordinates, and the three attorneys that are with FAALS.

Q. So we got six people total?

A. Yes.

Q. Yeah. Now, final decision maker on who gets links is Mary Katherine Stout; right?

A. That's correct.

Q. How frequently were names of schools being sent to Mary Katherine Stout to be approved?

A. It would depend. I mean, we're talking about an extended time period. So, with the exception of those that were Cognia-affiliated, it would be dependent upon the information that was either complete or incomplete on the application, which would lead to questions, which would need to be expedited up and reviewed separately.

Q. As you're doing that review --

A. Uh-huh.

Q. -- is there e-mail communication saying I've approved this group from Mary Katherine Stout, go forth and send links?

A. Yes, there are -- there is a list. There is a process in which that Mary Katherine Stout would provide that list and information with regard to Cognia schools to the FAALS Group. The FAALS Group would review that, then General Counsel Victoria North would approve that list. And then Mary Katherine would report that and authorize those schools to be given links.

That was done, as I indicated before, in 22 separate batches, because, again, all of the activity that's going on in order to try to create the program, get everything up and operating. This was a small percentage of that. You're talking about three individuals doing that that are performing these functions. And so you end up having the approval process

with Mary Katherine Stout going to Odyssey and Odyssey basically issuing that link.

Q. So for these 22 batches, there should be emails from Mary Katherine Stout, the Odyssey, saying send the links?

A. Yes. Plus the additional of those that were after the order of the Court.

Q. Was the process first-in first-out?

A. No.

Q. Why not?

A. Because the -- there was always an emphasis on trying to get the greatest number of individuals to be processed. So those individual schools that would take a longer period of time were delayed the longest as the -- and for those that were coming online would also be related to those, you know, in order to be able to try to get as many schools on as possible.

So the first aspect, as I indicated, was that you ended up having schools that were the most active in communicating with the program, saying we want our links. As well as, those schools that were K through 12 or K through 8, because the potential there was to have greater students.

The problem that we began to have was that once there was a emphasis on the contacts, Cognia and the

Texas Private School Association began to lobby their members to be able to contact us as often as possible to demand those links. We began the process of, again, focusing initially on those that -- that were asking for their links. And as a result of that, we were finding that many of the individuals that were getting the links were not -- were either not applying or delayed applying.

So that was clear that that wasn't going to be efficient. So we just kept working our way down into finding out the schools that would be franchised, those schools that would have no senior, or no capital or -- or principal organization over and above the entity itself that we're -- the entities that were stand alone. Anything that we could do in batches, as we're doing all this other activity, were being done on a daily -- on a regular basis. And then we would be issuing those to -- to Odyssey.

Q. Was there a written prioritization policy?

A. There isn't a prioritization policy. It was basically, effectively, just trying to triage what we had.

Q. As it relates to -- I understand Cognia is in -- in one bucket -- was there any priority by a creditor?

A. No.

Q. Were schools prioritized by whether they were TEPSAC listed versus TEA?

A. No.

Q. Were schools prioritized by whether they were Cognia-accredited?

A. Most schools were not prioritized by Cognia, no. Because we were -- we were reviewing those and upon the review, we would list them or remove them out into those -- in those 26 or so batches.

Q. Well, there was a priority though, right, because Cognia got put to one side while you did the other batches; right?

A. Well, there was some in that -- in that list that were coming on board on an ongoing basis. So not all of the schools that were being considered at the end were Cognia schools because you end up having, as you pointed out, rolling schools in a rolling basis. And so we were getting new schools that were being added on in addition to the Cognia schools.

Q. If somebody wanted to apply today, they could do that; right?

A. Yes.

Q. You said that the schools that would take longer to vet were delayed; is that fair?

A. It was longer -- yeah, there would be longer in

order to be able to sit back. Yes, in order to be able to keep --

Q. Okay.

A. -- keep the activity going forward.

Q. So for instance, if someone from the Middle East Forum alleged that a school had ties to a foreign terrorist organization, you'd have to vet that; right?

A. We would have to -- we would have to -- yeah, vet that. Yes.

Q. Okay. And so that would delay their approval; right?

A. Well, we had a little bit of a different situation with regards to that as well. I mean, as the, you know, as what we -- we got into this project, as we talked about before, our CID is involved in tax. We're not readily prepared or were not readily prepared to do investigations and to do deep research into foreign terrorist organizations or any other accusation.

And so that's the reason why that -- that the comptroller request -- made a request for an opinion from the Attorney General. And I did that on December 12th and that the con -- and that the comptroller was waiting for the Attorney General's response for -- you -- during this period of time, but again needed to continue moving forward with the Cognia schools. But on, I

believe, it was on the -- on January 24th, I believe, is when the Attorney General responded and basically told us that, you know, that even though that the Attorney General has a CID division that has -- it assists with local police and does a lot of investigations, that this was solely upon us.

And so there had to be some time in which that, you know, we were looking at this now with the CID that's really focused on tax, trying to figure out, based upon the Attorney General's instruction, to be able to potentially hire individuals that could be able to perform these functions and not having a background into, you know, any of these accusations. We needed to be able to put that together. So it took some time to be able to do that.

And so that was part of the reason why some of these schools that were at the end, you know, were delayed. Because of the fact is, we were trying to come to grips with, you know, what was being thrust upon us. On top of that, you also had the January 5th letter from Cognia that said that you also have to do that investigation. And that if you find that an individual school has a relationship with a foreign terrorist organization or an organ -- you know, or a hostile nation, then we will de-accredit that school.

And so, you know, I mean that's a lot that we were trying to swallow at one particular time. And so we came up with the process and -- and pulling this information together moving forward, we believe that we had additional time because there's no requirement and there -- and clearly in the -- in the instructions it tells parent applicants that they are not required to be able to identify a school.

So we thought that we had until June in order to be able to, you know -- May or June because you're going up -- we were going to end up having the lottery make the determination as to who it is that would actually receive the vouchers. And at that particular time, the schools needed to be available in late May. And so we were anticipating that we -- we had a lot longer of a -- of a run before, you know, we got hit with the with -- the two lawsuits.

MR. HUDSON: Objection; nonresponsive.

Q (BY MR. HUDSON) My question is a lot simpler than that. Middle East Forum calls you up and says here's 36 schools that we believe are tied to foreign terrorists; right?

A. No.

Q. Well, they sent you an e-mail; didn't they?

A. Well, they and others. I mean, that report

appeared more than one -- through one source.

Q. Well, didn't an e-mail come directly to the Comptroller's Office that said, here's a copy of the report that we intend to file?

A. Copy of a report we intend to file --

Q. Or intend to publish.

A. Well, it -- it did publish it.

Q. Right.

A. So and -- but along with Rep -- Representative Troxclair along -- there -- there was -- there was many people that provided that same report.

Q. And those allegations resulted in you having to pull all of those schools out of line to investigate; right?

A. The -- the schools that were pulled out of line or the schools that were pulled out of line were all Cognia schools. Virtually all the Cognia schools went through the same analysis, the same process, because we couldn't wait for the Attorney General and -- and there are organizations that are in the Foreign Terrorist Organizations, and whether or not there's affiliations that have nothing to do with any particular religion or any particular group.

Q. Mr. Miller, you would agree that 700 Cognia schools weren't listed in the Middle East Forum Report

that the comptroller relied upon in pulling 36 schools out of line; right?

A. The -- the -- no. We pulled all 700 for all the reasons that we had previously talked about.

Q. Okay. So all 700 schools were listed in the Middle East Forum Report?

A. No.

Q. No, 36 were; right?

A. Yes.

Q. And they got pulled out because of the Middle East Forum Report; right?

A. No, they got pulled out because of accusations that were made and communications that were made about the fact is that this -- these, you know, these particular entities were -- potentially had foreign terrorist organization relationships and their involvement, that they had the same thing with Transnational Criminal Organizations, or they were related to hostile nations that incorporated, not just the -- what was in the Middle East Forum, it included also what was before us with the CCP.

There were other potential claims and -- and allegations, and you have a situation where that, you know, we're receiving this information, we have due diligence to ensure the fact is that we are eligible to

contract with, you know, these particular entities. And so we -- we reviewed to see if they were on any of those lists.

Q. You understand that the district court did not order you to put any of these schools on the list; right?

A. That's correct.

Q. And you understand that there -- you didn't have to stop your investigations; right?

A. The investigations were winding down at the time that any of that -- before that order began.

MR. HUDSON: Objection; nonresponsive.

Q (BY MR. HUDSON) My question is, you understand that if you had investigations, they didn't have to stop on account of the TRO issued by Judge Bennett on March 17?

A. That's true.

Q. Okay. Were any schools prioritized by whether they were mentioned in communications with the Attorney General?

A. No.

Q. What about schools being prioritized, were any prioritized on account of being involved in communications with the governor's office?

A. No.

Q. I believe we are up to P5.

MR. HUDSON: For identification purposes, it's CPA 634 through CPA 648.

(Exhibit P5 was marked.)

Q. (BY MR. HUDSON) Go ahead and take a look at that. Let me know when you're finished.

Have you ever seen that document before?

A. Yes, sir.

Q. What is it?

A. It's a document of communication between myself, Mary Katherine, and Daniel Warner of Odyssey, as well as others concerning HQA Spring.

Q. We talked about Victoria North, Mark Domel and Jeffrey Mullins earlier; right?

A. That's correct.

Q. Now that's the -- could you remind the jury what the FAALS Group is again?

A. It's the Fiscal and Agency Affairs Litigation Services.

Q. Okay. And then we have Mary Katherine Stout, who's our decision-maker, all with you in the "To" and "CC" lines; right?

A. She's the director of the TEFA program.

Q. Okay. Can you explain to the jury who Daniel Warner is?

A. Daniel Warner is the Chief Executive Officer of

Odyssey.

Q. Okay. Do you know if Daniel Warner has any background in investigating school accreditation?

A. I do not.

Q. Does he have any background in law enforcement?

A. I do not know.

Q. Do you know if he has any authority from the Comptroller's Office to investigate particular schools for purposes of evaluating their accreditation?

A. That was not his purpose.

Q. Let me get you to go over to CPA 637.

A. Okay.

Q. So 637 and 638, we'll start at 638.

This e-mail is from Mike Platek and Daniel Warner to Tom Kera, Linda Fernandez, Jeffrey Mullins, and Mark Domel. Do you see that?

A. Yes.

Q. And that's from Mary Katherine Stout. It reads "Mike, please send -- see two additional schools that you receive application links as soon as possible, per the recent court order. The rows below are from the December TEPSAC Schools list. And I just pulled the TEPSAC screenshots and pasted them below in case helpful. Please, let me know when complete." Did I read that correctly?

A.    Yes.

Q.    Who is Mike Platek?

A.    Mike Platek is an employee of Odyssey.

Q.    So that comes on March 18; is that right?

A.    That is correct.

Q.    All right.  And it appears from this that Mary Katherine Stout believed that the court ordered her to send application links; is that right?

A.    I cannot interpret what she decided or what she knew.

Q.    Well, we can read the sentence.  It says, "Please, see two additional schools that should receive application links as soon as possible, per the recent court order."  Did I read that correctly?

A.    You read that correctly.

Q.    Okay.  Speaks for itself.  And March 18, it looks like Mr. Warner responds, "The schools have been sent their application links."  Is that right?

A.    That is correct.

Q.    Okay.  Now, if we flip over to CPA 636.

A.    Yes.

Q.    This is six days later; right?

A.    Let's see -- yes, sir, it is.

Q.    I -- I want to focus on that second full paragraph.  It says, "When our support team reached out

again, the school had sent us the file labeled HQA enrollment record. I do not find this document acceptable because it only shows one year of enrollment records and in my opinion does not look legitimate." Did I read that correctly?

A. Yes.

Q. Was it Daniel Warner's job to figure out what does and doesn't look legitimate as a record?

A. Yes.

Q. Okay.

A. Because he has black and white rules. Odyssey was responsible for, in short, to be able to collect the information as to whether or not that a school was in operation successfully for two school years.

Q. Okay.

A. And so as a result, when it was -- it was unclear or there was an issue, he raised it to Mary Katherine Stout and the rest of the team, in order for us to be able to look at it.

Q. Okay.

MR. HUDSON: Objection; nonresponsive.

Q (BY MR. HUDSON) My -- My question's a little bit different, he says the record doesn't look legitimate. Was his role to come in and confirm authenticity or legitimacy of records that he received?

A. His role was to raise an issue in order to be able to bring this forward for our investigation.

Q. Okay. So the Chief Operating Officer of Odyssey was contracted to do legitimacy reviews for thousands of schools on behalf of Odyssey and report that to the Comptroller's Office?

A. That's not what I -- that's not what I said.

Q. I know. That's what I said. Do you agree with that or disagree with that?

A. I disagree with that.

Q. Okay. So why is Daniel Warner looking into the legitimacy of records for one particular school that was brought to his attention by Mary Katherine Stout following a court order?

A. Well, in this particular instance, there were qualifying whether or not that the school was in two years of existence. Traditionally, if they had submitted documents that adequately established the two years, then there would be no communication because it would just been checked through the Odyes -- through -- with Odyssey, because they have the authority to do that.

But as a result of the fact is that they were submitting documentation that was -- that was identified as had -- being inconsistent to be able to establish the two years, then Odyssey raised that to the

group, including Mary Katherine, and we reviewed it, and we kept asking for additional documentation until they satisfied that basic standard.

Q. Okay. Where are these black and white rules that you referenced that Odyssey is bound by?

A. The -- it's the communication between Odyssey and the Comptroller's Office or through the program. Part of the basic of the contract is that these are the things that you're doing. And so when it came time for doing this, again, they were gathering the information with regards to the basic aspects of -- of, you know, 29358. And when they came to a question or an issue, it was raised to the comptroller to make that review and to make a determination as to what needed to be done next. And that's what you have here.

Q. So that whole process is laid out in the contract between the Comptroller's Office and Odyssey?

A. It's an extension off of what we're directing them to do, yes.

Q. Well, I'm not asking if it's an extension, so I'll -- I'll just tell you.

A. I --

Q. I do -- I do -- hold on.

A. Yeah.

Q. I do a lot of contract work.

A. Uh-huh.

Q. Contracts say what they say. My question is very specific. The process that you just described, is that written in the contract between the Comptroller's Office and Odyssey?

A. I do not know.

Q. Okay. If it's not in that contract -- let's assume for a moment that it's not. Where would I find it?

A. In the communication between Odyssey and the program.

Q. Okay. Do you know who would have sent that communication?

A. I do not.

Q. Okay. Who would be responsible for giving direction to Odyssey on how to operate the TEFA intake?

A. I'm not sure. I mean, under the circumstance, I know the fact is that what they're -- what they're obligated -- what they were obligated to do and what the limitations were. Limitations being as fact as if this -- if they met the requirement that there was no need to raise it up to Mary Katherine and the team.

Q. So there's a -- an e-mail out there somewhere, maybe, that gives that instruction to Odyssey?

A. Or a communication between the program, someone

in the program, and Odyssey, yes.

Q. Well, how many people in the program, because you've been telling me all day there's only five people.

A. Well, there is -- well, you might add the director overall, but she's not actually engaged in the -- in the document -- in the program itself. That would be Linda Fernandez, who's the director of all of the educational programs. You know, so that includes the college programs -- college savings programs in that she's the umbrella. But she's not the director, not making the determinations regarding this particular program.

Q. Do you know if Linda Fernandez had any communications with anybody at Odyssey about the TEFA program?

A. I do not.

Q. Has anybody looked?

A. I do not know.

MR. HUDSON: Can we go off the record for a minute?

THE NOTARY: Sure.

All right. The time it's 12:42 P.M. We are off the record.

(Break taken.)

THE NOTARY: All right. The time is

2:04 P.M.  We are on the record.

Q.  (BY MR. HUDSON) We took a nice long lunch break there, my apologies for that, but thank you for coming back.  Clearly didn't scare you off.

Any testimony that you gave this morning that you want to reconsider after the break?

A.  Not to my knowledge, no.

Q.  Okay.  Where we left off, I think I was moving into who at the Comptroller's Office could approve links, and that's where I want to start off.  So can you please tell the jury who at the Comptroller's Office had authority to direct Odyssey to issue links to potential education service providers?

A.  Given that process I had talked about where it was basically produced to the FAALS -- the FAALS staff -- and the FAALS staff would return it, it would be Mary Katherine Stout.

Q.  Okay.  Who at Odyssey was authorized to send links?

A.  I'm not sure all of who would be authorized to be able to send the links, but the two gentlemen that you've identified previously would be the ones that would be contacted in order to do that.

Q.  Mike Platek and Daniel Warner?

A.  Yes, sir.

Q.   Okay.  All right.  So I want to move into --
I -- I believe you mentioned this morning that all of the
investigations, if any, that you were -- that were being
performed by the Comptroller's Office concluded no later
than March 24 of '26; is that right?

A.   Yes, sir.

Q.   Okay.  I think we're up to P6.  So let me put
that out for you.

MR. HUDSON:  For identification purposes,
this is CPA 588 through 589.

Q.   (BY MR. HUDSON) Go ahead and take a look at
that and let me know when you're finished.

MR. ROOSIEN:  All right.

Q.   (BY MR. HUDSON) You ready?

A.   Yes, sir.

Q.   Okay.  Have you ever seen the document before?

A.   Yes, sir.  I have.

Q.   What is it?

A.   It is a document talking about the TEFA
program, Next Steps.

Q.   All right.  Who put this together?

A.   The attorneys within both FAALS as well as
OSLS.

Q.   What is OSLS?

A.   Operating Services -- it's Operations Services

Legal Services. That's the program that I work with.

Q. How many people are in your section?

A. There are -- well, we have open records and a variety of others, but in my specific section by -- in and by itself, we have five.

Q. This was drafted 3/20/26. Do you see that in the top right hand corner?

A. Yes, sir, I do.

Q. Are there any final copies anywhere?

A. To my knowledge, this is the final copy.

Q. Okay. So I want to go through these. The first one, Number 1, talks about review any remaining schools as of 3/20/2026. How many schools were left as of 3/20/26 that had to be reviewed for this Next Steps list?

A. I'm not sure exactly, but you can find that out by identifying the schools that were released after 3/20 -- or during and after 3/20/26.

Q. So is that just a -- a few keystrokes and you can organize that on some sort of Excel spreadsheet, or some other way to collate it?

A. There's -- as I indicated that, you know, each individual grouping were of the Cognia-related schools were done in batches, and so you would see the last four batches and there's communication going back and forth of

the identity of those batches between Katherine -- Mary Katherine Stout and as well as to Odyssey to be able to release those links.

Q. Number 2 on here talks about admitting vendors of educational products and services.

A. Yes, sir.

Q. So when we're talking about educational products and services here, what exactly are we talking about?

A. We're talking about therapists, we're talking about individuals that provide for products. What you have here is the vendors and those who were providing educational services, including therapists, were actually -- that -- that process began on December 9th, but as of mid-March of 2020 -- of -- mid-March in 2026, it was open vendors so that those individuals that were, you know, not already previously on an approved list with -- with TEA, those entities were able to come in and -- and make an indication that they were interested and that they would be reviewed.

Q. I want to jump to 4. It says, "Research and identify candidates for investigative services and candidates for enhanced computerized investigatory software service such as PingOne."

Did I read that correctly?

A.   Yes, sir, you did.

Q.   Okay.  So I believe you testified this morning that you hired two people, Lara Burns and Reuben Katz, to do professional research; is that right?

A.   That's correct.

Q.   What kind of professional research did they specialize in?

A.   Well, they specialize in any terrorism or any hostile nations, any of that activity.

Q.   How did you guys find them?

A.   Basically, we sought individual -- I mean, we were looking and sought individual recommendations and ultimately ended up finding those two individuals.

Q.   Did you put on an RFP for it?

A.   I don't know if we did.

Q.   "As it relates to investigation services and candidates for enhanced computerized investigatory software," what -- what is that about?

A.   Well, as the director of fraud, theft, waste and abuse, the anti-fraud, this is the software we would be looking for in order to be able to investigate those particular potential -- those potential events within the -- within the TEFA program.  And so this is the software that would allow us to be able to do that. PingOne is a technology entity, and they have created a

program that allows for an automated review of individual, like for instance, all their documents, the -- does a liveness testing for the opportunity to be able to identify if a person is real location where they're at, a -- a -- a large volume of services.

Q. Does that relate to investigations into terrorism?

A. Not necessarily, no. It really has to do with fraud, theft, waste and abuse. One of the key things there is, of course, is whether or not that the individuals, you know, are real. I mean, there's ghost students are -- are a problem. There's a variety of other different fraud aspects of this, and so I was seeking software to be able to deal with those things.

Q. Ghost students, meaning you think schools might fabricate the number of students they have and then receive funds that they weren't entitled to?

A. Yes. And there's also homeschooling in that where individuals can identify children which have very little information, you know, that's available. So these are all means by which -- you know, that issues that have arisen in other states that provide voucher programs such as Florida and -- and Utah, that these are ways in which that they can be searched out and -- and uncovered.

Q. Number 5 said, "Create a program integrity team

with TEFA program for in-house investigations and reviews of schools, vendors, and participating, parents, and families."

Did I read that correctly?

A.   Yes, uh-huh.

Q.   What is the integrity team supposed to be doing?

A.   Just that, find fraud, theft, waste, and abuse and work through it.

Q.   All right.  It says underneath that under the bulleted point, "Fraud, theft, waste, abuse, or other wrongdoing."

Do you see that?

A.   Uh-huh.

Q.   What is the other wrongdoing?

A.   Well, that's a catchall phrase for anything that we can't really just think of at the -- at the current moment because I -- you know, the -- in, you know, the -- the question about other related law, that -- that could be a lot of different things and we can't think of all of the potential options.

Q.   I want to jump down to Number 7.

A.   Uh-huh.

Q.   It says, "Gather all information concerning reports or TIPs that specific schools or vendors may be

disqualified from participating in TEFA under TX Ed Code Section 29358(h) and place in secure drive."

Did I read that correctly?

A. Yes, you did.

Q. Did that happen?

A. Yes.

Q. Where is it?

A. It's on the website of the comptroller for TEFA.

Q. Okay. When you say "it's on the website," is it publicly available?

A. Yes, it's publicly available.

Q. Okay. So as far as Number 7 goes, there isn't anything regarding TIPs that isn't publicly available?

A. That's to my knowledge, yes.

Q. Okay. And so what TIPs are available online?

A. Well, what ends up happening is it doesn't make any difference whether it's the unclaimed property or any division. We have a TIP line because TIPs is the number way in which that you uncover fraud theft, waste and abuse, and so we provide for a line or an e-mail location for people to be able to contact the agency and let them know that they believe that these frauds are occurring.

Q. Well, no, I guess what I'm asking is, is it says here that you gather all information concerning

reports or TIPs, and you're telling me that all of those reports and TIPs are publicly available online?

A.   I -- no.  I --

Q.   And that's -- that's what I'm trying to --

A.   -- I want to --

Q.   -- make sure I clarify because I think --

A.   I misunderstand --

Q.   -- you're answering a slightly different question than I'm asking.

A.   I -- I'm not quite sure.  I mean, under the circumstances, this would be outside -- this would be somebody in the public or somebody that's -- that is employed by one of these entities that would decide that they wanted to report something to the comptroller concerning fraud, theft, waste, and abuse.

Q.   Right.  So let -- let's take a step back because I want to make sure this is clear for the record.

A.   Okay.

Q.   Yeah, I -- I think we had a misunderstanding there.

A.   Okay.

Q.   So number 7 says, "Gather all information concerning reports or TIPs that specific schools or vendors may be disqualified from participating in the TEFA program under TX Ed Code Section 29.358(h) and place

in secured drive."

A. Uh-huh.

Q. All right. I read that correctly?

A. Yes, you did.

Q. Okay. So we've been talking about 29.3058H because that's the one that, as I understand it, the comptroller sent a letter to the AG's office and said, "Hey, can we investigate terrorism under this other relevant law provision"; right?

A. Are we required to --

Q. Well --

A. -- investigate terrorism because that was the -- those were the allegations?

Q. Right.

A. So we didn't -- I mean, we -- we weren't out there running around trying to figure this out. These were allegations that were made and that we were responding to.

Q. Right. But I guess my question for you is, that's what the 29.358(h) is referring to in Subpart 7; right?

A. It would be the -- it would be the first part about the -- the fact is that you no longer qualify.

Q. Okay. So then why does it say 29.358(h)(1)?

A. I -- I -- I don't know. I mean, under the

circumstances that -- you know, the -- the purpose or the -- or -- is pretty straightforward here. We have individual e-mail addresses in which the public and anyone can basically report to us what they feel to be fraud, theft, waste, or abuse, or for that matter, any issue.

We do this on all of our major divisions, including tax and also with regard to unclaimed property, and this program we're trying to do the same thing. In the case that it could be, you know, criminal, we need to be able to make sure that it's in a secure place in order to be able to save that for -- and I guess we're still in the process of trying to figure out, is our CID division going to be the one that's going to be working this? Because ultimately you have to have a secure chain of, you know, in order of -- for this information and that's what we're trying to gather.

Q. Well, that's what I'm trying to figure out. So it says, "Gather all information." So has information been gathered?

A. I don't know of any -- at this time, I don't know of any TIPs or anything that -- that has been communicated as of right now on that particular website.

Q. Okay. But there is a website out there for people to report things?

A.   Yes, sir.  It's -- it's -- yes.

Q.   And if somebody wanted to go report tomorrow, they could?

A.   Yes.

Q.   Prior to this deposition, did you look to see if anything had been reported?

A.   At the time, no.  And I usually get all of the information regarding our individual websites, and I have not seen a report as of yet of any particular activity on that website.

Q.   Okay.  Where's that information stored once it's received?

A.   It's on the comptroller's -- you know, it's on the comptroller system.

Q.   Okay.  Number 8, "Contact author of Middle East Forum article to see if they will provide underlying evidence showing ties between schools, vendors, and forest -- foreign terrorist organizations, transnational criminal organizations, foreign adversaries, gangs, or federal or state criminal activity."

Did I read that correctly?

A.   Yes, you did.

Q.   Okay.  Did that happen?

A.   I don't know if it -- I don't know if it has happened.  That would be in addition to any of the

activity that's -- that's going on now -- I mean, that was going on then, I should say.

Q. Okay. So is there a plan to contact the Middle East Forum?

A. Well, this particular document is -- is still being -- I mean, I don't know. I -- we have not, to my knowledge, made additional contact with the Middle East Forum.

Q. This particular document's being what?

A. This particular document is, you know, still being worked through. We're taking a look at -- of course, at PingOne. There -- there's some other alternatives. We're in the process of working through our budgetary process for the upcoming legislative session and so some of these things are, you know, are subject to change.

Q. Okay. Has anybody said don't contact the author of the Middle East Forum?

A. No.

Q. Okay. You just don't know as you sit here whether that's happened?

A. That's correct.

Q. Why does the Comptroller's Office need underlying evidence from the Middle East Forum?

A. It -- if there is any type of credible activity

in the -- in the future, there -- and there has been nothing as of yet that has -- that they have provided to us that has led to any determination that it's accurate to see if there would be something that would be, you know, available that would be applicable. But under the circumstances we've, you know, we've explored what they have. We've have our own researchers that have researched it and we didn't have anything that was there, though.

Q. Which researchers explored it?

A. Lara and -- and Rueben.

Q. They provide you a report?

A. We have the report and you've -- we provide -- produced those reports.

Q. Okay. Number 9 is, "Conduct investigations of schools and vendors that are identified in a credible claim or allegation that potentially violates TX Ed Code 29358(H), including claims of fraud, theft, waste, or abuse." Is that happening?

A. Well, it's always open. It's always available because that TIP -- TIP line -- if there's any available information that comes across that TIP line, but right now it's -- it's premature because, you know, we're just at the process. We have not had any transactions or transfers of funds, so at the present time, there's

really not much activity there.

Q. Number 9 -- or excuse me, Number 10 is, "Compile and evaluate evidence to determine if there's a reasonable objective basis that would necessitate suspension or termination of any school or vendor." Did I read that correctly?

A. Yes.

Q. Are you doing that right now?

A. Not -- not presently, because under the circumstances, again, this is premature. This -- this will come into existence when there is funding. Until there is funding, which would be July 1st, there's no money, no transfer, nothing occurring in which there -- there would be technically fraud, theft, waste and abuse occurring.

Q. Okay. So I want to make sure that the -- the jury's clear on this. So there's no investigation happening because you're -- you have an unfunded mandate to investigate?

A. No, I don't. We have a funded -- I mean, the -- the act itself that underlines the payments for the TEFA program, all that -- all those funds have -- have been provided. So it's not unfunded. It's just the fact is that at the current time there's little or no activity that would indicate that, you know, that there's any

information for -- that would be applicable of fraud, theft, waste, and abuse, and we have no other claims or assertions that would lead us to, you know, to another investigation.

Q. So what happens July 1?

A. July 1 is when the first tranche of 25 percent or more of the funds that go to the individual students that had received the vouchers is paid into their wallets or into their accounts.

Q. So what does that have to do with investigations?

A. Well, at that particular time is when you have the opportunity for the -- for the owners of those wallets, the parents typically, in order to be able to make a determination as for what they want to purchase, what they want to buy from the Odyssey -- I guess, I'll use the Odyssey store in which that all of the services and the products are available to be purchased.

And so at that particular time, you begin the process of taking a look at, you know, what transactions are occurring, seeing if there is fraud, theft, waste, and abuse. In the interim, there's also the possibility of looking at individuals and -- and backgrounds with regarding the scene, making sure that their account -- that their 1040s and other documents

that they provided, there -- there isn't a situation where you have a possible question about whether or not that their monies that they're seeking for -- like say, for instance, a disabled student, that they don't qualify or that if something sticks out or comes out as a result of what ultimately will be run through an audit or run through a, you know, a PingOne type of program. If there's something that's there that'd be able to be investigated in the future, we'll -- we'll have the opportunity to be able to do that.

Right now, we have only sought the PingOne as a -- as a potential vendor. We have not issued a request for proposal, and we have not as of yet done anything in order to be able to acquire those because we're talking with DIR, the Department of Information Resources, as for what potentially may be available, you know, through them before we take a look at PingOne and some other options.

Q. So I guess I'm a little confused. This morning I heard you testify -- and correct me if I'm wrong, but I thought I heard you testify that the whole reason that you used the TEPSAC and TEA list was that you wanted to be a -- a quality control check to make sure that applications didn't go out to schools that were obviously or potentially not qualified to apply; is that right?

A.    Yes.

Q.    Okay.  But now you're telling me that you're only going to do post-hoc investigations after parents actually receive money instead of doing it now before the money's actually funded.  So why the differential treatment?

A.    Well, the differential treatment is -- is, as I indicated, that there's no funds going anywhere.  There's no funds that are going to go to any schools, there's no funds that are going to go to any person's individual wallets or accounts, there's no -- no financial transactions until July 1st.

And so, therefore, you know, other than the possibility of somebody either erroneously or potentially fraudulently identifying that they, you know, that they qualify for this program and do not, that -- that -- you know, the information or the ability to be able to acquire evidence and -- and, you know, without the transactions that are underlying it is pretty much impossible.

Q.    So you don't think you can investigate whether there have been fraudulent documents from parents right now until they actually get money and start spending it?

A.    That or until we have the opportunity to be able to get a Ping -- the PingOne type program.  The

reason for that is that it has the ability to be able to review driver's licenses. It has the ability to be able to review, you know, passports and be able to validate whether or not that those are real passports.

We also have the -- would also have the ability to be able to do one-on-one communication directly with the -- the applicant and have the opportunity to be able to compare the -- those government documents with their real liveness self and be able -- so it's a -- it's a -- it's an identification program that allows for us to be able to verify in those particular regards.

Q. Is there any intent -- anything stopping you right now from investigating terrorism-related accusations based on funding on July 1?

A. It -- it -- it -- it would depend upon if you -- if we received some type of a -- a claim or some type of an assertion.

Q. Well, that's what I'm asking. Is there anything out there right now that you're just not investigating because you're waiting for some other service to come into place or some other funding mechanism to trigger?

A. No. We -- we looked at the individual lists and cross checked with what the information we had and

made the determination all these schools qualified under 29358.

Q.    Just so I'm clear, Number 8, you don't know if anybody's reached out to the Middle East Forum?

A.    I do not know at this time, no.

Q.    Okay.  So what if somebody reaches out next week and Middle East Forum sends them the support for their article?  Is that going to trigger another investigation or are you going to say, well, we've investigated the Middle East Forum article, now we're done.  We're not going to reopen that?

A.    Well, we've already did.  We've -- their information that's within the article and that which we've researched, you know, which goes beyond that article, it pretty much summarizes that -- that -- you know, that what -- who these individuals are.  So unless there is a TIP in which that's something brand new, you know, and that could be with anyone, that would justify a, you know, a complaint.  But the difference is, is that under that circumstance, that individual would be under 28385, so that individual -- 3585, and so that individual would go through the entire process of which that there would be notice and reason to be able to produce the evidence and have due process.

                MS. NAJAM:  Objection; form -- sorry.

Objection; nonresponsive, not -- not objecting to Eric's form.

Q. (BY MR. HUDSON) To be clear do you believe that the comptroller has discretion to suspend education service providers pending a determination of whether they're violating 3855?

A. I don't know because I don't know what -- I mean, there's a -- there would have to be evidence to be able to substantiate it.

Q. Understood. But does he have authority to suspend them pending the investigation in due process?

A. No. He would end up making a determination before that would occur. So he would provide notice of that violation and that would trigger the -- the process.

Q. Well, you say trigger the process. Isn't the first part of the process that the entity is suspended once they've received the notice?

A. But again, the comptroller would have to have evidence and proof and -- and that's the reason and give the notice as to why there was the termination --

Q. All right. So let's --

A. -- or suspension.

Q. And that's where I'm headed. So let's talk about that. So walk the jury through how this process plays out. The comptroller gets evidence of some sort.

Does he first alert the target entity that he has the evidence and he's considering it?

A. I -- I guess it, you know -- I mean using a scenario, you -- you -- let's say that there is a TIP that's reported on the line that there is a fraud, that the fraud is occurring within the purchasing of, for simplicity's sake, LEGOS, and they're buying LEGOS that -- you know, that -- in order to be able to resell them on the market to the extent that, you know, we have the information in-house to be able to establish that -- that the LEGO purchase had occurred, that there was -- and that we had the ability to be able to explore using, I guess, our CID or another law enforcement type agency that -- that there was a transaction that occurred that there -- on social media that there was a -- a eBay, that there was a sale by this particular individual, no.

I mean, at that particular notice we would have the -- all of the evidence that we would need to be able to produce that to the individual. We would provide notification that we believe that it was fraud, that we would indicate at that particular time what we believed that would be the appropriate response, whether it be that person repay the program for the LEGOS, or whether that individual was going to be -- you know, was going to be suspended, or whether that individual was going to be

terminated.

MS. NAJAM: Objection; nonresponsive.

Q. (BY MR. HUDSON) So I want to make sure I'm walking through the actual statute here because my issue is -- go to Page 172 for me.

A. Sure.

Q. So this is on P3 -- Exhibit P3 at Page 172. This is Section 293585. Do you see that?

A. Yes, sir.

Q. Okay. It says under Subpart A, "The comptroller shall immediately suspend a pre-approved education service provider or vendor of educational products on a finding that the provider or vendor is ineligible under this subchapter for participation, or has failed to remain in good standing by complying with a program requirement under this subchapter or other applicable law."

Did I read that correctly?

A. Yes.

Q. Okay. So comptroller has no choice, he has to suspend them if he makes that finding; right?

A. I think that if you take a look at 2C1, it basically says that, "The suspension under this section, the comptroller shall immediately send notice of the suspension to the suspended provider or vendor and each

certified education assistant organization by first class or/and e-mail, the notice must include a statement that, one, specify the grounds for suspending the provider or vendor." And so again, you have to make a determination before you apply this.

MS. NAJAM: Objection; nonresponsive.

Q. (BY MR. HUDSON) I'll -- I'll piggyback on that objection. My question is, does the suspension come before, or after notice the target of the suspension?

A. The suspension would come after notice --

Q. Okay.

A. -- or contemporaneous with notice.

Q. Okay. So I get a letter in the mail saying you're suspended. That's the first time I hear it as a target entity; right?

A. It -- well, it -- it -- there's a -- you know, again, there's a -- there's options that are made whether or not that you -- that we're asking for the money back, whether or not that we're asking for -- we're -- you know, we're asking for the individual to be suspended or that the individual potentially be, you know dismissed. But at the end of the day, we need to have evidence and we need to have a determination for, you know, for that suspension before this even goes into effect.

MS. NAJAM: Objection; nonresponsive.

MR. HUDSON:  I second that.

Q.   (BY MR. HUDSON) Subpart B says, "A payment may not be made from a program participant's account to suspend a provider or a vendor," right?

A.   Uh-huh.

Q.   Okay.  Contemporaneously, notice of the suspension with the finding is the way this is going to play out in practice is the comptroller's going to make a finding, then send a letter to the target entity without a chance to respond before the suspension decision's made; right?

A.   We've got 30 days to be able to respond.

Q.   Well, that's not my question.  So I want to make sure that the jury's clear on this.

A.   Uh-huh.

Q.   From the time you get a TIP to the time you send the suspension letter, is there any point in there at which you reach out to the target entity and say, we are investigating you, come respond to this before we make a decision about suspension?

A.   There's a possibility that may occur.

Q.   Okay.  But there's nothing in the statute that requires it?

A.   And there's nothing in the statute that prevents it.

Q. That's right. So is there some written policy that says the Comptroller's going to do that?

A. Not to my knowledge.

Q. Are you aware of any intent by the Comptroller's office to give an opportunity to respond before suspension decisions are made?

A. Not at this present time because we still haven't gone through this particular process.

Q. Okay. Now, let -- let's give the jury an example. If -- well, let -- let's talk about the timeline here. So the -- the lotteries occurred; right?

A. Yes. The lotteries occurred for Tier 2.

Q. So Tier 1 and Tier 2 have been done; right?

A. All of the -- all of the individual vouchers have been released, yes.

Q. Okay. And there's not going to be a Tier 3 lottery; right?

A. That's correct.

Q. Now, I -- I want to make sure I settle this. There are only four tiers; right?

A. Technically, there's a fifth, but you're right, there's four tiers.

Q. Well, when you say technically a fifth, what does that mean?

A. There's some ability to be able to provide for

additional monies and activity for special education students.

Q. But there's not a -- a fifth actual tier --

A. Correct.

Q. -- that -- that's going to be running a lottery.

A. That is correct.

Q. Okay. All right. So July 21, the wallets -- and I'm -- I'm referring to them as a wallet because I think you used that term earlier. I think -- I think that's the nomenclature I've heard, but --

A. Yeah.

Q. I want to make sure the jury understands. When we're talking about wallets, we're talking about the Texas Education Freedom Account -- well, let -- let's take a step back, because I -- I want to make sure the jury understands this. Here's my understanding, and you tell me where I'm wrong. The Texas Education Freedom Account lottery, what it actually awards is an account to the individual who applied from the household, and then after that is awarded through the lottery that can be funded on July 1; right?

A. If the individual identifies the school by June 1st and the school responds back by June 15th, that -- that school -- that student has been accepted. If a

individual has not selected a school by July -- by July 15th, then or -- or -- I said select one by July 15th, that's the final date in which you can select a school, then the school has the approval and -- provides us with notice on July 31st. And if that's the case, the funding will occur in the first two weeks of August --

Q. Okay.

A. -- for 25 percent of the total amount, and then in October 1st is the 50 percent, and then from June, I believe it's -- it's -- the following year is the remainder.

Q. Okay. All right. So let me throw this -- this at you. Let's say July 31st comes, school opts to allow in student with TEFA account, and on July 31st, TIP comes into the Comptroller's Office and says, that school that just let that kid in, here's a brand new set of documents showing that they're related to the Muslim Brotherhood and the investigation's done internally with no notice to the target school, and then the suspension letter comes the next day. Once that school's suspended, what happens to the child that enrolled in it?

A. Well, there's a -- but I mean, I guess you're -- you're jumping a potential tier, and that is is that if we have all of the proof and the proof is valid, the fact that a school belongs to a Muslim Brotherhood, a

determination has been made that the evidence supports that, you know, beyond a reasonable doubt or a shadow of a doubt, I'm not sure because we still haven't set a determination as of yet because we haven't experienced this process, then there's -- I -- if we don't have the information inside, the comptroller does have the authority to be able to audit the individual received notice at that particular time, and -- and so there would be the notification as to what the findings of that particular audit are.

Q. So let's assume that the suspension letter does go out --

A. Okay.

Q. -- and suspends the school. What happens to the kid that enrolled in that school?

A. If the school is no longer valid in that it can no longer participate in the program, that individual student would need to transfer.

Q. Now, the school could respond within 30 days after the notice of suspension, but during that 30-day period, the child wouldn't be allowed to enroll in that school; right?

A. No. The child would still be, you know, involved in the school. The school wouldn't be necessarily receiving any money at that particular time,

but again, depending upon the timing for the payments and a variety of other different things, that payment may be suspended during this process.

Q. So the school would have to basically eat the cost until it got finished with the investigation?

A. Not necessarily. The school may be paid in advance, or the fact is, is that the school would, you know, to the extent that there would be some withholding within 30 days the -- that payment would be made.

Q. So there could just be a spectrum of impacts on the school depending on the circumstances?

A. But the -- well, in your scenario, the fact is that the individual school has been found beyond a -- you know, beyond a reasonable doubt as being, you know, engaged with the Muslim Brotherhood, or for that matter, taking any other activity that would, you know, disqualify them because we couldn't contract with a school that is -- you know, that is engaged directly with the -- or participating directly with the Muslim Brotherhood.

MS. NAJAM: Objection; nonresponsive.

MR. HUDSON: Seconded.

Q. (BY MR. HUDSON) My question's a little bit different.

A. Sure.

Q. My -- my hypothetical is you get the TIP, you make the call, there's no notice to the school until after the kid's already enrolled. You make the decision to suspend the school and you're telling me there could be any number of things that the comptroller could do --

A. Right.

Q. -- at that point, but the fact remains that the school would be suspended; right?

A. It depends upon, again, the evidence that -- that is presented.

Q. So we just don't know because we don't know what specific evidence, but it could be a variety of things that could happen. Fair?

A. Well, there could be a variety of things that happen, I mean, but again, that -- that would accomplish -- that would be complicit with virtually every potential option.

Q. And we don't have any written policies about that yet, because as you said, we just haven't gotten to that point?

A. We're -- we have not gotten to a point where we have identified any particular schools that -- or individuals or vendors that would be disqualified and so we're still in the process of building this out.

Q. Okay. And I believe you said that you don't

know if it's going to be shadow of a doubt or reasonable doubt. What are you referring to there?

A. A standard of -- of the burden of proof.

Q. Yeah. Well, burden of proof -- I guess, burden of proof usually applies on an adversarial proceeding, but you would agree with me that until the suspension notice goes out, there's no adversarial conduct happening at the Comptroller's Office; right?

A. That's correct.

Q. Okay. And so --

A. I guess that my point going, being is, is that depending upon whether or not it's criminal in nature, you would end up providing that information to the, you know, to the -- to the police. If it was civil in nature, it would be a difference, you know, a level of proof. And so, you know, to the extent that that would apply, again, still in the process of building this out, I wouldn't be able to identify which one would be applicable.

Q. So you're still debating on whether to apply a civil burden of proof or a criminal burden of proof to TIPs that you get about particular schools?

A. Depending upon the nature of the TIP, yes.

Q. Okay. When do you guys plan to have those roles?

A.    We're in the process of trying to work through these.  I mean, you know, right now we're focusing in on funding.  I mean, as you've identified, there's only a handful of people that are developing this entire program.  It's like building a 747 in flight.

Q.    So do you have to go through notice and comment on your rulemaking before it comes into effect?

A.    Yes, sir.

Q.    Okay.  How long is that?

A.    How long is what?

Q.    Notice and comment period.

A.    It would -- to a certain extent, it depends, because depending upon the nature of the comments that are made, the number of comments that are made, but I do not know the exact number of days that -- that maximum it could be.

Q.    Okay.  But you have to go through notice and comment before you can put the rules into effect; right?

A.    Yes, sir.  And publication.

Q.    Do we have any timeline on how long it's going to be before you even have a set of rules to put out for public notice and comment?

A.    I don't know at the present time exactly when that will take place.

Q.    Is it going to be before or after you start

funding TEFA accounts?

A. Preferably, hopefully before.

Q. Okay. But we don't know.

A. At the present time, we're working through that -- that process.

Q. Okay. So before the rules are put in place, I guess, do you have any kind of working rules that you intend to apply?

A. Not at the present time.

Q. Well, what happens if you get a TIP tomorrow that says the Muslim Brotherhood's running a school in Texas? Like, what -- how are you going to handle that?

A. Well, then we have to reprioritize the limited resources we have to be able to deal with that.

Q. Okay. So the answer is we don't know as we sit here?

A. It's -- yes, on a case-by-case basis.

Q. Okay. So at the discretion of the Comptroller's Office?

A. It's on a case-by-case basis, and depending upon what the nature of the claim is. It might not be the Comptroller's Office at all.

Q. Okay. I'm going to hand you what I'm going to mark as P7. Let me know when you're finished.

MR. HUDSON: While you're looking at that,

for identification purposes, this is CPA 19 through CPA 62.

(Exhibit P7 was marked.)

A. Yes, sir.

Q. (BY MR. HUDSON) What is this document?

A. It's a document of the eligible schools that may apply and join the program on a rolling basis as of April 1st, 2026.

Q. All right. So these are schools that were -- had received links?

A. No. These are schools that either they -- the application or links were sent and no action was taken on the application, that's where it says not started. To those individuals that are rolling on, those are the ones that are in progress where the application has been started, the links have been filed, but there has nothing been submitted.

Those that are -- there have been those that are denied where the application has been submitted and it's been reviewed, but they don't qualify under the basic premise -- or the basic requirements under 29358. There's disabled where you end up having a duplicate account or a school withdraws or becomes ineligible or, if that matter, no longer exists and then you end up having it deleted in which the -- in some cases, they ask

us to delete the account because they have filed -- they have failed to be able to qualify and so they're going to want to resubmit.  There's a few schools that, as I talked about earlier, where they had been prematurely added to the TEPSAC list and that will qualify at the end of the school year for two full school years, and so they've asked that their account be deleted and that so that they could reapply fresh.

Q.   Deadline to apply as a school for TEFA for the 2026-2027 school year is when?

A.   I'm sorry.

Q.   What is the deadline for schools to apply for the 2026-2027 school year?

A.   Well, it's on a -- on an ongoing rolling basis, but the -- the last date in which that -- that would be available would be July 15th of -- of this year.

Q.   Okay.  I understand it's on a rolling basis, but I'm talking about for the '26 -- as a practical matter for the '26-'27 school year, and why is the July 15 deadline a functional deadline for the '26-'27 school year?

A.   Because that's the last date in which that an individual that has been granted a voucher would be able to make a determination as to the school, be admitted to the school, and then identify the school, and that -- and

that if they -- and that on the 31st, would be the date in which that -- the school would validate the fact is that school -- that student has been accepted.

If that student has not been -- has not done any of the actions that has not identified a school on July 15th, or subsequently they -- they identify a school but that school does not, you know, agree to accept that student because there's that entire process, then what would end up happening is that student would lose the voucher and a student that is on the -- you know, on the list waiting for that particular voucher, the first one would come off that wait list and take that student's place.

Q. Okay. This is probably a good time. I -- I know the -- the Court's asked several times about timelines here, but we have lottery done; right? So we have Tier 1, Tier 2, those are closed; right?

A. Those are the only two, yes.

Q. And Tier 3 is not happening, Tier 4 is not happening?

A. That's correct.

Q. Now, there's not a world in which enough kids roll off, either aren't accepted or don't want to do private school and now we're going to have enough money to go into Tier 3. There's not going to be a -- a Tier 3

lottery for the '26-'27 school year.

A. Not to my knowledge. Basically, what ends up happening is the wait list is a priority list of those individuals that were collected after in Tier 2 and to the extent that those would be -- you know, would go -- be gone through there's a possibility -- although negligible, that there's a possibility of it reaching Tier 3, but not likely.

Q. Well, so as I understand the wait list, and I want to be clear for the -- the Court and the jury here, the wait list is for the account itself, not the funding; right?

A. Yes. For the -- for the -- for the fact is that the individual student's been selected for the voucher, yes.

Q. Right. So there's a possibility that the wait list in terms of getting an account in the first instance, there's a world in which that theoretically could reach Tier 3 for the '26-'27 school year?

A. That's correct, but it's unlikely.

Q. All right. Now, that wait list only moves up if the children in front of whoever's on the wait list either doesn't receive or doesn't accept the funding.

A. That's correct.

Q. Okay. Any significance to the program of

June 1?

A. June 1 is the first date in which that individuals can identify -- or that individuals would identify a school so that on June 30 -- June 31st, they would have the opportunity to be able to identify -- the schools would be able to identify the fact that the student has been enrolled and accepted so that July 1st would be -- it would be the first time that those funds would be available in their wallet. For those students that are delayed that have -- that wait until July 15th, that would be, as I talked about before, would be in -- it would be in early August when those would be funded.

Q. So June 1 is when we open for schools that are already on the -- the TEFA program; right?

A. Well, I'm --

Q. Well, in other words, you can't select a school that's not on the list as the school that you're going to attend. Fair?

A. Oh, well, you could wait all the way until -- until the schools later on, all the way until technically July 15th.

Q. Okay. So you don't have to pick your school on June 1, but, I guess, my -- my question's a little bit different. If you're not on the list on June 1 as approved through Odyssey, a student who has received a

Texas Education Freedom Account cannot select your school as their school; right?

A. As of June 1?

Q. Yes.

A. That -- that is correct as of June 1, yes.

Q. And as the rolling approvals keep coming, you might be able to select them later in the process up to the July 15 cutoff, but the July 15 cutoff is for the children to select the school; right?

A. That's correct.

Q. Okay. So we have a window of June 1 to July 15 in which you can select a school that has been approved on the TEFA list?

A. No, technically you've had until, you know, from February 4th as these schools have rolled on all the way through July 15th in order for that to occur.

Q. Well, so to the extent that we're talking about the actual selection process, so what does June 1 mean? Is that the first date that you can actually select?

A. No, it's the date in which that in order to be funded by -- on July 1st that you identify the school so that it can be, you know, accredited and valued and identified by the school as you having been meeting -- you know, gainfully enrolled.

Q. Okay. If I select my school on June 30th, can

I still get funded by July 1st?

A. If you -- if you selected on June 30th, no. Typically, no.

Q. Okay. So explain to the -- the jury how the funding works as kind of a waterfall, so to speak, because if on June 1 -- I've picked by June 1 therefore I get funded on July 1, does it mean that on June 2, if I select, I'm going to get funded on July 2? How -- how does this work in terms of the funding?

A. Well, it's -- it's pretty straight forward. What you end up having is that if you've had from -- as a -- as a parent, as these schools have rolled on from -- you know, from February 4th all the way until June 1st, you've had the opportunity to select from all of those schools that have been added, that's what I'm saying is the fact is we were anticipating that this is the time period that we had, and then you would have to go to the school itself and seek to be able to be admitted into the school and do whatever is necessary in order to be approved and admitted by that school.

Once you got that verification, then you would identify that on your -- on -- on the electronic form -- your application. And then the -- let's say that you did that on June 1st, then the school would have to validate the fact is that you have applied -- that you

have been accepted on July 31st or by July 31st in order for you to qualify for that first, you know, funding, which would be 25 percent of the amount, unless you're homeschooled then you get the full amount on, you know, on, on July 1.

If you had missed that June 1st date, then you would have somewhere between, you know, June 1st or June 2nd and July 1st, you would have that time period again. Let's say that you went to a school, the school denied your application, you need to go to a second school. You go to that second school and get the application, or for the first time your -- your son has been or daughter's been, you know, questioning between a couple schools, they finally choose it on June 2nd. Then what would end up happening is you would have to -- you would report that before or -- on or before July 1st or July 15th in order for the school to be -- validate your application and that you've been accepted on July 31st, and so then you would be funded, as I indicated, in the first or second week of August.

Q.    All right.  Let's take a look at P7.

A.    Okay.

Q.    So is this list, as of today, complete and accurate?

A.    Yeah.  The date is as of April 1st 14 -- you

know, at 14:45 hours, 2:45 in the afternoon, I believe it's accurate as of that date and time.

Q. All right. Has this list changed since then?

A. Yes, it significantly would have, given the fact is -- that there are some that may have started, there's those that have in progress may have been completed, those that denied may have reapplied, those that are disabled. Well, there -- those would not be, unless the school withdraws and then comes back or the school closes. For those that are deleted, they may come back on, but otherwise they would -- you know, with the new applications I indicated before, otherwise they -- there would be still a remain that it says deleted.

Q. So would it be fair to say that this information is not static, it's currently dynamic as things are moving through the system?

A. All information is -- is dynamic going through the system.

Q. Okay. I'll hand you what I'll mark as Plaintiff's 8.

MR. HUDSON: For identification purposes, this is CPA 329 through CPA 330.

(Exhibit P8 was marked.)

Q. (BY MR. HUDSON) So Mike Platek works with Odyssey; right?

A.    That's correct.

Q.    And I believe you said Mr. Platek is somebody who works underneath COO Daniel and his last name escapes me, but the CEO -- the COO that we discussed earlier?

A.    Yes, sir.

Q.    Yeah.  You'd agree with me that Odyssey is able to send school application links?

A.    Yes.

Q.    They maintain and operate the provider portal?

A.    Yes.

Q.    Odyssey can market schools participating?

A.    No.  In -- in part because of what they do, but Outschool, I believe, is the name of the company that provides the information as for where to locate the schools and school finders and performs outreach for that information.

Q.    What's the name of that company?

A.    I believe it's Outschool.  I can validate -- I can verify the name of that.  It's a - it's a third-party provider that works under Odyssey.

Q.    Okay.  Odyssey can disable a school from the portal?

A.    Disable, yes.

Q.    Okay.  And when I'm saying portal, I want to make sure the jury understands, there is an online, well,

for lack of a better word, portal where schools are able to go log in and handle all of their application materials after they've received the application link; right?

A.    Yes.

Q.    Okay.  And that's the application portal that Odyssey operates as a third-party vendor for the Comptroller's Office?

A.    Yes.

Q.    Okay.  Now, Odyssey is able to and does communicate directly to schools; right?

A.    Yes, through their customer service.

Q.    And Odyssey also communicates directly with the Comptroller's Office about school documentation?

A.    Yes.

Q.    And Odyssey reviews submitted school documents?

A.    I'm sorry.

Q.    Odyssey reviews submitted school documents?

A.    Some it does, yes.

Q.    Odyssey advises the comptroller on whether submitting documents were sufficient; right?

A.    Or whether -- yes, whether there's an issue with them, yes.

Q.    And Odyssey's actions affect whether parents can select schools; right?

A.   It depends.

Q.   Well, so that's yes and no; right?

A.   It depends.

Q.   Okay.  What does it depend on?

A.   Whether or not that the school is -- you know, has even applied, whether it's been denied.  There's all kinds of sorts of reasons as to why the school would not appear on the portal.

Q.   Understood.  Let me give you a specific example.  We looked at an exhibit earlier this afternoon where the COO indicated that he didn't believe documents were legitimate; is that right?

A.   And directed it to be reviewed by the Comptroller's Office, yes.

Q.   Right.  So the -- the interagnum between him declaring that documents were illegitimate in that review that delayed adding the school to the portal, did it not?

A.   His -- well, his recognition of the fact is that these are, that -- and for a variety of reasons, that e-mail identified a series of reasons as to why that -- it did not feel like it met the two-year criteria, including the fact that they only produced one year of enrollment that -- that was -- information was insufficient and so he raised that with the Comptroller's Office, yes, the program.

MR. HUDSON: Objection; nonresponsive.

Q. (BY MR. HUDSON) My question's real simple. In that particular exhibit, we saw request went from Mary Stout on March 18. On March 24, the COO indicated that he didn't believe the documents were legitimate; right?

A. That was one of the -- one of the conditions, yes.

Q. Okay. And so six days passed and the particular school, which I believe was HQA Katy, was not added to the list; right?

A. I didn't -- I believe that might be correct.

Q. Okay. Well, we don't have to believe that, we can just look at the exhibit.

A. Yeah. Because I'm not sure how long it took to be able to resolve that one issue.

Q. I think you might have it over P5 next to you.

A. Okay. Here we go.

Q. So Daniel Warner was the COO and we have a date on P5 of March 24. March 18th is when the request went to Ms. Stout. So it would be fair to say that at least for six days, HQA was not added to the list because there were concerns about documentation?

A. Between the 18th and the 24th, yes.

Q. Okay. So I'll ask it again, Odyssey's actions can affect whether parents can select the school; right?

A. Well, if it's not on -- if it's -- it's -- if it's not on the system because the -- because it doesn't -- hasn't qualified yet, I know it can't. I mean, it -- it's not going to be on the system.

Q. All right. Okay. Okay. Let's go back to P8, if you would.

A. Yes, sir.

Q. So this e-mail from Mike Platek to Mary Katherine Stout I'm going to read it, follow along. It says, "Hi, M.K., I have confirmed that all of these schools have been disabled in Odyssey. I found an additional explorer location in McKinney that we've also disabled."

Did I read that correctly?

A. Yes.

Q. Okay. The date on this is January 29, '26. Do you see that?

A. Yes.

Q. And it's says (inaudible) schools to remove temporarily; right?

A. That is what is stated there.

Q. Okay. And the subject line would have originally come from Mary Katherine Stout per her e-mail on January 28 below that one; right?

A. Yes.

Q. So Ms. Stout writes particularly about Bayaan Academy, "This is an MSA school that has been brought to our attention as having potential ties to foreign terrorist organizations."

Did I read that correctly?

A. Yes.

Q. Okay. What is an MSA?

A. MSA is the -- in this particular instance, the Bayaan Academy was -- you know, was admitted because it's a middle states accreditation and it did not identify the fact as it was one of the Cognia schools, and so this was brought back in because of two reasons. One, it was a Cognia school, and two, that there was some accusations made against that particular school.

Q. So this e-mail doesn't say anything about Cognia, does it?

A. This particular e-mail does not.

Q. Okay.

A. It just identifies the fact that it is an MSA school, which is -- which is the reason why it was not caught earlier.

Q. Okay. Now, she says it has potential foreign terrorist -- ties to potential foreign terrorist organizations; is that right?

A. Yes.

Q. Did the Comptroller's Office investigate that?

A. Yes.

Q. What was -- what was brought to the comptroller's attention?

A. The -- the -- there was several issues that are all in the report that was talked about the Bayaan School. Those were the accusations that were made. Again, the process was concluded in which that those accusations were found to be not incorrect and so the school was admitted.

Q. Okay. Which report are you talking about?

A. The Bayaan Academy report. I mean, it's the -- in the review as for the public information regarding Bayaan Academy.

Q. So when you say that the report brought it to the attention, so are you talking about the report that was created by the Comptroller's Office?

A. Well, the first -- going back twofold. First, is that one of the key things that identified this was the fact that it was a Cognia school, and we did not know that identified a school if it had been identified upfront as being duly, you know, accredited, it would have been caught up in the original Cognia schools and would have been part of that group from the onset. But in addition to that, there were allegations that had been

made that we had collected from public sources and that was the review that was -- that was made, and then evaluated against the foreign terrorist organization. The -- you know, the hostile nations and all of the other lists and the individuals that were identified were not -- were not deemed to be part of any of those lists, and so it was admitted.

MS. NAJAM: Objection; nonresponsive.

MR. HUDSON: Same objection.

Q. (BY MR. HUDSON) So I'm just asking how was it brought to the attention of the comptroller and you told me about a report. So I'm going to show you P9 first.

A. Uh-huh.

Q. Have you ever seen that document before?

MR. HUDSON: For identification purposes, this is CPA 401 through CPA 424.

(Exhibit P9 was marked.)

A. Yes, I have seen this.

Q. (BY MR. HUDSON) And what is that?

A. This is a Middle East Forum document in which that it says, "Hamas officials, family, and affiliates established and staff -- and staff top Dallas Private School." It talks about the Brighter Horizons Academy.

Q. Okay. So is this the report that was brought to your attention that made you believe that Bayaan

Academy had potential terrorist ties?

A. This would have been one of them.

Q. Okay. Where else?

A. I believe that there's other attachments of a similar report or a similar report in which -- that identifies those 36 school and I believe the Bayaan Academy was included in that.

Q. Okay. So there's an additional report somewhere with 36 schools on it?

A. Or some communication, yes.

Q. Okay. So there's some communication somewhere that has a list of 36 schools?

A. Yes. And they are consistent with the, you know, with the Middle East Forum and -- and other communication that we received from -- again, from the representative Troxclair and -- and others.

Q. Okay. You agree with me, P9, the date on that's March 6th of 2026; right?

A. I see -- let's see -- I see -- well, I guess, that's the printing date.

Q. Well, no, the printing date's 4-1-26 is what we're talking about.

A. Yeah -- no, I'm looking at -- yes, March 6th, 2026.

Q. All right. And Ms. -- Ms. Stout's e-mail in P8

is January 29, about a little over a month before this article was printed.

A. Uh-huh.

Q. So you would agree with that; right?

A. Yes.

Q. So this wouldn't be a publicly available source that you relied upon; right?

A. No, I don't -- don't agree under the circumstances there was other information that was brought to our attention.

Q. Okay. That's what I'm trying to figure out. What other information, and by whom was it brought to your attention?

A. Well, I -- well, for one individual is, you know, we did receive information from Sam Westrop, the author of this particular document. As I indicated, we also received information from a variety of sources.

Q. What are the other sources aside from Sam Westrop?

A. Well, there was -- there's Middle East Forum, there is -- Amy Mek has provided some aspects to this which is -- I -- I believe it's the RAIR Foundation that she represents. There was the information that was available on -- on YouTube, and there's information or -- or there's communications through -- you know, throughout

the period of October through December and -- and January regarding the -- this issue as the comptroller was out on the campaign trail.

Q. Okay. Did you preserve any of those YouTube videos that you think tied particular schools to foreign terrorist organizations?

A. Those info -- that -- those were the congressional hearings and it depended upon the time period as for when those hearings took place.

Q. Well, I -- I guess, let me ask you, does the comptroller have somebody that sits in Washington DC and attends hearings at the national congressional level?

A. Not to my knowledge.

Q. Okay. So did somebody go to a congressional hearing in DC to watch YouTube videos?

A. You wouldn't go to a Washington DC to watch a YouTube video, you'd watch it on your phone or, you know, on your device.

Q. Well, that's what I'm trying to figure out. I'm trying to make the connection because you've said that a few times. You said Chip Roy's got something going on up there, you said there's YouTube videos going on at the -- at these hearings. Who is sending YouTube videos to the comptroller that's tying Texas schools to foreign terrorist organizations?

A.   Well, just in general, foreign terrorist organizations and that's -- that -- that's the purpose of the hearings.  And so when you end up having individuals that are communicating to you, orally or otherwise, they identify the fact is that we have the -- we should go out and take a look at this YouTube video --

Q.   Okay.

A.   -- so we would, you know, to the extent that it would be available in some other form we would -- we would have that available, but usually, it's by YouTube video that these are being communicated.

Q.   Did Sam Westrop ever come to the Comptroller's Office and speak with people directly?

A.   Not to my knowledge.

Q.   What about Amy Mek?

A.   Not to my knowledge.

Q.   Did anybody communicate with Sam Westrop by phone?

A.   Yes.

Q.   Who?

A.   I did.

Q.   Okay.  When did you communicate with Sam Westrop by phone?

A.   It would have been either February or -- yeah, February or March --

Q. Okay.

A. -- of this year.

Q. What about Amy Mek? Who -- has she talked to anybody on the phone at the Comptroller's Office?

A. Not to my knowledge.

Q. Okay. So you said you spoke to Mr. Westrop in February; right?

A. February or March.

Q. Okay. So we're still on January 29 of '26. Where did the terrorist organization information come from that Ms. Stout was relying on in January of '26?

A. It had been generated from the communications that had been occurring October, November, and December, which led to the comptroller asking the Attorney General for, you know, an opinion in December -- on December 12th.

Q. Okay. What communications occurred in October, November, and December to the comptroller in writing?

A. In writing, I believe that, you know, Sam -- Sam Westrop would have provided some information. There would have been any materials that he would have submitted at that particular time. I believe --

Q. When you say he, I want to make sure the record's clear.

A. Sam Westrop.

Q. Okay.

A. And, or the mid Middle East Forum. There would have been communications or, you know, directly or indirectly through individuals because there was people that were submitting, you know, these documents to the comptroller and to the Comptroller's Office in the TEFA program.

One of those would include a -- a -- you know, information that Amy Mek and/or the RAIR Foundation was producing to the extent that there was information that was available on hearings or that -- that would have been available by YouTube, but again, I don't know exactly when the dates of those were and/or for congressional action that was there. And then also related but necessary -- not necessarily unrelated, in June of 2025, the -- excuse me, the FBI and Homeland Security and other federal agencies created an anti-terrorist group that is operating in both Eastern Texas and in Southern Texas in order to be able to look at this particular issue. And then you've got the -- you know, the question that's been raised as a result of the governor, you know, issuing his proclamation as well.

Q. Okay. All right. So that was responsive but also well beyond responsive, so I -- I appreciate that, but I want to make sure that the answer to the original

question is clear.  Are there documents that were submitted in writing or information that was submitted in writing to the comptroller in October, November, December that resulted in him asking for an opinion from the Attorney General's office?

A.  There may have been, yes.

Q.  Okay.  Where are those kept?

A.  Those would be -- well, I -- I mean, those would be somewhere amongst the materials that are more than likely with the FAALS or -- or with our particular division.

Q.  Okay.  In reviewing the materials that have been produced in discovery, the materials that you just referenced, did you see those anywhere in the materials that have been disclosed?

A.  They would all be referenced in the -- the reports because the reports are all -- all the -- that information is public information, and so that public information would relate to anything that we had received prior to that.  So there would be -- you know, there'd be sources of that information there.

MS. NAJAM:  Objection; nonresponsive.

MR. HUDSON:  Same objection.

Q.  (BY MR. HUDSON) I'm going to hand you what I'm going to mark as P10.

(Exhibit P10 was marked.)

A. Uh-huh.

Q. (BY MR. HUDSON) So this is the Bayaan Academy -- Bayaan Academy document.

MR. HUDSON: And here, just real quickly, for identification purposes, this is CPA 679 through CPA 690?

A. Yeah.

Q. (BY MR. HUDSON) Is this the report that you're talking about?

A. Yes, sir.

Q. Okay. Where are the underlying documents that support that report?

A. They're -- I mean, they're -- they're basically -- I mean, they're basically with the researchers --

Q. Okay.

A. -- and/or, you know, some of these are obviously things that we had collected or that we had provided to the researchers based upon the information or the allegations that had been made in order to be able to give that information to the researchers to take what was allegations and summarize it in order for us to be able to look at all the individual relationships in order to be able to make that search on those particular lists,

foreign terrorist list, et cetera.

MS. NAJAM: Objection; nonresponsive to everything past the first sentence.

Q. (BY MR. HUDSON) The report that I have here, which researchers put that one together?

A. I would think -- it appears to me that this would be Reuben Katz with the support of Lara Burns.

Q. Okay. And so Comptroller's Office is pulling things internally and then sending that to Lara -- Lara Katz or Lara Burns and Reuben Katz?

A. In order -- well, ultimately, yes, in order to be able to get a summary of all of the potential allegations in order to be able to compare against those lists, yes.

Q. Who decided what documents to pull and send the researchers?

A. It would -- I know I submitted whatever I had, but I would have been the one that would have communicated with these researchers, to begin with.

Q. How did you communicate with them?

A. By phone.

Q. You ever send them any e-mails?

A. I'm not sure how -- I'm -- I would have had to have sent them something in order to be able to -- in order to be able to get information to them, yes.

Q. Okay. So there's e-mails out there somewhere of you sending things to Lara Burns and, or Reuben Katz?

A. Or somebody potentially sending it that had that particular document, yes.

Q. Okay. Did you hold on to all of the documents that are listed in P10?

A. I'm sure that we would have those available if we don't have them in-house.

Q. Would you expect that your researchers would have held onto them?

A. Yes.

Q. So in looking at P10, is there some sort of a conclusion on here about what to do about the Bayaan Academy?

A. No.

Q. Why not?

A. Because that wasn't the role of the researcher.

Q. Okay. So this report comes back from the researcher. Who gets the report?

A. It would be our group along with Mary Katherine Stout.

Q. When did that report come back?

A. I don't recall exactly when the report -- the date the report came back.

Q. How did the researchers deliver the report to

you?

A. I'm not sure by mail or if they -- or if they e-mailed it. I do not know. I don't remember.

Q. Would anybody have scanned the front of the letter so that we could figure out when this report actually came in?

A. It's possible, yes.

Q. Okay. With regard to the report itself, did -- were these created before or after the March 17, 2026, temporary restraining order hearing?

A. I don't remember.

Q. Who pays your researchers?

A. The law firm does.

Q. Which law firm? Would it be Jackson Walker?

A. No.

Q. Okay. Which one?

A. See, it's -- it's -- it's Garrett, and there's a second individual that is stated. I can get that information for you, but I don't -- I don't remember the name off the top of my head.

Q. Why is a -- it's a private law firm?

A. Yes.

Q. Why is a private law firm paying for researchers for the Comptroller's Office?

A. Because the attorney general has refused to

represent us and has asked and told us that we had to do the investigations and we had to perform all of the functions of an investigation and he directed us to hire outside parties.

Q. Okay. So Murl, you know -- you know, I used to work at the AG's office --

A. Uh-huh.

Q. -- so I happened to have a little bit of experience with approving outside counsel contracts. Did the Comptroller's Office submit a request for approval of outside counsel to hire this private law firm?

A. It didn't have to. The attorney general rejected the representation at that particular time.

Q. All right. Did an RFP go out for law firms to step into the role for which this law firm you're referring to is currently sitting?

A. No.

Q. How did you find this particular law firm?

A. It was by -- it was -- it was -- it was basically by reputation as to the information of individuals that had this particular expertise. So we had sought -- we asked the researchers because we found the researchers first a particular entity that would be able to assist us in -- in developing, you know, the particular review that we were talking about earlier.

Q. Okay. So the private law firm pays the researchers and then the private law firm bills the comptroller directly?

A. Yes.

Q. Okay. So there should be a bill somewhere that says researchers 5,000, or do they actually require the researchers to bill their time too?

A. The researchers bill their time as well.

Q. Okay. So we would be able to take those bills and figure out when they were working on this report; right?

A. Possibly, yes.

Q. Okay. I'm going to hand you what I'm going to mark as P11.

(Exhibit P11 was marked.)

MR. ROOSIEN: Do you have an extra copy of 10?

MR. HUDSON: I'm sorry?

MR. ROOSIEN: Do you have an extra one of 10?

MR. HUDSON: I -- I don't think so, but we're happy to make a copy during the break.

MR. ROOSIEN: Yeah. I'll -- I'll -- I can do that.

MR. HUDSON: But it -- again, it's CPA 679

through CPA 690.

MR. ROOSIEN: Okay.

Q. (BY MR. HUDSON) Have you ever seen that document before?

A. Yes.

Q. Okay. I want to go ahead and make a correction here. I -- I have led you astray in the -- in the questioning, you've been kind to -- to say yes and not correct me, but we have at 9 and 10, Mike Platek is actually the COO of Odyssey and Daniel Warner is the state director for Odyssey. I've been referring to Daniel Warner as the -- as the COO, so does that change any of your testimony this morning?

A. No, sir.

Q. Okay. Are -- are you good with that clarification because, my apologies, I have been referring to them -- referring to him as that?

A. No problem. No, I have no objection.

Q. Okay. I want to turn your attention to Number 22. Sam Westrop, you have listed as an outside source.

A. Uh-huh.

Q. What does that mean?

A. Is the fact is that he's been producing or providing the information from himself and the Middle

Eastern Forum as well as spring as -- as well spring schools.

Q.    Do you know what Mr. Westrop's background is?

A.    I do not.

Q.    Did you ever ask him?

A.    I understand that it -- that he's been a researcher for a number of years, that -- that he's an -- appears to have represented himself as an expert, but I do not personally know him, no.

Q.    Okay.

A.    I can also see a -- a mistake in -- on 21.

Q.    Okay.

A.    It's supposed to be Ali Andrews, other former OAG member --

Q.    My brother used to work with her.  She's great.

A.    Yes.  And so that's -- that's who that is, not Ally Andres.

Q.    I -- I appreciate the correction.  Thank you. Let me go ahead and hand you what I'm going to mark as P12, 13, and 14.

MR. HUDSON:  For identification, P12 is CPA 572 through CPA 586.

(Exhibit P12 was marked.)

A.    There seems to be two things that are changed here.  One is the honor roll of the Spring Education

Group and the other is ISF textbook series.

Q.   (BY MR. HUDSON) Right.  And this is just a copy of it.  So we have on the one side on CPA 572, that's the ISF textbook series; right?

A.   Uh-huh.

Q.   And then we go into the Primavera stuff.  And I'll just tell you, I'm not going to ask you about Primavera because I'm not interested in that, but this was attached to the ISF textbook series --

A.   Okay.

Q.   -- which is why it printed out that way.  So --

A.   Okay.

Q.   Yeah, to be clear, I have zero interest in CCP. So --

A.   Okay.

Q.   -- Exhibit 12, ISF textbook series, is this a report from one of your researchers?

A.   I believe it's actually a last page of a report from one of the researchers, yes.

Q.   Okay.  Do you know which researcher put this together?

A.   I believe it would have been Reuben Katz with -- potentially with the assistance of Lara Burns.

Q.   Do you know what Reuben Katz's background is?

A.   I know that he's a researcher of individuals

that are -- have relationships with foreign terrorism or transnational criminal syndicates and -- and hostile nations. Same with Lara Burns, both of them have extensive knowledge on both subjects.

Q. I'm going to hand you what's been marked as 13. I believe this is the front half of that article. I -- I'll just tell you, I don't know why the documents came out that way, but they printed out that way --

A. Okay.

Q. -- in groups. So you would agree with me CPA 561 through 572 is the ISF report from Reuben Katz?

(Exhibit P13 was marked.)

A. That's correct.

Q. Okay.

A. And/or with the assistance of Lara Burns.

Q. Okay. I'm going to ask you the same questions I asked about the Bayaan report. First off, do we have any conclusions about what to do with Islamic Services Foundation in here?

A. No, that's what was determined -- that's what's determined by the Comptroller's Office or the program.

Q. Okay. Any findings in the Islamic Services Foundation?

A. Just the listing of the accusations and identities of the individuals that potentially could be

of interest, in which that we reviewed through the individual lists and found that there was no -- no basis to be able to deny this school.

Q. Okay. As it relates to Exhibit 13 and then the first page of Exhibit 12, just as with the Bayaan report, do you have -- do you have the actual source material for this somewhere?

A. I -- I believe that under the circumstances we could obtain the source material. If we don't have it in house, we could obtain it from the researchers themselves.

Q. Okay. Who would have provided it to them?

A. It would have been the researcher's work. To the extent that we -- it was from the materials that we had received, it would have been myself, and then to the extent that they did the research, it would be the materials that they had at their disposal.

Q. Okay. To the extent that you're sending materials to Lara Burns and Reuben Katz, are you routing this through this private law firm, or are you going directly to these two researchers that you've retained?

A. At the time -- at the time, I believe that when we first were communicating with them, I believe, I presented the material -- any materials to them. Everything else has since gone through the law firms.

Q. How much are you paying those researchers?

A. I don't know off the top of my head.

Q. I'll hand you a copy of what I'm going to mark as 14. Have you ever seen that document before?

(Exhibit P14 was marked.)

A. Yes, sir. I have.

Q. (BY MR. HUDSON) And what is this document?

A. This is document is the report on the accusations to the Houston Quran Academy Incorporated, which is in Katy, Texas.

Q. Okay. Now, I understood you to say that there were 36 schools that were alleged to have foreign terrorist organization ties; is that right?

A. Yeah -- yes, 13 that had foreign terrorist organizations or a transnational criminal organization potential ties or accusations to that, and then there was also the 13 schools that were allegedly related to the CCP.

Q. Okay. How many of the 36 were Islamic schools?

A. I believe -- I believe as of the 36, those were all Islamic schools and 13 were the CCP.

Q. Okay. Where are the other 33 reports?

A. I don't know if they've been asked for in discovery. I -- I wasn't part of the rolling out.

MR. HUDSON: Well, so objection;

nonresponsive.

Q. (BY MR. HUDSON) My question is, where are the reports? Do you have those reports?

A. Yes.

Q. Okay. So there are 33 other reports out there on Islamic schools that look a lot like 12, 13, and 14; right?

A. That's correct.

Q. Okay. And the underlying information associated with those reports would be held by these researchers that you obtained through private counsel?

A. Or information that we transferred to them that we had received before, yes.

Q. Okay. Okay. You would agree that 12, 13, 14, and then the other 33 reports that the Comptroller's Office has care, custody, and/or control over all of the underlying data that is in support of these reports and the other 33?

A. To my knowledge, I believe that's correct.

Q. Okay. Well, it means your law firm that hired the researchers, so you would have control over them; right?

A. That's the conclusion. I don't know.

Q. Not legal conclusion, they're your agent; right? It's usually what happens when you hire a lawyer.

A.   Well, whether they're privileged or not, I don't know.

Q.   Okay.  Do you think Exhibit 14 is privileged?

A.   No.  These are all -- this is all public.  This particular information is public information.  All of this information came from public sources that are identified.  Again, this is a list of all the accusations made against the organization, any affiliations or any persons that would be with the entity.  This particular one has -- the principal has been identified as having relationships with Hamas.  But again, under the circumstances, you know, having looked at the information that's provided, that -- that was not an individual that we -- that we deemed or -- nor this school that we deemed to be not qualified and we -- we, you know, provided the links and their -- their part of the program.

Q.   The --

          MS. NAJAM:  Objection; nonresponsive.  And I'm sorry to keep saying this, but I do want to have time left over after my colleague's questioning.  The question was, is this privileged?

Q.   (BY MR. HUDSON) Of the 36 reports were any of the schools deemed ineligible for TEFA?

A.   No.

Q.   No.

MR. ROOSIEN: Is it a good spot for a break?

MR. HUDSON: Sure. Ten minutes.

THE NOTARY: All right. The time is 3:38 P.M. We're off the record.

(Break taken.)

THE NOTARY: All right. The time is 3:56 P.M. We are on the record.

Q. (BY MR. HUDSON) As it relates to 12, 13, 14, who -- you've already told me that the -- Lara Burns and Reuben Katz created those documents; right?

A. These drafts, yes.

Q. Okay. We call them drafts. Are there final reports out there?

A. Yes. These -- these are the final reports.

Q. Okay. How do you spell Lara Burns?

A. B-U-R -- L-A-R-A, B-U-R-N-S.

Q. Okay. And what about Reuben Katz?

A. I believe Reuben is R-E-U-B-E-N, K-A-T-Z.

Q. Okay. Do you know when any of the 36 reports were created?

A. These, no.

Q. Okay.

A. I mean, I -- I don't, I do not know.

Q. And you're -- when you said these, you pointed

at 12, 13, and 14 in front of you; right?

A. That's correct, yes.

Q. All right. Do you know whether they were created before or after the TRO?

A. I do not recall.

Q. Were any of the reports, any of the 36 created before the TRO?

A. I believe that there -- yes.

Q. Okay. Who received copies of those, of the 36?

A. It would have been myself and the program.

Q. You said the program, what does that mean?

A. It would have been -- it would have been -- let's see -- let's see who would have -- I would have received it -- I believe, in providing the information it would have been Mary Katherine would have received it. Most recently, Yadi Gibson, who is an attorney that has been added just recently to the staff would have -- would have seen these in order to be able to go through and look and cross-check the lists with the information that's in these or these accusations that are in here. This is a summary of the accusations to be able to cross-check with those lists.

MS. NAJAM: Objection; nonresponsive last few sentences.

Q. (BY MR. HUDSON) So have you not cross-checked

those reports in 12, 13, and 14?

A. No, they've all been cross-checked. That's the reason why they were -- those schools were released.

Q. Okay. So of the 36, some of them came in before the TRO?

A. What do you mean?

Q. Of the 36 reports?

A. I -- I believe that -- that the information came from all those, yes.

Q. Was any of the information from any of these reports from Lara -- Lara Burns -- Lara Burns or Reuben Katz used to withhold application links for the TEFA program?

A. No.

Q. Was any of the information used to make a provider decision?

A. A provider decision?

Q. Sure. Education services provider.

A. No.

Q. Well, you said you had to cross-check them and clear them before you would let them into the program; right?

A. Well, they're the allegations that are in here, and then we cross-check to make sure that we had the authority to be able to contract, yes. And so once that

it was clear that they were not limited by being a foreign terrorist organization or any -- you know, on any of those lists, then they were admitted to the program. Yes, due diligence was done.

Q.   So links didn't go out to any of these 36 schools until after you'd cross-checked these reports?

A.   That's correct.

Q.   All right.  Did you use --

A.   Or I -- I'm sorry.  We -- yes, the information that's in these reports.

Q.   Was any of the information in any of the 36 reports we've been discussing used in communications with the Office of the Attorney General?

A.   No.

Q.   Was it used in any communications with the governor's office?

A.   No.

Q.   Did the Comptroller's Office verify the factual assertions in any of the 36 reports?

A.   I'm sorry.  Would you restate that question?

Q.   Sure.  You said you cross-checked everything in these reports.  Was any of it verified as true?

A.   As for the information as to whether or not that these individuals were tied with -- on those lists, yes, that was checked and it was -- and those individuals

were not on any of the lists.

Q. Okay. Did any of the schools prior to this litigation receive copies of these reports, or were they made aware in any way of these reports, to your knowledge?

A. No.

Q. Were any of the schools or individuals given the opportunity to respond to these reports?

A. No, because they were all admitted.

Q. Okay. You would agree with me that links were not provided until everything was cross-checked?

A. Links were not provided because of the nature of how we were going through the process of -- you know, in batches, and since this was the last -- the last portion of it, it was closer to the end, yes.

Q. None of the 36 schools on whom you have a dossier, like in 12, 13 or 14, were given an opportunity to respond to any questions the Comptroller's Office may have had about the institutions. You would agree with that; right?

A. There was no questions needed because we had approved -- we had determined that there was no limitation on contracting with them.

Q. Does the comptroller have any dossiers like in 12, 13 or 14 for Christian schools?

A. No, because there were no allegations made against Christian schools. We do have the ones, of course, against the -- against the CCP or schools that affiliate -- allegedly affiliated with CCP, but they were cross-checked --

Q. Okay.

A. -- against those same lists.

Q. What about Catholic schools? Any dossiers on Catholic schools?

A. No dossiers, but again, they were all cross-checked against the same list.

Q. What about Jewish schools? Any dossiers?

A. All three of those schools were part of that -- those final groupings and they were all checked against the same list, and there was no dossiers because there was no accusations specifically against those schools.

Q. Okay. Last links go out March 24 of '26; right?

A. I'm sorry?

Q. March 24, '26 and then -- when the last set of links went out?

A. I believe that's correct, yes.

Q. Okay. And there were no open investigations as of March 24, '26; right?

A. Yeah. Yes.

Q.   Okay.  And so the Comptroller's Office had decided no terrorist ties amongst the Islamic schools; right?

A.   That precluded us from contracting, that's correct, which is the reason why they were all given their links.

Q.   Well, you said which precludes you from contracting, do you think that there are terrorist ties that don't preclude you from contracting?

A.   No.

Q.   Okay.  I'll hand you what I'm going to mark as 15.  I think that's where we are at this point.  Have you ever seen that document before?

(Exhibit P15 was marked.)

A.   I have.

Q.   (BY MR. HUDSON) Okay.  What is that?

A.   This is a document by the acting comptroller, Kelly Hancock, to the Attorney General, Ken Paxton, basically communicating to him about his displeasure with the Attorney General's response with regard to the opinion.

Q.   All right.  The second full paragraph on there, follow along with me.

A.   Okay.

Q.   It says, "Among the schools, the Court is

temporarily allowed to participate in TEFA program as Houston Quran Academy," at the time the order was issued which would have been March 17, "scant evidence had been presented to the court, and it was not aware that the school has documented ties to the Muslim Brotherhood, which Governor Abbott and President Trump have designated as a terrorist organization."

Did I read that correctly?

A. You did read that correctly.

Q. So why in the world did the Comptroller's Office allow the Houston Quran Academy to receive a link if they have documented ties to the Muslim Brotherhood as he says in this March 24, '26 letter?

A. Because -- well, first of all, there's a lot of mistakes and misstatements in this particular letter, but again, I'm not the acting comptroller. But given the information that was on that report, the principal was allegedly identified as part of the 1991 Muslim Brotherhood document memorandum and -- and so, you know, he's basically was focusing in on -- on accusations and that's where, as you can see, the response to this letter shows how many, you know, inaccuracies that are identified in here, and so he was responding to the allegations which we had determined were not accurate.

Q. Okay. So the -- the comptroller runs the

Comptroller's Office; right?

A. Yes.

Q. Okay. So the comptroller says there's Muslim Brotherhood ties, but you're saying --

A. That's not what the program had found.

Q. Okay.

A. And we had not had any -- any involvement in this letter. We had talked about, you know, the nature of how -- what we were doing, how we were doing it. This letter came completely out of the blue, and -- and so this was a surprise to all of us.

Q. So Kelly Hancock's still currently the comptroller of the State of Texas; right?

A. He's the acting comptroller for the state of Texas, yes.

Q. Okay. Well, acting, not acting, he's the comptroller; right?

A. No, there's a -- there's -- he's technically the chief clerk as the original comptroller who was elected is now the Chancellor of Texas A&M, and so he qualifies as -- can be seen as a qualified response given Attorney General Paxton's response calling him chief clerk.

Q. Okay. So let me make sure I understand this. You don't think Kelly Hancock is in charge of the

Comptroller's Office?

A.   I didn't say that, but he's the chief clerk, he's not the comptroller.

Q.   Okay.  So if Kelly Hancock came in and said, hey, Murl Miller, I want you to go grab Mary Stout and we're going to call Odyssey, and we're going to tell them you need to remove the Houston Quran Academy, what would you say?

A.   That is not going to happen.

Q.   Why is that?

A.   Because the fact is that under the circumstances that they would have to fall under 29.385 or 3585, and so we would have to go through the entire procedure, and we would have to have evidence to be able to substantiate that.  And since we do not have evidence to substantiate that, that's not going to happen.

Q.   Okay.  So if Kelly Hancock gave you the order and said, I disagree with the Murl Miller, go get Ms. Stout, we're going to Odyssey, we're removing him, you would just what -- say no?

A.   The evidence speaks for itself.  It -- it -- that was -- that just is not going to happen.

Q.   Okay.  So there's no world in which Kelly Hancock can direct Odyssey to remove Houston Quran Academy because of alleged ties to the Muslim

Brotherhood.

A. The acting comptroller does not have sufficient evidence to be able to do that, and so I doubt seriously that your scenario that you give would ever exist.

MR. HUDSON: Well, objection; nonresponsive.

Q. (BY MR. HUDSON) I've got a letter from him on March 24, 2026 saying exactly the opposite of what you're saying. So my question is, does he, as acting comptroller, have authority to go tell Odyssey to remove the Houston Quran Academy?

A. Well, in this question, I don't believe your -- your question is correct because what he's asking for is the Attorney General. He's angry that the Attorney General did not do an investigation and has -- and has failed in his responsive abilities to do the investigation instead threw it upon us. And so therefore, you know, the -- the accusation is, hey, here is one of these that I'm identifying, you should go off and investigate them. You should be doing this, the Comptroller's Office should not.

MR. HUDSON: Objection; nonresponsive.

Q. (BY MR. HUDSON) My question's real simple. Can Kelly Hancock direct Odyssey, who is a contractor of the Comptroller's Office, to remove the Houston Quran

Academy?

A. I don't believe he'd ever do that, no.

MS. NAJAM: Objection.

MR. HUDSON: Objection; nonresponsive.

Q. (BY MR. HUDSON) Not asking if he would, asking if he could.

A. No.

Q. Why not?

A. Because there -- because in those particular -- at that particular time, I believe the Attorney General may -- may get involved.

Q. Okay. That doesn't really answer my question. My question is, does Kelly Hancock have the authority to direct Odyssey to remove a school?

A. It's possible, yes.

Q. Okay. One of those schools could be the Houston Quran Academy?

A. If presented with sufficient evidence to be able to establish the fact is -- that it cannot -- we cannot contract because we've already made the determination. It's already -- it's already part of the program. So we would have to have evidence to be able to substantiate the fact is that it is no longer eligible for the program. We would end up having to produce that evidence, we would go through the process of 293585.

Q. Okay. So if Mr. Hancock wanted to go through that, he's the ultimate decision maker, right, about whether you do or don't have the evidence?

A. We would end up with advice and counsel from both outside counsel as well as from internal counsel.

Q. Well --

MS. NAJAM: Objection; nonresponsive.

MR. HUDSON: Well, objection, nonresponsive.

Q. (BY MR. HUDSON) I -- I -- I hear what you're saying. It sounds very deep state. What I'll tell you is it sounds like you don't think that Kelly Hancock, who is the comptroller, has the authority to overrule people who are subordinate to him. Is that -- is that what you're telling me?

A. No, I'm thinking that the hypothetical that you're trying to provide in order to be able to -- is so far removed from reality that I'm -- you know, that it's -- it's questionable. As for whether or not that he could potentially do that, I believe it's possible he could. But would he? Has he? Well, if he -- if that was the case, he would have never have allowed for the approval of these schools to go forward because think about how challenging that would be. We have -- we have allowed them to --

MR. HUDSON: I'm going to object to the narrative response.

THE WITNESS: Okay.

Q. (BY MR. HUDSON) So just to be clear, what's the date on the letter in P15?

A. March 24th, 2026.

Q. Okay. So that's roughly seven weeks ago?

A. Yes, sir.

Q. Okay. Are you aware of any public statements by Kelly Hancock recanting what he said on March 24, 2026?

A. To my knowledge, no.

Q. How much longer is he going to be the comptroller for the state of Texas or the chief clerk, however you want to put it?

A. It depends on whether or not that he will continue for the full term, or whether the -- or whether he will set -- stand aside for Huffines who's been the individual that was the GOP candidate for that particular position.

Q. GOP meaning GOP?

A. Yes.

Q. Meaning Republican Party?

A. Republican, yes.

Q. When are we going to find that out?

A.   I don't know.

Q.   I'll hand you what I'll mark as Plaintiff 16. You've ever seen that document before?

MR. HUDSON:  For identification purposes, this is CPA 590 through CPA 591.

(Exhibit P16 was marked.)

A.   Yes, I've seen this document before.

Q.   (BY MR. HUDSON) What's your understanding of what it is?

A.   It's a -- a letter from Barbara-Jane Paris, who is the representative of Cognia, basically complaining to the Texas Education Freedom Accounts website, which also includes as a CC to Mary Katherine Stout, that in a press announcement that there was -- I believe it's referring to the acting comptroller's press announcement that they were accredited through an agency operating at an address that is hosted publicly advertised events organized by the Council of American Islamic Relations, and that she is identifying the fact as that it appears by the nature of it that somehow that this would reflect on Cognia as being cognizant operating at that address and hosting care events whereas she identifies that her -- or the Cognia's address is here in Alpharetta, Georgia.

Q.   Were any actions taken by the Comptroller's Office to correct that?

A.   I don't know.

Q.   You would agree with me that it's not correct; right?

A.   That -- that the address in which that -- there was a advertised event organized by the Council of American Islamic Relations that was identified with being Cognia and the event acting -- being at 9115 Westside Parkway, Alpharetta, Georgia 3009.  I believe that's -- that to be incorrect.

Q.   Do you know who put together that press release?

A.   I believe I do.  If I could see that list of individuals that you -- if I look at that list of individuals before --

Q.   P11?

A.   Yes.  I believe that would've been Travis Pillow that would have produced that document.

Q.   Mr. Pillow is the press secretary for the Texas Comptroller's Office; right?

A.   Yes.  The TEFA program.  I think technically the TEFA program, not necessarily the Comptroller's Office.

Q.   TEPSAC is not the only accreditation agency that's recognized by the Comptroller's Office; is that right?

A.   I'm sorry?

Q.   TEPSAC is not the only accreditation agency that's recognized by the State of Texas; is that right?

A.   That's correct.  TEA has -- also recognizes other specific identified accreditation agencies, yes.

Q.   Like Cognia?

A.   Cognia is -- I believe, is on the TEPSAC list.

Q.   What is a credible claim to the Comptroller's Office?

A.   In conjunction with what?

Q.   Well, and let's make it specific to this case. What is a credible claim to the Comptroller's Office of a tie that would disqualify a school from being on the Texas Education Freedom Account program?

A.   Well, it would depend on the case-by-case basis on the specific evidence that would be presented against that school.

Q.   Understood.  I'm trying to figure out what a credible claim would be.  So if I get a document from the Middle East Forum like in, I believe, P14, I think it was, is that public report enough?  Is that a credible claim?  Do we need to suspend them based on that claim and investigate, or what do -- what do we do?

A.   No.  I mean these are a list of a -- all these reports are the -- all the public identifiable

information regarding the allegations that have been made or connections with those particular schools, and so we compared that against that -- against those lists. And when those individuals were not participation in any of those lists, then they were qualified and they moved forward. To the extent that there is something in the future that would end up having a -- a factual basis that would need to be investigated, again, we would end up having, depending upon the nature of it, either go to the school and obtain information, like say through an audit, or be able to evaluate the level of the degree, because again, we have a responsibility to both the citizens as well as to the beneficiaries of the program to make sure that both -- you know, we can't contract with nations or with individuals that it's unlawful to contract with nor can we accept fraud, theft, waste and abuse. And so to the extent that they -- they appear to be credible enough, we will end up investigating them. But again, it depends upon the nature of who is it that's making those accusations, what is the nature of the accusations, how complete is the accusations. Here, all of these accusations were being -- you know, that were being made through the -- through the Middle East Forum and these other efforts were -- were beginning to be a process looked at. This was expanded by the -- by the -- the

individual -- the individual researchers, and then we addressed all of those particular accusations and determined them not to be valid.

MS. NAJAM: Objection; nonresponsive.

MR. HUDSON: Same objection.

Q. (BY MR. HUDSON) Let me ask you, the dossiers in 12, 13, 14 and the other 33 dossiers --

A. Uh-huh.

Q. -- are those placed in a file for the particular school or entity that are maintained by the comptroller, either comptroller proper or through Odyssey?

A. I think they would be with the comptroller and they would all be, I believe, in one file.

Q. Okay. If I send a public information at request to the Comptroller's Office, am I -- for those specific dossiers, am I going to get those as a member of the public?

A. I don't know. That's not my area of expertise.

Q. Okay. Is there anything in any file indicating that all 36 Islamic schools that you've testified about already have been cleared of any tie that would, at least as of today, prohibit them from contracting with the Comptroller's Office.

A. No, because the fact is that we've, you know,

allowed them all the schools, we've given them links and they're -- they're free to contract with the state now. So we've already made the decision.

Q. Understood. Have you publicly announced that?

A. It's on the website. So it's all -- it is covered -- I mean, all of those things are covered because they're on the website, they're available to be chosen virtually across the board. That's -- they are -- they are available for, you know, to contract with today.

Q. Let me see --

MS. NAJAM: Objection; nonresponsive. I'm sorry.

MR. HUDSON: Yeah, you go ahead. Same objection.

Q. (BY MR. HUDSON) Well, let me see if I can explain it like this. So we have Exhibit 15 right here.

A. Right.

Q. That -- that's the letter?

A. Uh-huh.

Q. Okay. There's nothing publicly contradicting Kelly Hancock except Ken Paxton; right?

A. Contradicting Ken Paxton, and well, I guess the facts, yes.

Q. Okay. Is there anything on the comptroller's website that says this March 24 letter was incorrect?

A. Not to my knowledge, no.

Q. Is there anything from the comptroller indicating that they withdraw or rescind the allegation that this particular school that's referenced in the March 24, 2026 letter is not in fact tied to terrorist organizations such that they're allowed to contract with the state?

A. The fact is that they are contracting with the state does reject that, but also the response for the -- for the Attorney General.

Q. But there's no affirmative statement from the controller rescinding this. You would agree with that?

A. That's correct.

Q. And you would also agree that for the other 35 Islamic schools, there's no public statement rescinding the intent to investigate them or not put them on the list without having first created a dossier about them?

A. None of them have been identified as in -- as in this -- this was public. I mean, this one school, but the rest of them have not been identified as -- in any type of form of similar conversation.

Q. Well, you say similar conversation.

A. Similar letter.

Q. Do you know where those 36 dossiers have reached beyond the Comptroller's Office?

A.   Yes.

Q.   Where have they gone?

A.   They've gone to -- internally with -- within the group with Mary Katherine Stout, the FAALS and OSLS with my group and that's it.  And then -- and then to you, I believe, through discovery, not all 36, but the schools that are plaintiff schools here.

Q.   Okay.  And as it regard -- as it relates to the dossiers, they've also gone to Kelly Hancock, haven't they?

A.   The -- the information was communicated to Kelly Hancock, but I do not believe that the -- that the documents themselves ever made it to Kelly Hancock.

Q.   Okay.  They never made it to his campaign?

A.   No.

Q.   Okay.  Are they vaulted at the Comptroller's Office?

A.   What's -- what's -- what do you mean by vaulted?

Q.   Well, I -- I tried to ask it by asking about the Public Information Act request, but you're telling me that's not your expertise.

A.   Right.

Q.   And I'm trying to figure out if somebody issued a public information at request, because I -- I'll just

tell you, Murl, I -- I have this coming up more and more in my cases. It seems like the -- the same characters are -- are sending public information at request for this information that's being compiled by the state. And so what I'm trying to figure out is, is you're telling me that this information's not out there and I'm asking you, can it be?

A. No, because it's in our -- in the OSLS secure. You know, our particular part of the overall comptroller computer system, we have a dedicated area that's on the G drive that this -- these reports are located.

Q. And so Public Information Act request comes in as you sit here, you don't know whether it could reach these reports or not?

A. I do not know. That would go through our open records division and they would be responding to that. I have nothing to do with open records.

Q. Okay. Is there any in tent by the Comptroller's Office to put out any kind of public statement indicating that to the extent that schools are on the list have been cleared of any wrongdoing or relationship with Foreign Terrorist Organizations?

A. Just foreign -- I mean, you're just talking about not any of the CCP schools or anything else?

Q. Yeah, I'm not here for CCP.

A. Okay.

Q. So --

A. To answer your question, I don't know.

Q. Okay. If I have five minutes to go to my notes, probably be able to turn it over to my colleague.

THE NOTARY: All right. Going off. All right. The time is 4:26 P.M. We are off the record.

(Break taken.)

THE NOTARY: The time is 4:34 P.M. We are on the record.

Q. (BY MR. HUDSON) Mr. Miller, you'd agree I've been courteous to you today?

A. I believe so, yes.

Q. Yeah. I'm going to turn over to my co-counsel.

MS. NAJAM: Sorry, I should have untangled these previously. I -- I -- I get it.

E X A M I N A T I O N

BY MS. NAJAM:

Q. All right. Mr. Miller, we met briefly at the beginning of the day, but again, my name is Ayesha Najam. I'm with a firm in Houston called Gibbs & Bruns and I represent a few of the plaintiffs in this lawsuit. As you might expect, I am going to retread some of the topics the two of you already covered. I'm not going to try to rehash anything you already covered, but I

apologize if I do. Sometimes, it'll just kind of be segueing because I am going to -- by this -- the nature of me going second, I'm going to be a little bit all over the map. I want to start with a letter that I think you referenced earlier. I'm going to mark that as the next exhibit.

MS. NAJAM: Do we have exhibit stickers, or am I just writing on there?

MR. HUDSON: Right at the top, I typically put --

MS. NAJAM: And what exhibit are we on?

MR. HUDSON: 16.

MS. NAJAM: For uniformity's sake, do you have "P" or something on it, or just --

MR. HUDSON: P16 so it will to be.

MS. NAJAM: Doesn't that say 16?

MR. HUDSON: Yeah. I forgot to put a P.

Q. (BY MS. NAJAM) I'm marking P17. It's a letter dated December 12, 2025.

(Exhibit P17 was marked.)

A. Yes, ma'am.

Q. (BY MS. NAJAM) Earlier, you referenced a letter that the Office of the Comptroller had issued to Ken Paxton's office seeking guidance on the question of what it means for a potential TEFA participate -- for a

potential TEFA participant to have violated other relevant laws. Is this the -- that letter?

A. In part, yes. Also, it requested the information as to who would be responsible for investigating that.

Q. Okay. And did you actually take part in drafting this letter?

A. No, ma'am, I did not.

Q. Did you review it before it went out?

A. No, ma'am, I did not.

Q. You -- we're going to get to another letter that you -- you actually did look at with Mr. Hudson. Are there statements in this letter that you think are misstatements or erroneous?

A. The -- the letter stands for itself.

Q. But have you reviewed it before sitting here; right?

A. Well, I've -- I've seen the letter and I've seen the -- the request, but the letter stands for itself.

Q. Well, it came from the office on whose behalf you are here to testify; right?

A. Right.

Q. And there's in fact a topic that was part of your deposition notice entitled something like

communications between your office and Mr. Paxton's office; right?

MR. ROOSIEN: Well, I respectfully disagree. There's not a topic that says whether or not the December 12, '25 letter is correct, accurate, things along those lines --

MS. NAJAM: No, because that would be --

MR. ROOSIEN: -- this level of specificity that he won't be prepared for.

Q. (BY MS. NAJAM) Are you prepared on Topic 15, which is communications between the Comptroller's Office and the office of the Attorney General --

A. Sure.

Q. -- regarding potential disqualification of schools based on affiliation, association, or similar criteria, including, but not limited to, the December 2025 request for guidance by acting Comptroller Kelly Hancock? Would --

MR. ROOSIEN: And -- and -- and here it is. So this is -- this letter almost --

MS. NAJAM: My question -- there's a pending question to the witness.

Q. (BY MS. NAJAM) Are you prepared to testify on that topic that I just read to you referencing this letter --

MR. ROOSIEN: And -- and I'm saying you're badgering him because he absolutely is prepared. Here it is. You have all of the contents right here of the communication.

MS. NAJAM: I don't know why. I just started questioning. We've been here for four and a half hours and you've decided to make your speaking objections with me. I hope it has nothing to do with me personally, so I will get back to the witness.

Q. (BY MS. NAJAM) -- On Exhibit 17?

A. Yes.

Q. This is the document referenced in Topic 15, if you're aware of that?

A. It's one of the documents, yes.

Q. Okay. So if you look at Page 2 of the letter --

A. Okay.

Q. -- the first -- the -- the first paragraph, the last line ends in the phrase, "A formal Attorney General opinion is necessary to ensure uniform compliance and legal certainty."

Did I read that correctly?

A. This is in Page 2. Where specifically are you? The last line --

Q. Final.

A. -- is which paragraph?

Q. We'll -- we'll just read the whole first paragraph on Page 2.

A. Oh, the first paragraph?

Q. Yes.

A. Okay. Yes.

Q. Mr. Hancock, the acting comptroller wrote, "We are concerned these schools might be disqualified from TEFA participation under the other relevant laws provision of Section 29.358" -- I'm going to skip over the parenthetical --

A. Uh-huh.

Q. -- "unless and until compliance can be verified and any legal concerns fully resolved, because these determinations carry substantial statewide implications, a formal Attorney General opinion is necessary to ensure uniform compliance and legal certainty."

Did I read that correctly?

A. You read that portion of the letter correctly, yes.

Q. Am I right that a formal AG opinion did not come?

A. No. A formal -- a formal opinion was issued. That was -- that was the KP-0509.

Q. I'm sorry. Let me ask a better question.

And -- and let me just hand you the opinion that you're referencing. I'm going to mark it as Exhibit 18.

Are you familiar with Exhibit 18?

(Exhibit 18 was marked.)

A. Yes, ma'am, I am.

Q. (BY MS. NAJAM) It's -- it's the January 2026 response to the letter we just looked at; right?

A. It's opinion number KP-0509, yes.

Q. And in this -- in this letter, Mr. Paxton's office offers general legal guidance; is that right?

A. Well, he -- there's several particular issues. He's interpreting the statute. He provides for some general legal guidance, and he basically comes with the conclusion that -- that the Comptroller's Office is vested with sweeping authority, and it's our obligation to find the facts that implicate the restrictions that are related, yes. So it's -- it's basically putting the investigation upon the -- the Comptroller's Office.

Q. Okay. And part of putting the investigation onto the Comptroller's Office was vesting in the comptroller the decision making on what constitutes a violation of relevant law; right?

A. He identifies what he believes that is another relevant law, but he does not go into any detail as for that -- specifically to that, yes.

Q. Besides Exhibit 18, are we going to find in writing anywhere the guidance that the Comptroller's Office is using as how to determine whether a school has violated relevant law?

A. That would be a case-by-case decision based upon the evidence and the facts of that particular case. So until a case is presented, I -- I -- I don't know how you would do that.

Q. And putting aside the specific evidence in a specific case, just to be clear, besides Exhibit 18, there's nothing written that we can look at and say that is how the Comptroller's Office will decide whether a school has violated relevant law or as used in a different statute, applicable law?

A. No.

Q. Then what else could I look at?

A. You look at the statute that's the other relevant law.

Q. Which -- which statute are you referring to?

A. Well, that's the problem. There's a lot of potential statutes that could fall into this particular situation. For instance, if this -- if that particular business or that particular school is not currently in good standing with the state, then under Texas Government Code, you know, 557, you would not have the opportunity

to be able -- and I believe also 2252 of the government code, you would not be able to contract with that particular entity.  So you would -- the evidence would be you go to the Secretary of State, see that this is not in good standing and be able to communicate.  Now, could they correct that?  Absolutely.

MS. NAJAM:  I'll object as nonresponsive.

Q.   (BY MS. NAJAM) You just gave me an example of a statute that a TEFA participant could be in violation of.  Outside of Exhibit 18, is there any written list or guidance of these are the "relevant laws" that the Comptroller's Office should look to in determining whether a school is in compliance with "relevant law"?

A.   I just identified exactly that.  Under other relevant law, there would be a series of potential statutes that you would have to look to see if there's a violation of, and that would be the basis for the determination that the school could not be participating in TEFA.

MS. NAJAM:  I'll object to as nonresponsive.

Q.   (BY MS. NAJAM) Is there a list of that series?

A.   Is there a list of what?  I mean, there's -- there's a list in -- there's a list in -- there's a list somewhat in here with regard to some of the examples of

other relevant law, but -- and as it relates to Foreign Terrorist Organizations, you -- and as for also adverse -- adverse nation states, you have 2252 and you also have 2274 of the Texas Government Code. So you'd be looking to those particular statutes to be able to determine if there is a violation, and whether or not that based upon that evidence that you could make a determination that you cannot contract or that there -- this particular entity would be disqualified for participation in the TEFA program.

MS. NAJAM: I'll -- I'll object as nonresponsive.

Q. (BY MS. NAJAM) You just gave me examples of statutes. Is there a list of statutes that the Comptroller's Office plans to look to in determining whether a school is in compliance with relevant law?

A. It will look at other relevant law.

Q. As in any --

A. I just gave you several examples.

Q. Sure. And there are lots of examples of laws in Texas and the United States that you didn't give me; right?

A. But those would not be necessarily relevant to the issue at hand.

Q. Well --

A. For instance, maritime law would not be applicable.

Q. Exactly. So who is going to decide what is relevant law that the Comptroller's Office should be cross-checking against when it comes to schools?

A. I think, first of all, you would have to find out what the nature of the TIP or the accusation is. And then once you found out the nature of the TIP or the accusation, you would act upon that.

MS. NAJAM: Okay. I'll object as non-responsive and I'm going to move on.

Q. (BY MS. NAJAM) I want to talk about the process for suspension and then potentially permanent removal for a school. And I think we've covered this and just let me know if I'm recapping it right. Under the comptroller's understanding of the statute, a school after notification will have 30 days to -- to respond to that notice of suspension; is that right?

A. Yes. Based upon, I mean, pure reading of the statute, yes.

Q. And -- and that's how the comptroller intends to apply the statute; right? To the extent any school --

A. Well --

Q. -- it finds, needs to be suspended and intends to follow the statute, notify the school, and give them

30 days to respond, true?

A.    Well, it would -- it -- it would -- to a certain extent, it would depend.  It's very similar to what you have with tax.  You would end up in a situation where if you ended up having the clear determination by the comptroller and evidence that the comptroller has in its possession that there is a violation that did not need to be -- there would not be -- need to be any engagement with the -- with the party that's being accused, then you would get the notice with that particular, you know, accusation and they would have 30 days to respond.  To the extent that there would be a need for an audit or some type of evaluation or that in the response to that evaluation, there would be an extension off those 30 days as, you know, if -- if -- if at all possible.

MS. NAJAM:  I'll object to -- as nonresponsive.

Q.    (BY MS. NAJAM) Didn't you testify when Mr. Hudson asked you that the comptroller's plan, to the extent any removals or -- sorry, suspensions need to take place, that its read of the statute is the suspension and notice are simultaneous?

A.    Not necessarily.

Q.    So you're saying the comptroller could decide

to notify a school that it's thinking about suspending it; right?

A.   Yes.

Q.   But it's not required to under the statute, correct?

A.   If it -- it -- it -- like, let's take it into consideration a criminal matter.  Okay?  Then you would end up having a situation where there would be an investigation.  That investigation may take an extended period of time, it would be by law enforcement.  And then under those particular circumstances, if you did not have to actually engage that particular school, then you would -- that entire investigation would come through.  And then when the determination was made and there would be a chargeable criminal offense, you'd end up having that particular notification with the evidence, and then that school would have 30 days or, you know, potentially more depending upon the nature to be able to respond.

MS. NAJAM:  Okay.  I'll object as nonresponsive.

Q.   (BY MS. NAJAM) I'll just hand you the administrative code.  I'm going to mark as Exhibit 18 Administrative Code Section Title 34.  Well, let's do Title 34, Section 16.405.  You and Mr. Hudson discussed the education code.  Are you familiar with this provision

of the education code -- I'm sorry, administrative code?

(Exhibit 19 was marked.)

A.   Not as much, but -- but yes.

Q.   Okay.  And in Part A of this statute, it provides for suspension of a program participant's account.  Do I see that right?

A.   Yes.  At any time the participant fails to comply with the program requirement or other applicable law.

Q.   And then in the second sentence, "An education service provider," that would include a school; right?

A.   That is correct.

Q.   Shall be -- sorry, "shall immediately be suspended from participating in the program at any time the provider or vendor fails to meet the eligibility requirements or fails to comply with any program requirement or applicable law."

Did I read that right?

A.   Yes, you did.

Q.   And then it's Part B says, and I'm going to paraphrase and ask you if it's accurate, "Upon suspension, the comptroller or designee shall notify the school"; right?

A.   That's after the comptroller has made a determination the participant fails to comply with a

program requirement or other applicable law, yes.

Q. Okay. And then in Part C, again, I'm going to paraphrase, "But once the 30 day expires, the comptroller has the discretion to permanently close the school's TEFA account," in other words, remove them from the program; right, sir?

A. After -- again, the participant has failed to comply with the program requirement or any other applicable law. So there's already been a finding in our -- there will be a final determination. As we talked about earlier, there are a variety of different potential outcomes.

MS. NAJAM: That was not my question, so I'll object as nonresponsive.

Q. (BY MS. NAJAM) Isn't it true that under Part C, once the 30 day expire -- 30 days expires, the comptroller has the discretion to permanently remove the school from the program?

A. They -- it -- well, after -- could you repeat the question, please?

Q. Sure. We are past Part A and B, so what I'm asking is once the Comptroller's Office has decided, I have hereby -- hereby found that this school, which is currently part of TEFA, has violated applicable law --

A. Uh-huh.

Q. -- and once the comptroller has notified the school, you are suspended and 30 days have now passed. Isn't it true that the comptroller has the "discretion" to permanently remove that school from the program?

A. After the -- after the response by the -- the individual school and a final determination, the answer could be yes, maybe yes.

Q. I'm sorry. I'm not asking about what would happen in a hypothetical -- hypothetical situation, the question is about the comptroller's authority under this statute. The comptroller has the discretion to make that suspension permanent, true?

A. It's one of the options, but you have to go through A, B in -- in order to get to C, so, yes.

Q. Yes. If you've gone through A and B, that is the comptroller's discretion to make that suspension permanent; true?

A. It's one of the options, and again, it's a situation where you would have to fulfill all of the obligations and there would be a response by the -- by the individual school.

MS. NAJAM: I'll object as --

THE WITNESS: So there'll be evidence.

MS. NAJAM: -- sorry, as nonresponsive, and I'll just ask again to get a clean answer to my

question.

MR. ROOSIEN:  Now -- now you're badgering.
And -- and he gave you an answer twice and the answer is
different than your question, that's all.  It is more
complicated.  There's a whole page here.

MS. NAJAM:  I know.

MR. ROOSIEN:  You're trying to summarize
it.

MS. NAJAM:  And I've just wasted
seven minutes on the backdrop.  Well, there could be A
and there could be B, we're beyond that.  And so --

MR. ROOSIEN:  I -- I think -- I think you
haven't answered your question and I -- I think you're
badgering him.  That's just my view.

MS. NAJAM:  Okay.  And I disagree with
your view and it is a yes or no question.

MR. ROOSIEN:  It's not.

Q.   (BY MS. NAJAM) Does the statute use the word
discretion in Part C?

A.   Not in -- if you're taking a look at a
subsection of this in isolation, it does say that, yes.

Q.   I'm not asking you to isolate.  Look at Part C.
Before it lists the comptroller's options, does it use
the words comptroller's discretion before listing the
options?

A.    Does it say that the comptroller has discretion in order to determine its outcome?

Q.    That was not my question.  Let's look together at C.

A.    Okay.

Q.    Before listing the options, which are numbered 1 through 3 --

A.    Uh-huh.

Q.    -- it uses the words "at the comptroller's discretion"; right?

A.    Let me read this.  What it -- what you're ignoring is the entire frontal portion of how A builds upon B builds upon C.  So after all of the activities of A, B, and C, based upon the severity of the violation and the response and actions taken by the program recipient, including those corrective actions, the education service provider or a vendor of the educational products or services and the risks of the integrity of the program, it can be held at the comptroller's discretion, and then it lists 1, 2, and 3.

Q.    So the answer to my question was, yes, the comptroller, after all those things have been done, has a discretion to, one of the things is, permanently remove the school?

A.    I gave you my response.

Q. So that's a yes?

A. No.

Q. The comptroller doesn't have the discretion to make a suspension, that he's already made, permanent?

A. I stand by my prior answer.

Q. Okay. Have you -- sorry if I've already asked this. Had you read 16.405 before just now?

A. I have in the past, yes.

Q. Have you read the rest of the administrative code involving TEFA?

A. Over -- yes. Over a period of time, yes.

Q. By -- by the way, if -- if -- since we're on the topic of removal, you and Mr. Hudson talked about what would happen if, say, Houston Quran Academy is removed tomorrow. I want to ask a different hypothetical. For parents who have been approved for funds, whether Tier 1 or Tier 2, can they make changes to their selected school after July 15th?

A. After July 15th, well, it -- it would depend. You know, as we talked about with -- with -- with Mr. Hudson, if a school is disqualified, that would be one particular situation. I do not know the answer to your question. If, say, a student were to move from one school to another, whether this would be transferable, I do not know the answer to that question.

Q.   Okay.  So for example, if a parent's chosen school is in fact permanently suspended -- sorry, I should say removed, permanently removed after the 30-day suspension, after July 15th, you don't know whether they can actually still use their voucher funds?

A.   That -- that's not where -- if a -- if a school has been removed, then that would have been a period of time in which we would have been out of compliance.  We would not have been able to contract with that individual, and also the statutes preclude the contractual aspect of this.  The school would be responsible for returning the funds and the student would be able to relocate to a school that's part of the program, but as for whether or not that absent the school being, you know, being disqualified.  A school, let's say that I'm going to ABC Academy and my family decides to relocate, then in that particular instance, I don't know if in that particular instance whether the -- a student mid -- mid -- mid-season or mid-semester would be able to make a transition and that -- that individual would be able to, you know, take the funds with them and qualify for that new school.  I -- I don't know the answer to that question.

Q.   Okay.  I wasn't asking about a -- a school relocation.  Is the answer, I don't know, to the question

of what happens if my child is enrolled at an Islamic school today --

A.    Uh-huh.

Q.    -- I have been approved for voucher funds --

A.    Uh-huh.

Q.    -- but then after July 15th, my chosen school is kicked out of TEFA --

A.    I don't --

Q.    -- can I apply those funds to a -- a different school that's still part of TEFA?

A.    Yes.

Q.    After July 15th, I can make that change of school election?

A.    Yes, because in that particular instance, you've already been given a -- you've already been given a voucher, you're already eligible, you've made a school choice.  It's no fault through your own the fact that the school has been no longer capable of participating in the program.  That will be an act of the school, and so we would not put a child in a situation where that child would be penalized for the action of a -- a service provider or, for that matter, a -- a school.

Q.    For any decisions that are made to permanently remove a school from the TEFA program, can a school appeal that decision or is it just a -- a parent of a

child there?

A. A school can -- can appeal.

Q. What -- what statutory, if any, basis do you have to -- to believe that?

A. 29.3585.

Q. Can you pull out Exhibit 3 and tell me what you're looking at?

A. Okay. It says on Page 172 section 29.3585, "Provider and vendor suspension and removal."

Q. Yes. What -- what subpart are you looking at that makes you think that a school can appeal its permanent removal from TEFA?

A. This raises a question. When you say appeal, what exactly are you talking about?

Q. Once the Comptroller's Office decides that a school shall be permanently removed from the program, is there any way for the school to challenge that?

A. I see you. I'm sorry, I -- I misunderstood your question. The comptroller's decision with regards to an appeal I believe is final. However, depending upon the nature of what a potential claim could be, such as a violation of the constitution, there would be an independent cause of action separate and distinct from that.

Q. To be brought in a court?

A.   Yes.

Q.   Like this lawsuit?

A.   Yes.

Q.   Okay.  And just to start -- end where we begin, the statute does provide for a -- a -- a "appeal" within the Comptroller's Office, but that's just for parents; right?

A.   Yes, but I believe that if there was a issue that was raised as a matter of due process, the comptroller would act upon that just as it does in tax situations.

            MS. NAJAM:  I'll object as nonresponsive.

Q.   (BY MS. NAJAM) There's actually a specific statute for appeals; right?  That's section 29.373 on Page 188.

A.   Are you talking about 29.375?  Oh, no, that's a right to intervene in a civil action.

Q.   No, I was asking about 373.

A.   Okay.

Q.   That's the provision of the TEFA statute that provides for appeals; right?

A.   Second here.  Okay.  I had to see at the bottom of it.

Q.   Are you with me, the provision that's entitled, "Appeal Finality of Decisions?"

A. Yes, ma'am. I'm reading it right now. I just see that in C, it says, "The appeal of this does not constitute a contested case action for any purpose," which is so as C says, "This subchapter may not be construed to confer a property right on a certified educational assistance organization, an education service provider, a vendor of educational products or a program participant." So it would appear that, under C, that this particular section would apply to -- wait a second, make sure the -- it would apply more than just to the program participant.

Q. Well, I'm going to have to unpack that. Let's go subpart by subpart.

A. Okay.

Q. Subpart A says, "A program participant may appeal to the comptroller an administrative decision made by the comptroller or a certified educational," I'm just going to call that Odyssey, "under this subchapter, including a decision regarding eligibility, allowable expenses, or their participant's removal from the program." So to sum that up, that provides a right to appeal within the Comptroller's Office for a parent of an enrolled child; right?

A. It would appear that that would be the initial portion of this, yes.

Q. And then B just talks about it being a contested case and you read to me C. That actually says, "Don't read this subchapter as -- as conferring a property right on school."

A. It doesn't -- it says it doesn't provide the -- this does not -- this subchapter does not confer a right upon any of these parties.

Q. Including schools?

A. Including schools.

Q. Okay. So to sum up the statutes we've just been through, I had originally asked you the question, "The statutes involving TEFA, when it comes to a school, the comptroller has decided shall be permanently removed from the program. The statute is to provide an administrative route for the school to appeal it." True?

A. From a -- from a SOAH perspective, or just directly with the -- I mean, you have the ability to be able to go to the courts so that you will be able to appeal that comptroller's determination is final. And so, again, based upon the other components of the statute that we have covered, you would have to follow all those, but it's possible. I -- I guess, could you restate the question?

Q. Sure. The statute provides a way to appeal to the comptroller a decision to remove the school, and that

we just saw is limited to the parents of the kids enrolled there; right?

A.   I don't know.

Q.   Who --

A.   Because of the -- because the determine -- the -- the breadth of -- of C.

Q.   Who -- who within the Comptroller's Office would know the answer to that question if not you?

MR. ROOSIEN:   It might be a legal question.

Q.   (BY MS. NAJAM) Are -- isn't he -- aren't you an attorney, sir?

A.   I am.

Q.   Okay.  So is there another -- is there another person who was tasked with knowing what a school's rights may be to appeal within the Comptroller's Office a permanent removal?

A.   It would probably be an individual in the FAALS group.

Q.   Okay.  But -- and that's a group that you're part of too; right?

A.   No.

Q.   You're not in the FAALS group?

A.   No.

Q.   Okay.  Got it.  Is -- what was the acronym of

the group that you're in again?

A.   Fiscal and Agency Affairs Legal Services.

Q.   Oh, no, I'm sorry.  The acronym for your division, was it OCLS?

A.   No, OSLS.

Q.   OSLS.  Okay.  Mr. Hudson asked you about a letter that Mr. Hancock sent out in March.  It's Exhibit 15.  Could you please pull that up?

A.   Yes, ma'am.  The March 24th, 2026 letter?

Q.   Yes, sir.

A.   Uh-huh.

Q.   I believe you testified earlier that this has inaccuracies and misstatements in it?

A.   Which are identified by the acting -- by the Attorney General in his response, yes.

Q.   Okay.  On behalf of the Comptroller's Office, do you agree that the -- one goal of the comptroller is to avoid having TEFA funds dispersed to any school with ties to terrorism?

A.   Can you repeat the question, please?

Q.   Sure.  Is it -- so you, as the representative of the Comptroller's Office, is it the office's goal to avoid dispersing TEFA funds to any schools with "ties to terrorism"?

A.   No.

Q. Okay. So the reason I ask is if you go to Page 2 of Mr. Hancock's letter --

A. Uh-huh.

Q. -- there's a paragraph that starts with an italicized first?

A. Yes.

Q. It ends with the following sentence, "I am hopeful that with additional information, the Court will not take the drastic step of ordering Texas to fund schools with ties to terrorism." Did I read that correctly?

A. Yes.

Q. Do you disagree with Mr. Hancock's hope that the Court not order Texas to fund schools with ties to terrorism?

A. I believe what the -- because the impetus of this particular letter is the -- frustration with the fact is that the Attorney General's office is not doing the investigation, that this particular aspect potentially lies in that since the agency has already -- is already contracting with these particular individuals, then they would have been determined not to have be involved in participating in terrorism or on any of those lists. And so it's almost a situation where he's basically saying, you know, if -- if there are subsequent

findings that these were involved, you know, that these are directly engaged in terrorism, we've done our best.

Q. Okay. And when Mr. Hudson asked you earlier about ties, I believe you agreed with him that a, "tie" is not enough to disqualify a school, that it has to be something more than that; is that accurate?

A. Yeah. As a matter of fact, he -- he says, "I am hopeful that with additional information, the Court will not take the drastic step of ordering funds with ties to terrorism." You have to have evidence to be able to support an assertion and you have to end up -- in this particular instance, have to have a name or an organization on a specific list as a matter of law to be able to -- you know, in order to be able to make that determination, and those don't exist.

Q. Okay. And I believe you testified earlier that in the comptroller's current view, that the Foreign Terrorist Organization in question must be directly involved in running or operating the school; is that accurate? Did I recap that right?

A. I believe that's correct, yes.

Q. Okay. That -- that standard, is that written anywhere within the Comptroller's Office?

A. I believe, it -- it goes back into some of the information that is on the request for an opinion -- the

opinion itself, just in the kind of the communication that goes -- that goes back and forth prior to this March 24th letter.

Q. You mean the formal opinion we looked at earlier?

A. Yeah. I believe that -- I mean, there -- he's basically -- in general, he's basically saying this Exhibit 18, he requested concerning the eligibility to protest in -- to participate in a TEFA program, and in the end, invoke a limited set of facts regarding certain schools. And then it -- it talked about the fact is -- that, you have the exclusive duty of establishing and administering the TEFA program. Part of that includes your obligation to find facts bearing on participant's eligibility, obligating the, you know, the -- nonetheless your inquiry improperly shifts the responsibility of making these factual determinations. And we do not dictate which schools are accredited, nor do we have our office decide unexplored questions of facts which lie beyond the reach of the opinion we have repeatedly asked and emphasized. However, what we cannot shoulder is your statutory responsibilities. And then he goes into the fact is that the education code makes it clear, "An education service provider or vendor of educational products that receives approval under Section 29.358 may

participate -- may participate in the program until it no longer meets the requirements under that section or violates the subchapter or other relevant law." Where we're at right now is that the -- the comptroller and -- and -- both the comptroller and the -- the program administrator and, you know, in their official capacities made a determination that these education service providers have received the approval under Section 29.358 to participate in the program and what is missing is that there -- that there is the requirement that they have to -- there has to be evidence to prove or establish that there's no -- that they no longer meet the requirements under that section or violate other relevant law.

MS. NAJAM: Objection; nonresponsive.

Q. (BY MS. NAJAM) My question was that in today's deposition, you gave us a standard that the comptroller has used to determine whether, for example, those 36 Islamic schools had violated relevant law. The standard you gave us, I won't repeat it, has to do with the level of participation by the Foreign Terrorist Organization in the school. So my question to you was, are we going to find that standard written anywhere in the comptrollers -- within the Comptroller's Office?

A. I think you misstated my testimony. My testimony was the fact is that in these reports are

allegations. Those allegations list identities of individuals, organizations, and -- and -- that have been made against a particular school. We cross-reference those directly to the Foreign Terrorist Organization, you know, information, the -- the OFAC list, all of the different levels of -- of -- of information that you would have and none of those individuals, and none of those organizations were found in that. And so under the circumstances, we have admitted them into the program. They are now qualified under 29.358 and they are able to be contracted with. That is my testimony.

MS. NAJAM: I'll object as nonresponsive. That is not the testimony I was asking about.

Q. (BY MS. NAJAM) Earlier, you gave us a threshold that the office used to determine the level of participation by a terrorist organization that wouldn't be necessary to find that a school shouldn't be approved. Are we going to find that standard written anywhere within the Comptroller's Office?

A. It's -- it's -- in answer to your question, I don't know exactly if that standard would be written, but it's -- in order to apply the law, you would have to do so.

Q. Okay. Back to the letter from March from Mr. Hancock, so that was Exhibit 15.

A. It -- let's see, Exhibit 15. Oh, yes, ma'am. I see it right here.

Q. By the date of this letter, I believe you testified that all the investigations into those 36 Islamic schools had been closed; is that correct?

A. Yes. We -- we had released all of the links for all of the schools -- virtually all of the schools that were Cognia-related across the board. There was -- as I indicated, there were 26 different tranches, all of them were released by the 24th.

Q. Got it.

MS. NAJAM: Objection; nonresponsive.

Q. (BY MS. NAJAM) My question was not about whether links had been sent, I just wanted to clarify that all of the investigations had been closed for the 36th, sorry?

A. Yeah, for the -- for 29.358, absolutely, because we contract -- we're -- we've sent the leaks, we -- we are contracting with those people.

Q. Are you able to tell me why Mr. Hancock used the word 'temporarily' in the second paragraph?

A. I do not.

Q. Okay. And Mr. Hudson asked you whether any kind of public statement went out recanting this letter or clarifying -- sorry, clearing those 36 Islamic schools

of unlawful ties to terrorist organizations.  You recall that questioning?

A.   There's no -- I mean, well, first of all, there's never been a communication of any schools that it -- with the exception of this one identified school in this letter.  So there hasn't been any public information out with regard to any of the accusations made against any of the schools -- any of the 49 schools.

MS. NAJAM:  Okay.  I'll object as nonresponsive, but now I need to cover that.

Q.   (BY MS. NAJAM) This letter, Exhibit 15, this -- this was made public by somebody at the Comptroller's Office; right?

A.   It was released by the -- by the comptroller's press secretary, yes.

Q.   By Mr. Hancock's press secretary?

A.   Yes.  Uh-huh.

Q.   Okay.  So this is an example of a -- a publicly available statement wherein the acting comptroller is saying among the schools the court has temporarily allowed to participate is Houston Quran Academy; right?

A.   Identify that one school, yes.

Q.   He says it's among the schools that are temporarily in; right?

A.   I don't know what other -- among the other

schools. I mean, at that particular time, there were multiple schools above and beyond --

Q. Okay.

A. -- these, including the spring schools.

Q. So anyway, where we got off on this tangent, I was actually just trying to segue. Okay? But I'll skip the segue.

A. Okay.

Q. Putting aside mass public statements --

A. Uh-huh.

Q. -- have any letters or emails gone out to any Islamic schools saying something like, the investigation is closed, or you have been cleared of the allegations of ties to terrorism, something like that?

A. Not to my knowledge.

Q. You testified that people should publicly see that they are in the TEFA program and assume that they've been cleared of allegations. Did I hear that right?

A. No, that's not correct.

Q. Okay. What -- what has been -- what, if anything, has been provided to these -- to the Islamic schools who are now being allowed to participate that they can show parents of the students to show them that there's no pending investigation against us, we've been approved as not being in violation of law?

A.   There is a link on the -- then they could be chosen by any individual parent to be able to attend any of those schools.

Q.   Okay.  So that's what I was getting at.  You're -- the Comptroller's Office believes that the fact that there's a link to choose them in the portal is enough.

A.   For all of the schools that were withheld -- were held and delayed, yes.

Q.   Okay.  But for the 36 Islamic schools, has the Comptroller's Office sent them anything specific that they can show that -- to those parents about the Islamic schools that were delayed in getting links?

A.   Other than this particular school, I'm not aware that anybody would know of any of the other school's identities.  So in answer to your question, I don't know.

Q.   Sir, you're aware that by the time of the temporary restraining order hearing, no Islamic schools had been approved to receive -- had received a link; right?

A.   Yes, and that's because we did -- weren't --

Q.   I didn't get that.  Could you try again?

A.   That's because we were not aware of the fact is that CISNA was -- was directly the lead accreditor.  It's -- we had no idea that in capturing all Cognia schools

that we would capture the Muslim schools as well.

MS. NAJAM: Okay. I'll object as nonresponsive.

Q. (BY MS. NAJAM) You understand that by March 17th, not one Islamic school had been approved to participate in TEFA; right?

A. I just explained what happened, yes.

Q. That -- so -- but you -- I just want to make sure, are you aware of that fact?

A. I do not know that to be a fact, but I believe that, under the circumstances, to the extent that they were -- with the exception of -- of the -- with the exception of the -- let's see, of one school that was -- that was accredited by Middle States Accreditation that was not identified as being Cognia, that I believe that -- I -- and I don't have evidence the fact is that all of the Muslim schools were captured when we -- we set aside Cognia.

Q. On behalf of the Comptroller's Office, are you aware of any Islamic school that was approved for participation in TEFA before we got the TRO?

A. We don't know.

Q. Okay.

A. We -- because we don't account for religious affiliation or religion. It's not part of the -- it's

not part of the -- the question, we were focusing in on Cognia.

Q. Okay.

A. And we -- and we might have captured -- and I don't know I -- if we captured all of the Muslim schools, because they would -- because Cognia has an affiliation with CISNA. So as CISNA came through as the lead accreditor, we might have inadvertently collected them all, but I don't believe all Muslim schools are accredited by Cognia. I don't know that.

Q. Oh.

A. So I don't know -- you know, because not all schools are identified, like for instance, Brighter -- Brighter Horizons, you're -- you're not going to know that that's a Muslim school. We have one --

Q. Well, you can know by going to the website; right?

A. Well, if -- if -- for the standpoint, yeah. It's possible, yes.

Q. Well --

A. And -- and --

Q. Did -- did. Okay.

A. -- and in our -- in our case, you end up having an allegation that was made. No, I don't believe allegations have made -- been made against all Muslim

schools. I don't know exactly how many Muslim schools there are. We don't. But under the circumstances, you know, those that were captured with Cognia would be part of the schools that we had set aside. So --

Q. Okay.

A. -- to the extent that there are schools out there, I'm not aware of any.

MS. NAJAM: Okay. I'll object as nonresponsive.

Q. (BY MS. NAJAM) And where we got off on this tangent was that I was asking whether the Comptroller's Office sent anything to the Islamics -- the 36 Islamic schools that were being investigated, whether it provided them with any documentation that they could share with their parents. Is the answer no?

A. I don't know.

Q. Are you aware -- is the Comptroller's Office aware of anything specifically sent to them --

A. I don't know.

Q. -- for them to share? Okay. And I think Mr. Hudson asked this with respect to just the dossiers that the researchers put together, but did the -- except for the 36 Islamic schools identified by Mr. Westrop at the Middle East Forum and the other 13 schools that were allegedly tied to the CCP, did the Comptroller's Office

do any investigation into any other schools --

A.   Yes.

Q.   -- in connection with TEFA?

A.   Yes.  With -- with regard to Cognia, we went through the process of making sure that all of the Cognia schools, which -- would include all of the schools that are at issue --

Q.   I -- I'm sorry.  I didn't -- let me -- let me --

A.   Okay.  I'm sorry.

Q.   -- reasked the question with -- with more detail at the end.

A.   Okay.

Q.   Besides those 36 Islamic schools identified by the Middle East Forum and then the 13 that were alleged to have ties to the CCP, did the comptrollers Office do any other investigation to determine affiliations with foreign adversaries or terrorist organizations?

A.   They vetted all of those schools that were part of the Cognia as we were going section by section, by section.

Q.   You hired --

A.   And that was part of the inquiry, yes.

Q.   Okay.  You had researchers out there compiling reports; right?

A.  With regard to -- they -- what they did was they looked at the allegations that were made against specific schools.  To the extent that there were not allegations made against schools, there was no reason for them to research that.  And so to the extent that we took a look at all of the schools, no matter what their qualifications were, we basically -- there were -- that Cognia group we went through and we made the same review across the board.  Are they a part of any of those lists?  Do they end up -- are they qualified as being, with the Secretary of State, as in good standing?  All of those same determinations were made.

MS. NAJAM:  I'll object as nonresponsive.

MR. ROOSIEN:  Why would not -- wait.  You -- you -- let's take a break.  Let's just take a break.

THE NOTARY:  All right.  The time is 5:26 P.M.  We're off the record.

(Break taken.)

THE NOTARY:  All right.  The time is 5:36 P.M.  We are on the record.

Q.  (BY MS. NAJAM) When we left, we were talking about investigations.  I will ask a new question.  Were any researchers engaged to investigate any schools besides the 49 that we've discussed today, the 36 plus

the 13?

A. The -- the researchers were only looking at the allegations that were made and that's the areas that they researched. And so to your answer, I do not believe -- I would believe the answer is no.

Q. Okay. I want to ask you about a few exhibits.

A. Okay.

Q. I'm going to -- I -- just for the record, I erroneously marked two 18s. So before we leave today, I will fix the administrative code provision --

A. Okay.

Q. -- that I handed to you that actually will need to be Exhibit 19. Sorry about that.

A. No worries.

Q. I'm now going to hand you what I'm marking as Exhibit 20. So Exhibit 20 is the first communication that the Comptroller's Office has produced in this lawsuit with the Middle East Forum, and it is dated January 20th, 2026?

(Exhibit 20 was marked.)

A. Yes, ma'am.

Q. (BY MS. NAJAM) And attached to it is a document that -- I'm just going to call it what the attachment calls it, it calls it, Texas Schools Draft, Version 1.2. Do you see the attachment?

A. Draft. Yes, I do.

Q. And just to make sure I understood your testimony from earlier in the day, there was a separate longer list provided by the same individual, Mr. Westrop, before December 9th of 2025?

A. I do not know the specific date, but there was a longer list that was provided by Mr. Westrop, yes.

Q. But it was-- you said sometime before application links went out to schools other than the 700 Cognia schools; right?

A. I'm not sure exactly. Can you repeat the question, please?

Q. Sure. I believe earlier you testified that there were two reasons why Cognia schools were not part of that initial tranche of schools that got links in December of -- of '25; right?

A. Uh-huh.

Q. You said one reason was because there was an issue with Cognia accreditation, and the second issue was that there were 49 schools that were flagged by TIPs; right?

A. No, there -- I -- what I did -- I did say that the fact is that ultimately that there was 49 -- there were accusations made against a total of 49 schools with regard to terrorist organizations or transnational

organizations. There ultimately was 36 that were identified. And as for the those schools that could potentially be related to the CCP or foreign hostile nation, there were 13 schools.

Q. Okay. The 36 that were the subject of allegations that we've been talking about all day, was the source of that list also Sam Westrop who's identified on Exhibit 20?

A. That was part of the source, yes.

Q. Okay. And by the way, I -- I -- I think you told Mr. Hudson you actually had a conversation with him or -- in February or March of this year?

A. I don't know exactly when, but sometime -- probably around that period of time, yes.

Q. How long was that conversation?

A. I don't recall exactly, but it'd probably be about an hour, I would imagine, possibly.

Q. What did he talk about for possibly an hour?

A. Just being able to find out what the nature of the accusations are, and be able to kind of feel as to whether or not that he seemed to be credible.

Q. And did you make a determination that he was credible, or was that just part of a -- a larger conversation?

A. I mean, it -- it was a part of a larger

conversation, but I did find that, you know, the nature of what he was stating in his research, it -- it appeared to be credible.

Q. Does the comptroller consider a potential bias of any sources when it comes to potential allegations of disqualifying a school?

A. Absolutely. That's the reason why they just were allegations and they were looked at independently, and again, verified directly against the lists that are -- that, you know, are applicable to terminate a -- you know, or to preclude a school from contracting with the state.

Q. Did you Google Mr. Westrop?

A. I did not Google, no.

Q. Did you ask any researchers to research him as in terms of his credibility?

A. I have talked with individuals and researchers and they have found that he generally is credible.

Q. Who -- who was that? Who said he was credible?

A. Lara and -- Lara Burns as well as Rueben Katz.

Q. Did they make you aware of a defamation judgment against him for falsely accusing someone of being a terrorist?

A. No, they did not.

Q. Okay. Sorry. Back to Exhibit 20. This is

dated January 20th, and it's at 8:10 P.M. Do you see that?

A. Yes, ma'am.

Q. And earlier, you mentioned that you had gotten a report -- a report from the Middle East Forum through other means. I think you said a Texas legislator had also sent the same one?

A. There are documents that we have submitted to you that have the various reports, yes, and as transmitted from Representative Troxclair and as well as other individuals, including Mr. Westrop himself.

Q. Okay. So if you look at Exhibit 20, this is the only Middle East forum report about Texas Islamic Schools that was produced to us as being transmitted, like it's the only e-mail, but you think -- you believe there are others; is that right?

A. Whatever is attached to the communications that were provided, I -- you know, would -- would be all that I have seen. I was not party to the -- the collection of the data or information.

Q. Okay. But in any event, on this date, after receiving this particular draft from Mr. Westrop, the Comptroller's Office decided to put in place some procedures to follow up; is that right?

A. Oh, no. Given -- as I indicated and as I

testified before, that -- there was a continuous communication and a variety of contexts, whether they be out the comptroller out on the campaign trail, legislatures, I mean, individuals, you know, citizens communicating and talking about this particular issue with the comptroller and the Comptroller's Office during October, November and December of 2025, which is what led to the -- in conjunction with the questions that we had regarding the accreditation issues with Cognia led us to set them aside and -- and not issue the Cognia schools links, and decide that we're going to review those in tranches during the period of time as separate and distinct from the other schools.

Q. Okay. Well, an example of one change made was that as soon as this particular report was received, the office decided to remove Bayaan Academy; right?

A. The reason why Bayaan Academy was removed was because it was identified originally as being Middle States, and it was not identified as being co-accredited by Cognia. When it was identified as being co-accredited by Cognia as well as the accusations, it was brought in -- back into to be reviewed.

Q. Okay. I'm going to hand you Exhibit 21.

(Exhibit 21 was marked.)

A. Uh-huh.

Q.   (BY MS. NAJAM) This is later that night as -- the same night as Exhibit 20; right, sir?

A.   Yes.

Q.   And Ms. Stout is attaching that same Sam Westrop draft document about Texas Islamic Schools; right?

A.   I don't know if that's the case because I don't see -- in here the subject says, "Review of radical influences over Cognia accredited schools." I don't see an attachment or any reference like what's up here where it says, "Texas Schools Draft B 1.2 docs."

Q.   Okay.  So this is how it was produced to us without the attachment, but actually --

A.   Oh, I'm -- I'm sorry.  Yeah.  I actually see now, not on the -- I was looking at the Sam Westrop information.  I see that in the front here.  It says, "Attachments," and it has a series of attachments, Facebook, Twitter, YouTube, LinkedIn, and logo.png, and it says, "Texas Schools Draft Version 1.2 docs."

So there's a variety of documents that are attached to this that are not present.

Q.   Okay.  But my question was, this is Ms. Stout attaching, okay, put aside the PNGs, those are pictures, the same document entitled Texas Schools Draft Version 1.2, which was the same name as the one Mr. Westrop had

attached in Exhibit 20; right?

A. It -- it -- it is one of the many attachments there to this particular document, yes.

Q. Okay. And she says, "Circulating this e-mail and attachment received this evening that highlights a number of schools in our Cognia hold per the letter to the OAG." And then she says, "At the very least, based on the information provided, it seems that there would be reasonable questions about possible affiliation to FTOs, foreign adversaries, or perhaps concerns. Read the Government Code Chapter 557." And then she says, "Please review this and let's discuss how this might inform our next steps." Did I read that correctly?

A. In part, yes.

Q. What part did I misread?

A. Well, not misread that. I mean, you're missing one where it says, as I indicated before, the Bayaan Academy is not a Cognia school per our -- our information from TEPSAC.

Q. Okay. I -- I was reading the first paragraph.

A. Okay.

Q. So now I'm going to move on.

A. Uh-huh.

Q. Number 1 is about Bayaan, right --

A. Yes.

Q. -- as you just pointed out?

A. Yes.

Q. And an -- an underlining, I'm not going to read it out loud, but she is saying that the office should proceed with temporarily removing Bayaan two hours after Mr. Westrop's list and citing that list as a reason; right?

A. Well, it cites multiple -- there's Outlooks, I don't know what those -- I have no idea what those Outlooks are, but certainly Texas Schools Draft Version 1.2 is one of the documents that she's indicating the fact is that there appears to be a question about possible affiliation and so that's an accusation that she believes that needs to be investigated.

Q. So let me ask that again. She is saying that given Mr. Westrop's list naming Bayaan, she thinks they should proceed with temporarily removing that school?

A. It -- not removing the school and putting it back into the, you know, to be reviewed because of the Cognia affiliation and this -- these accusations, but it says at the very least based upon the information provided, the information provided is all of those attachments. So I don't know what any of these attachments are.

Q. Okay. Maybe we can clear that up later if we

can get this reproduced with all the attachments. Bayaan was shortly, after this January 28th e-mail, temporarily removed from being available on the -- the portal, true?

A. That's true.

Q. Okay. I'm going to hand you Exhibit 22. It's an e-mail from the next day. And to save us some time, I will tell you what my question is going to be.

(Exhibit 22 was marked.)

A. Okay.

Q. (BY MS. NAJAM) Okay? There's a process that Ms. Stout outlines in the middle of the page. It has three bullet points. Do you see them?

A. Yes, ma'am.

Q. The first one has to do with Googling, the second one has to do with the school website, and the third is comparing to info provided already.

A. Uh-huh.

Q. And then underneath that, she says, "If the school clear -- is clear on all three, she'll add them to the list to approve application links, and if the school fails for one or more criteria, they'll be on hold." Here's my question. Is this the process that was in fact followed?

A. It's a process that may have been partially followed or may have been followed for a short period of

time, given the fact that at this time I believe that the Attorney General had not responded back to the comptroller's question, and that we were trying to find a way to be able to move forward. And so again, under the circumstances with regards to, you know, some of the schools whether or not FTOs or any allegations have been made, this was the effort to be able to work with those. And then at the bottom here is, as I testified before, going to shoot, as we were releasing these in batches, there was 110 approximate schools at the end of the week that were co-accredited, and so those were the ones that -- that could be cleared at this -- at that particular time, and so that's the portion of it with regards to, again, moving forward to try to maximize the number of schools that we could release at any one time.

Q. Who at the Comptroller's Office would know to what extent and for how long the process that Ms. Stout decided on January 21st was in fact followed?

A. Mary Katherine Stout would be the best person that would know.

Q. And according to the process as of January 21st, if a school -- if information had been provided to the Comptroller's Office about a possible affiliation with an -- an FTO, then according to this process, that would -- that would be a "fail." In other words, that

school would continue to be on hold; right?

A. It would be on hold. I mean, at this particular time, you know, we -- we had not heard any information from the Texas comptroller, I'm sorry, the Attorney General. And so we were trying to figure out how we were going -- what we were going to do in the interim. So we made a determination that we would clear the schools that were jointly accredited believing under the circumstances that of the 700 schools, that 110 approximately would be released because they were at least accredited by somebody other than Cognia. And then we began the process of -- of when the -- because it was just a couple days later that the Attorney General came back with a response and basically told us that we were solely responsible and then it became, you know, what were we going to do? Because we -- at this particular time, we're really not in the -- in the mode of investigating, we're looking to be able to see if the Attorney General investigate. You know, as I -- as I testified before, our expertise is in tax and so there's a question about, you know, what were we going to do? And so this is an effort at that period of time what was going on.

Q. Okay. Now, we looked at other examples of these reports. I'm just going to mark the one that has

to do with my client. It's Exhibit 23. Can you just confirm for the record that this is the report put together by those two researchers, Ms. Burns and Mr. Katz?

(Exhibit 23 was marked.)

A. Yes, ma'am.

Q. (BY MS. NAJAM) For Excellence Academy?

A. Yes, ma'am.

Q. And do you happen to know on which date the Comptroller's Office received this one?

A. I do not know.

Q. And so when Mr. Hudson was asking you about whether the researchers were asked to form any conclusions, you -- you -- you said no; right?

A. Yes.

Q. If you look at the last page, 678.

A. Yes, ma'am.

Q. There's a legal/national security significance section. Do you see that?

A. Yes.

Q. And by the way, it starts with the words, "the federal TRO." You understand that to mean temporary restraining order?

A. Yes, ma'am.

Q. So is it fair to say that the -- that this

report was issued after March 17th?

A. I don't know.

Q. Well, the federal TRO in this case was issued on March 17th; right?

A. Yes, ma'am.

Q. So if it -- if the document references it, then fair to say that the document was created after March 17th?

A. It appears to be so for this document, yes.

Q. At the -- at the end of that paragraph, it -- the author of this said -- I mean, I'm not going to go through them, but it references throughout this report, "Alleged institutional connections to an organization and speakers," and then it says, "should" -- and I'm second from last line, "should disqualify it from receiving public funds under Texas's designation of care and the Muslim Brotherhood as Foreign Terrorist Organizations." Can you explain why the -- whoever wrote this document would be actually arriving at a -- a conclusion about legal implications or inclusion in TEFA?

A. I -- I cannot. And obviously, we did not rely upon that statement.

Q. So it wasn't asked of the researchers, whoever wrote this just volunteered it?

A. Volunteered it, yes.

MS. NAJAM:  Okay.  I'm almost done, I promise.  Okay.  No, I -- I'm -- actually, I have no further questions.  I pass the witness.  I don't know if you want to take a break.

MS. GHYAS:  Yeah.  Can we have, like, a five-minute break?

MS. NAJAM:  Yeah, of course.

THE NOTARY:  All right.  The time is 5:15 P.M.  We're off the record.

(Break taken.)

THE NOTARY:  All right.  The time is 6:02 P.M.  We are on the record.

MS. GHYAS:  Thank you.

E X A M I N A T I O N

BY MS. GHYAS:

Q.  Hi, Mr. Miller.  My name is Maha Ghyas, and I represent some of the plaintiffs in the school and I just have a couple of questions for you.  So going back to the beginning of this timeline, how many non-Cognia schools were approved before -- in January 2026?

A.  I couldn't tell you off the top of my head as to how many schools were approved.  I know that as -- currently there's 2,599, but I do not know exactly what the date was at that time.  I would have to -- you would have to see the, you know, the schools, we -- we would

have to run that separately.

Q. Okay. So of the non-Cognia schools, did the Comptroller's Office or Mary Stout's office apply that vetting process to any of those schools?

A. The vetting process, no.

Q. No? Okay. And just to clarify, the vetting process that we talked about, you testified earlier that after the Attorney General issued his opinion on January 26th, that the process that Mary Stout had outlined in Exhibit 22 changed?

A. It -- as I testified before, it was consistently changing throughout based upon, you know, the nature of what it was that we were trying to get accomplished. As, again, we're building out a program that we've -- you know, that have never been in existence before and we're doing it with a handful of people. So, you know, we have -- we have a number of individuals that are continuously -- you know, from the beginning, we're starting off with the rules, we're starting off with, you know, putting in the infrastructure.

In October, we bring upon Odyssey. There are conversations that are occurring on an ongoing basis to how this relationship works based upon the contract they get to work. And then we begin the process in February 4th, beginning the collection of schools and

putting -- bringing them on board. We've invited approximately 3,912 of the schools to potentially participate, but then -- you know, but before we did that, we pulled out the 700 schools approximately from Cognia. We also had the hundreds of potential pre-approved individual vendors that were -- and therapists, and other service providers that were going to be -- that are going to be made available in order to be -- purchase those services. So we're -- we're putting all of these things together in anticipation.

Of course, then when we get to the point where we're also looking at having the opportunity to be able to move these forward so that they can be selected. So we're thinking about the lottery process, validating the fact that all of these individuals fit within these tiers duping. I mean, there's all these things going on, and so finding and working through the schools is just a part of the regular every day. And so if you take a look at, you know, for -- with regards to Cognia or, just for that matter, all the schools in general, the -- the Cognia schools are being brought through in batches.

Q. Uh-huh.

A. And as I testified, there were about 26 or 28 individual batches. And you can see in the -- in the makeup of those schools, the nature of those schools --

and -- and again, the first 110 that we released from Cognia, those were schools that were dual-accredited. We started to begin the process at first of trying to get the squeaky wheel because we believed that those -- and we talked about the fact is that those -- that ended up being a -- a -- a -- more of a problem than a help. So we ended up working our way all the way through. So the process is continuing to evolve --

Q. Okay.

A. -- as we're going through and at different times, there's different things --

Q. And how -- how did the process evolve? For those specific Cognia schools, as you're working through the batches, how did the process change?

A. Well, the -- the process changed by trying to -- again, trying to find the information that would make it the most efficient way to be able to make determinations as for whether the school qualifies under the program.

Q. Okay. So were you applying extra statutory criteria in your review?

A. It -- well, again, we're taking a look at all the criteria. It's not extra statutory because, again, you're making determination whether the accreditation was -- you know, was valid, whether or not they were good --

good standing, whether or not that they were involved in any type of, you know, TRO and that -- so that's being applied across the board to all the schools so that -- that -- those filters are -- are -- are the same. And so you -- you can see as I -- I -- again, I would take a look at the -- the batches that are being made. At -- you know, as it goes through, you can see that all of the schools are being done. And the schools that have the heaviest lift are being delayed just simply because we're trying to maximize the number of schools that we can get, you know, determined in any one single day. We're also trying to figure out exactly how we're going to evaluate those schools, and getting people on board that have the ability to have the expertise to be able to provide us with information so that we can make a valid determination in an area that we were anticipating the Attorney General would -- would take control over.

Q. Okay. And so when -- in the e-mail that Mary Stout had sent, that was predated the Attorney General's investigation --

A. Yes, ma'am.

Q. -- she referenced googling the name of the school along with CAIR or with Muslim Brotherhood. Did you recall that?

A. I do.

Q.   Okay.   And so did you continue the Google investigation for all those 700 schools and those 28 badges?

A.   Well, they -- this -- in order to be able to determine information about the school, yes, we'd look at the website, and we would look at -- for information. With regard to CAIR, CAIR was a little bit of a -- of a different lift because we were -- I mean, as you can identify with the -- with Congress, there was a question whether or not that CAIR would be determined as a Foreign Terrorist Organization.   There were hearings on that.

Q.   Right.   But at that point, it had not yet been determined?

A.   No, it -- it still has not been determined.

Q.   Right.

A.   There is -- the Attorney General had -- the Attorney General and the -- and the governor have been sued by CAIR and its affiliates -- CAIR Texas and its affiliates because of the fact that there was a proclamation that determined it to be a Foreign Terrorist Organization and a Transnational Criminal Organization.

Q.   Okay.   So I'm going to move on a little bit.

A.   Yeah.   Go ahead.   Sure.

Q.   And so the second part of that is, you know, there would -- there would be a review to -- to determine

whether or not the organization had ownership that was suspect or was included in some of those lists. Do you recall that second bullet point?

A. Yes. In part, yes.

Q. Okay. Did you then review the website to see if any teachers or any school staff was affiliated with those organizations?

A. The -- as a matter of fact, yes. And -- and you can see that in the final reports where it talks about principals or individuals that are part of it, because again, what we're looking --

Q. And which -- which final reports are you referencing?

A. The -- the reports that -- the reports that -- that are part of the record that we've looked at today.

Q. The dossiers, or in the Excel sheets?

A. Well -- well, the -- no, the -- the -- in the dossiers -- I guess, you're using dossiers, but basically this is a list of the accusations and a list of the individuals that are identified as being part of that school. And so once we found the organizations, we found the individuals that were there, you just look at the Foreign Terrorist Organization list and the OFAC list and the rest, are they there -- are the organizations there? Because there's a lot of situations in which -- that

you've have -- you know, like for instance, if you take a look at the -- if you take a look at any of the litigation that has occurred prior to this, then you end up in a situation where there are individuals that are unindicted co-conspirators, you have individual information that's ancient.

Q. Uh-huh.

A. You have a variety of different things. And so if they're not -- if they're not on those lists, even though there may be some accusations or allegations as a regard to that, we have no solid evidence that that is accurate or that is true. And since we didn't have anything that would be able to establish any of these as being factually accurate or they were so old that they would no longer potentially be relevant, that made a determination that, you know, that under the circumstances they should be approved with their links.

Q. Okay.

A. So again --

Q. And I guess maybe to be a little clearer with my question because I may not have been.

A. Sure.

Q. You did not apply that process to the Cognia schools that were not one of those 49 schools about which you had received a complaint?

A.   The -- it -- well, it -- it -- it -- if we're talking about the nature of the accusation, the nature of the accusation drove the inquiry.

Q.   It drove the process that you applied in the investigation?

A.   Well, in -- in that -- in those particular allegations, laying out the potential allegations, and also with regard to CAIR because there was a possibility where the Attorney General and/or -- you know, because the Attorney General did -- is a defendant and also a -- is prosecuting a case of declaratory action against CAIR. If at any time during this particular process all of a sudden CAIR pops up, you know, we have the nature of the connection and the nature of the connection, like for instance, there was one representation of know your rights.

Q.   Uh-huh.

A.   Well, knowing your rights is not anything that would be actionable.  I mean, that in and of itself the fact that CAIR was there and you're giving a -- having attorneys talk about that.  So, you know, under the circumstances, a lot of these, you know, innuendos or statements or allegations, when you take a look at the underlying statement, you know, do not add up.

Q.   Okay.  Thank you for that.  So there was a -- a

question that my co-counsel, Ms. Najam, asked you. She asked which sources you used to identify the 36 schools back in December, and you named Sam Westrop as one of them. What were the other sources?

A. Well, the other sources were individuals that had identified or been talking with one of the staff and --

Q. What were their names?

A. I don't have all of their names because some of this occurred out on the -- on the, you know, campaign trail, et cetera. But we also have -- and I believe we submitted the ones that -- that we actually have documents for, and I believe that would be Representative Troxclair, we have Westrop, I believe that Amy Mek, there's references, of course, to the RAIR Foundation. There are other references within the -- there -- again, this is all public information that is in those reports that basically lay out the accusations, and so those are the things that -- that we have. So the best source of that information is looking at the -- is looking at the reports to be able to see all of those particular connections.

Q. Okay. And so just to quickly touch on 29.358, does the Comptroller's Office only apply H2 to determine if other relevant laws have been violated if it receives

a complaint about the school or the entity?

A.   If there's an accusation and it falls potentially within other relevant law, say, for instance, as I indicated before, is that this -- is that the entity is no longer validly operating in -- in the State of Texas.  We find out a situation where they actually would be -- there's alleged and you're looking at -- it's alleged that they're a Foreign Terrorist Organization or connected directly to a Foreign Terrorist Organization, you're looking to see if they're on a list.  You know, so there -- there's a direct application as to what the allegation is, and so you're -- you're basing it upon the nature of the allegation.  For those individual accreditation issues, you're also looking through the accreditation question.

Q.   But that question doesn't come up until there's a complaint that's made?

A.   Yes.

Q.   Okay.  And that includes if an entity is not validly operating in the State of Texas, the Comptroller's Office does not investigate that independently?

A.   We -- we -- we could.  I mean, under the circumstances, there's some things that we're potentially going to go back in and take a look at some aspects to

this, but usually it's self-reported.  The fact is that they are, you know, no longer valid because of the failure to report franchise tax, and so they will -- they will -- there's a lot of self-reporting, just like there was situations where we were finding out that, you know, entities or schools did not have their final, you know, site visit and so the accreditation, those types of things.  There -- there's a variety of things that occurred throughout this.  The TEPSAC list, as we found out, was not as clean and as accurate as it should have been.

Q.  Okay.  And so let's talk about the investigators that you-all hired, I think, Lara Burns and Rueben Katz?

A.  Yes, ma'am.

Q.  When were they hired?

A.  Let's see.  There was conversations with them in advance and -- and work that was performed.  I -- I'm not exactly sure exactly -- when exactly they were hired, I -- because they -- there's -- they did perform work and then a contract occurred subsequent to some of the work that they did, so I'm not exactly sure, but we could find that out.

Q.  Like, rough estimate, do you know?

A.  I don't.  I wouldn't want to -- I'd prefer to

be able to be exact.

Q. And you testified earlier that they were hired based on some individual recommendations. What recommendations were those? Who were they made by?

A. Well, we were looking for academic information, and so academic, you know, expertise that led us to -- that led us to Lara Burns. And then from there, there was -- she was referring to the -- to Rueben, and then -- so that's kind of how that moved across. We needed that to --

Q. And so what was her academic recommendation, or what was the academic, I guess, expertise that you were looking for?

A. She was -- she has expertise in Foreign Terrorist Organizations and -- and also adversarial nation states. She works for the -- and is a full-time employee as well with the Georgetown University.

Q. Okay. Thank you. Let me see. Okay. And just to quickly go back to what is a credible claim. In Exhibit 6, and I think Mr. Hudson asked you about this, under Number 9, it says, "Conduct investigations of schools and vendors that are identified in a credible claim or allegation that potentially violate Texas Education Code Section 29.358, including claims of fraud, theft, waste, or abuse." So if you get a complaint that

references a school's curriculum or their teachers, is that a credible complaint under Section 29.358?

A.   I -- let me -- I'm trying to figure out -- look for 6 here real quick.  I'm sorry.  Okay.  This is P6. Can you restate the question, please?

Q.   Yes.  When you are to -- how do you determine what is a credible claim?

A.   Again, that would be on a case-by-case basis, but I -- it would be by the -- the nature of the -- of the person that is, you know, presenting that to you, the evidence that is being presented, and the appearance support for that evidence, and the ability for you to be able to validate or verify, you know, the -- the accusations as being -- you know, appearing to be reasonably accurate.

Q.   So could a complaint about the curriculum taught at a school be a valid complaint?

A.   I don't believe, or I don't know that we have the authority to be able to look at curriculum.

Q.   And that would be under Section 29.368, I think you-all are limited from evaluating curriculum?

A.   Yes, ma'am.

Q.   What about a complaint about a teacher at a school?

A.   A teacher as in what type of a complaint?

Q. Like, let's say, who the teacher is?

A. Well, it -- no, I mean, because we -- we check that. I mean, under the circumstances, if unless you're on the list, then there's -- you know, there's no violation. If you're inciting violence, for instance, and you're, you know, doing that, then you're run afoul of -- you know, of the state law, and that would be totally different. So, I mean, depending upon the circumstances, just the fact that an individual teacher is present absent being a portion of any of those lists, no.

MS. GHYAS: Okay. I believe that's all I have, so I will pass the witness.

THE WITNESS: Okay.

C R O S S E X A M I N A T I O N

BY MR. ROOSIEN:

Q. I only got one question. Do you know whether or not yesterday, in connection with our initial disclosures, we produced a list of the 700 schools and that includes annotations on the batches when the links were released?

A. Yes.

MR. ROOSIEN: That's all I have.

MS. GHYAS: Okay. I have some quick follow up.

EXAMINATION

BY MS. GHYAS:

Q.   Did you predetermine the batches?

A.   Predetermine the batches as they were --

Q.   Yeah.  Did you decide at some point there were going to be, like, this number of batches, and I know you said we would do, like, 100 schools per batch?

A.   Not 100 schools, no.  I mean, we have 24, 26, or 28 batches, but the batches that are listed, again, we're trying to build out the program --

Q.   Uh-huh.

A.   -- with a limited number of people, so it's -- really gets down to time that's available.  And so, you know, with all of the things that you've got, with the parents being approved, validation of their information, getting prepared for the next phase, getting new contractors, you know, on board, getting, you know, all of this involved, these particular Cognia Schools was an actual extra lift and it involves all kinds of schools.

Q.   So how did you determine what schools would go into what batch?

A.   As we talked about, you know, is that we tried to be able to find ways, and it kept evolving as the -- during the time period to be able to try to maximize the number of schools that we could go.  And we -- as we

talked about, the first was the 110 schools that were -- that were -- I'm sorry -- 110 schools that were dual-accredited. Then we went to a -- a -- a time period in which we were focusing and trying to be able to get schools that were K through 12 or, you know, with potential for larger numbers. We were talking about the squeaky wheel about, you know, individuals that were asking for their -- you know, their -- their links and trying to work through those. And -- and then we found that with Cognia and through the private school -- Texas Private School Association, that they were really pushing all of the -- you know, their -- their schools to be able to make those requests. We found out that as a result of that, we -- you know, we would issue these links.

Nobody -- you know, they would apply or they would delay or null apply or they would delay an application, so it was clearly not a particular issue, that really wasn't assisting. And so we just kept -- we -- we kept the schools that had the heaviest, you know, burdens of being able to verify and working our way through and so that process was continuing. I think you'll see that in the -- you know, as for the number and as for the nature of all the schools in that -- in those -- in those batch lists.

MS. GHYAS: Thank you. And I'll pass the

witness.

MR. ROOSIEN:  Nothing further.

MS. GHYAS:  Okay.

THE NOTARY:  All right.  The time is 6:22 P.M.  We are off the record.

(Deposition concluded.)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS

BAYAAN ACADEMY, INC., *et al.*,  §
  Plaintiffs,  §
              §
v.  §  CIVIL ACTION NOS. 4:26-CV-01960
              §              4:26-CV-01675
KELLY HANCOCK, *et al.*,,  §
              §
  Defendants.  §

REPORTER'S CERTIFICATION
DEPOSITION OF MURL MILLER
MAY 19, 2026

I, ADRIANNA HUGHES, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MURL MILLER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

Certified to by me this 5th day of June, 2026.

_____

ADRIANNA HUGHES
Texas CSR #13089
Expiration Date: 09/30/2026
STENO