# EXHIBIT "4"

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 30/03/2017

**Before** :

**SIR DAVID EADY**

- - - - - - - - - - - - - - - - - - - -

**Between :**

**Mohamed Ali Harrath**                    **Claimant**

**- and -**

**(1) Stand For Peace Limited**            **Defendant**
**(2) Samuel Westrop**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr Jacob Dean** (instructed by **Carter-Ruck**) for the **Claimant**
The **Defendants** were unrepresented

Hearing dates: 14 March 2017

- - - - - - - - - - - - - - - - - - - -

# Judgment

**Sir David Eady :**

1.   The purpose of the hearing before me on 14 March 2017 was for the court to assess the appropriate award of compensatory damages following the order of Master Kay QC on 27 October last year that judgment be entered for the Claimant. This followed the Defendants' failure to comply with an order for the payment of costs. A fuller account of the background to the dispute, and of the matters earlier raised in the parties' statements of case, is to be found in the judgment of Warby J at [2016] EWHC 665 (QB).

2.   The Claimant was politically active in Tunisia prior to his arrival in the United Kingdom in 1995, where he was in due course recognised as a refugee and granted indefinite leave to remain. He is the founder and chief executive of the Islam Channel, which is a television channel specialising, as the name indicates, in current issues relating to Islam. The first Defendant is a limited company and operates a website ([www.standforpeace.org.uk](www.standforpeace.org.uk)), which is said to provide a platform for rational discussion of "the topics that drive the Muslim and Jewish community apart". The second Defendant is a director. They claim to provide "a fair and well referenced account of the forces that threaten the liberty, equality, tolerance and democratic values that make Britain a free society". The evidence before me appeared to show that there are regular references in the mainstream media to the organisation and the

content of its website, which would suggest that it is widely known about and regarded as an authoritative source of information in its specialist area.

3.     The Claimant sued upon an article posted on that website on 27 October 2014 under the heading "Subway withdraws sponsorship of extremist charity fundraiser", which remained there until March 2016.  For much of the time it was given considerable prominence.  It explained that a fund raising event was to be held in Manchester under the title 'Reviving Gaza', which had initially been sponsored by Subway, a fast food chain, but it had withdrawn its support once it had become aware of "extremist links".  The article went on to identify some of those supposedly extremist links, referring specifically to the Islam Channel and claiming that "Its CEO, Mohammed Ali Harrath, is a convicted terrorist".  Those are the words complained of and they are plainly seriously defamatory of the Claimant.  The meaning pleaded in the particulars of claim is simply that "the Claimant is a terrorist".  In view of the Master's order, there can be no defence and no dispute as to meaning.

4.     There was a hyperlink attached to the words "convicted terrorist" with a link to an article which had appeared on the *Guardian* website from 24 October 2010 (i.e. four years before the words complained of).   It is a reasonable assumption that a significant number of readers who were interested in the words complained of would have followed the link.  The *Guardian* article does not much matter for present purposes, save to the extent that it contained a reference to the Islam Channel and an accusation by the Quilliam Foundation that it promoted extremist groups.  It added that the Quilliam report also alleged that the Claimant "has a conviction in Tunisia for terrorism related offences".

5.     The Claimant has adduced evidence to demonstrate that the allegations against him are untrue, and that there is no defence which could have succeeded.  He was concerned to demonstrate that he does not simply rely upon the burden of proof or upon the circumstances in which the judgment was obtained.  He wishes it to be clear that he is entitled to succeed on the merits.  It had become obvious, well before the Master's order, that this was the case, as illustrated by the history set out in the judgment of Warby J, dated 6 April 2016.  The Claimant is thus entitled to obtain a convincing vindication of his reputation, on the evidence before the court, and not merely because the Defendants are barred from defending.

6.     It is important to record this expressly because of the contents of a document placed before the court which is dated 6 March 2017.  It arrived with the Claimant's solicitors on 8 March directly from the second Defendant after months of non-engagement: his solicitors had come off the record on 20 October 2016 as being without instructions.  It was apparently intended partly as a skeleton argument and partly as a witness statement.  I read it without objection from Mr Dean, although much of it was inadmissible and/or irrelevant.  (For example, it is clear that the limited means of the second Defendant are irrelevant to the assessment of compensatory damages.  So too, his state of mind and his motives would be nothing to the point.)  But what is significant in the present context is the suggestion that the Defendants were debarred from defending "on the basis that neither has any money to pay the costs".  I have no wish to be unfair to the second Defendant: it may be that these words were intended to mean no more than that the Defendants were unable to meet the costs ordered against them by the Master. But there was some concern on the Claimant's part that this *may* indicate an attempt to "spin" the outcome; that is to say,

by giving the impression that it was only their lack of funds that prevented them from putting forward a substantive defence. In case this suggestion gains further currency, it is right to say that the Claimant can refute it. There simply was no evidence to support the allegation of terrorism or to rebut his evidence to the contrary. The Defendants' case had crumbled, and their statement of case had been correspondingly amended, by March of last year. The Defendants then acknowledged, albeit late in the day, that the Claimant "is innocent of these offences". It seems unlikely that they would now seek to resile from this concession.

7.    There can be no doubt that the Defendants' words mean that the Claimant was guilty of terrorism. Moreover, that allegation could not be proved by reference to a conviction in a foreign court. That contrasts with the position under s.13 of the Civil Evidence Act 1968, whereby a claimant's guilt of a criminal offence *can* be proved in a libel action by reliance upon an English conviction. As it happens, the Claimant discovered, after the event, that he had been "convicted" of an offence in his absence by a Tunisian court in or about 2005. He still has no idea as to the evidence (if any) on which this was based. He denies that he had committed any such offence and contends that this was a politically motivated act – such as had been perpetrated on a number of other political opponents of the then Tunisian government. Indeed, a few years later in 2011 (i.e. after the *Guardian* article had been published), all those people were declared innocent by a so called "amnesty" and provision was made for claiming compensation. The term "amnesty" is apt to mislead, however, since the evidence is to the effect that it went beyond a mere pardon and was intended as an acknowledgement of innocence.

8.    Strictly speaking, since the Defendants are debarred from defending, the Claimant does not need to explain the background to the *Guardian* article. Yet, as I have said, he does not wish to rely on any presumption of innocence. Indeed, the Defendants do not seek to challenge his evidence and would not now wish to maintain the suggestion that he is guilty of terrorism – or even that there are reasonable grounds to suppose so.

9.    I can safely proceed, in the light of the evidence before me, on the basis that the Claimant is *not* a terrorist. There is thus no doubt as to his entitlement to compensation for the injury to his reputation, for embarrassment and hurt feelings and for the purpose of vindicating his reputation. In other words, the sum awarded should be such as to leave interested onlookers in no doubt as to the baselessness of the Defendants' charge against him.

10.   It has been recognised for the last twenty years or so that, in order to ensure that libel damages are proportionate, judges (and formerly also jurors) should, when assessing the appropriate amount of compensation, work to a notional upper bracket or "ceiling": see e.g. *Tolstoy Miloslavsky v UK* (1995) 20 EHRR 442; *John v MGN Ltd* [1997] QB 586; *Barron v Vines* [2016] EWHC 1226 (QB), [20]-[26]. Currently, it would seem that the upper notional limit stands at around £300,000 (a figure which takes account of inflation and of the modest increase in libel awards suggested in *Simmons v Castle* [2013] 1 WLR 1239).

11.   Clearly, an allegation of terrorism is likely to attract in most cases an award towards the upper end of the scale, since few if any allegations could be more serious. Here, as almost always, they carry the imputation that the person so accused is prepared to take part in or to encourage indiscriminate murder.

12. It will often be appropriate in such cases to select a starting point for an award in six figures, but there is some scope for moving up or down the "scale" – depending on such factors as the extent of publication, for how long the defamatory allegations remained available, whether they have been qualified or withdrawn, whether there has been an apology or, on the other hand, whether there has been a defence of truth advanced, or a brusque dismissal of the complaint. As Sir Thomas Bingham MR observed in *John v MGN Ltd*, cited above:

> *"A successful plaintiff may properly look to an award of damages to vindicate his reputation: but the significance of this is much greater in a case where the defendant asserts the truth of the libel and refuses any retraction or apology than in a case where the defendant acknowledges the falsity of what was published and publicly expresses regret that the libellous publication took place".*

13. In this case, unfortunately, matters were undoubtedly aggravated by the attitude of the second Defendant and his solicitors (no doubt on instructions). From a defendant's point of view it is unwise to mount a defence of truth, where the charge is one such as terrorism, unless there is solid evidence available. Yet that is what they did. It remained on the record from 18 January to 8 March 2016, which in itself the Claimant found "seriously distressing". It was also suggested that the allegation was unlikely to cause harm to his reputation and, indeed, that he would not even be able to surmount the statutory hurdle of showing "serious harm" introduced by the Defamation Act 2013. The solicitors' letters were unnecessarily combative, dismissive and aggressive. The complaint was described, for example, as "ludicrous", "utterly misconceived" and "doomed to fail". The claim was also made that the proceedings were an abuse of process, as they were intended to "target a Jewish-Muslim interfaith organisation". Not surprisingly, the Claimant regarded that as "extremely offensive" too. Moreover, despite his initial complaint, made in April 2015 when the article was first drawn to his attention, it remained on the website until March 2016. There was also for a time a plea of general bad reputation. These are all aggravating factors.

14. It is fair to note, however, the criticism of the Claimant contained in the judgment of Warby J, at [62], for his share of "the pre-litigation shadow boxing". This referred, in the Claimant's case, primarily to his delay in drawing to the Defendants' attention the fact of the "amnesty" which should, in practice, have put to rest at an earlier stage any lingering doubts about his supposed "conviction". As to the Defendants' pleaded case, and their eventual concessions, Warby J commented: "The main operative causes of the defendants' mistaken pleadings were their own evidently incomplete researches, the limitations of their own disclosure of the basis for their case, and their refusal to engage in alternative approaches to the resolution of this dispute". He expressly said also that the Claimant's failings at that pre-trial stage were not a sufficient justification for the approach taken by the Defendants and, in particular, their outright rejection of attempts to negotiate or exchange information. It was they, for example, who insisted that proceedings be launched rather than pursuing constructive discussions.

15. It is not possible to arrive at a definitive figure for the readership of the website in this jurisdiction and no information has been made available. I have already referred to its claims to provide a platform for discussion of Jewish/Muslim topics and it is

inherently likely to attract readers interested in that subject-matter. The evidence adduced by Mr Dean showed also that reference has been made to the website in the mainstream media, where it seems to have been cited as a source of such material that is sufficiently authoritative to merit reliance and quotation. It is reasonable in my view to infer that these striking allegations will have been read and taken seriously, over a considerable period of time, by a substantial number of people. What is more, they will almost certainly have gained credibility and acceptance over the length of time for which the Defendants persisted in them.

16. The defamatory words are likely also to have spread to some extent by word of mouth and social media. Indeed, there is evidence about the StandforPeace Facebook page, indicating that it has been "liked" by 752 people, and as to the YouTube page having 350 subscribers. Although not directly relevant, these figures would give some indication of the likely scope of readership and the extent of the Defendants' influence. Furthermore, a snippet of the article in question was tweeted by the StandforPeace twitter account on 27 October 2014 with a link to the article itself. On the same day, it was retweeted by Mr Campbell, the Defendants' Head of Research, who apparently has 2,264 followers.

17. I will take a conservative approach and proceed on the basis that the readership of the words is to be measured in the hundreds or low thousands although, as is sometimes said, this exercise should not be approached purely as a "numbers game". Any allegations of terrorism are to be taken as serious and inherently damaging.

18. Mr Dean cited a number of earlier cases in which judges have made assessments of damages towards the higher end of the scale. They can only assist to a limited extent, since each case will turn on its own facts, but such decisions can at least be helpful in encouraging the desirable objectives of consistency and proportionality.

19. The citations included originally *Ghannouchi v Al Arabiya* [2007] EWHC 2855 and *Berezovsky v The Russian Television and Radio Broadcasting Company* [2010] EWHC 476, in which I had awarded respectively £165,000 and £150,000. On reflection, however, Mr Dean withdrew those as comparators because they were instances of much wider circulation.

20. He did cite *Veliu v Mazrekaj* [2007] 1 WLR 495, where I fixed the starting point for an assessment under the offer of amends regime at £180,000; *Al-Amoudi v Kifle* [2011] EWHC 2037, in which His Honour Judge Parkes QC gave £175,000; and the later case involving the same parties where I awarded £180,000: [2013] EWHC 293 (QB). Reference was also made to *Bento v Chief Constable of Bedfordshire* [2012] EWHC 1525 (QB), where Bean J (as he then was) made an award of £125,000, and to *ZAM v CFW* [2013] EWHC 662 (QB), in which Tugendhat J increased a base figure of £100,000 to £120,000 to take account of aggravating factors. (Mr Dean set out in relation to each of these cases a figure which he suggested was appropriate to provide an up to date equivalent, taking inflation into account, as well as the *Simmons* uplift.)

21. Two recent decisions of the Court of Appeal were cited as giving helpful guidance on the correct approach to the quantification of damages in these cases more generally: *Cairns v Modi* [2013] 1 WLR 1015 and *Cruddas v Calvert* [2015] EWCA Civ 171. I have taken these into account.

22. The claim form indicated that the Claimant expected to recover no more than £10,000, but it seems clear from CPR 16.3(7) that this does not limit the power of the court to give judgment for the amount which it finds the claimant is entitled to recover. The Claimant made clear that he is quite willing to pay any additional fee if necessary. Mr Dean canvassed the alternative idea of an order that the judgment should not be enforced beyond £10,000 without leave of the court (having regard to the second Defendant's claims that even that sum would not be recoverable), but his Client was concerned that this might lead to the outcome being "spun" or misrepresented.

23. Having considered these matters, and taken into account the helpful and measured submissions from Mr Dean, it seems to me that the appropriate award is £140,000. That is a figure which appears to be proportionate and consistent with earlier awards, while leaving no doubt in the mind of a reasonable onlooker as to the Claimant's entitlement to vindication.